**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE: NITROGEN, PHOSPHORUS, AND POTASSIUM (NPK) FERTILIZER ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL CASES | MDL No. 3187<br><br>Case No. 26-md-3187-EFM-BGS<br><br>**JURY TRIAL DEMANDED** |

# CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

I. PARTIES ....................................................................................................6

A. Plaintiffs ....................................................................................................6

**1.** Direct Purchaser Plaintiffs ....................................................................................................6

**2.** Indirect Purchaser Plaintiffs ....................................................................................................8

**3.** The Nutrien Defendants ....................................................................................................17

**4.** The Mosaic Defendants ....................................................................................................21

**5.** The CF Industries Defendants ....................................................................................................25

**6.** The Koch Defendants ....................................................................................................27

**7.** The Yara Defendants ....................................................................................................30

B. Agents and Co-Conspirators ....................................................................................................33

II. JURISDICTION AND VENUE ....................................................................................................33

III. FACTUAL ALLEGATIONS ....................................................................................................43

A. Overview of the U.S. Fertilizer Market: Three Primary Types, Their Applications, and Agronomic Role ....................................................................................................43

**1.** Nitrogen Fertilizers ....................................................................................................43

**2.** Phosphate Fertilizers ....................................................................................................44

**3.** Potash Fertilizers ....................................................................................................45

**4.** Fertilizer Used by American Farmers ....................................................................................................46

B. U.S. Market Size and Structural Trends over Time ....................................................................................................49

C. Vertical Integration and Distribution Channel Control ....................................................................................................54

**1.** Nutrien ....................................................................................................55

**2.** Mosaic ....................................................................................................56

**3.** CF Industries ....................................................................................................57

**4.** Koch ....................................................................................................57

**5.** Yara ....................................................................................................58

D. Defendants' Conspiracy Drove Fertilizer Prices to Supracompetitive Levels that Cannot Be Explained by Supply and Demand or Other Legitimate Market Forces ....59

**1.** Defendants' Parallel Pricing Caused Fertilizer Costs to Skyrocket....59

**a.** The Price Surge: Magnitude, Synchrony, and Persistence ....59

**b.** Defendants Implemented Parallel Price Increases and Inflated Prices to Supracompetitive Levels During the Class Period ....63

**c.** Defendants' Parallel Pricing During the Class Period Is Confirmed by Statistical Analysis ....73

**d.** Raw Material and Supply Chain Costs Cannot Explain the Dramatic Price Surge ....76

**e.** Domestic Fertilizer Prices Developed a Persistent Premium Over Foreign Benchmarks ....86

**f.** Defendants Pegged Their Prices to Farmers' Maximum Ability to Pay, Not to Legitimate Market Forces ....89

**g.** The Financial Proof: Defendants' Own Financial Statements ....94

E. Defendants Coordinated Supply Curtailments and Capacity Reductions....101

F. Government Investigations ....108

G. Plus Factors Supporting the Inference of Unlawful Conspiracy ....115

**1.** Extreme Market Concentration....116

**2.** Conduct Against Individual Self-Interest ....118

**3.** Opportunities for Collusion Through Joint Ventures, Trade Associations, and Industry Meetings ....122

**a.** Canpotex ....122

**b.** Point Lisas Nitrogen Limited....125

**c.** The Fertilizer Institute: Board Leadership, Annual Meeting, and Industry Conferences ....126

**d.** The International Fertilizer Association: Executive Committee and Annual Conference....129

**e.** Other Shared Forums and Trade Organizations....132

**4.** High Barriers to Entry....134

**5.** Inelastic Demand ....137

**6.** High Degree of Product Interchangeability ....139

**7.** Defendants' Prior Antitrust Violations and History of Cartel Conduct ....140

IV. ANTITRUST INJURY AND STANDING ....141

A. DIRECT PURCHASER PLAINTIFFS ....143

B. INDIRECT PURCHASER PLAINTIFFS ....143

V. TOLLING OF THE STATUTE OF LIMITATIONS ....145

VI. CLASS ACTION ALLEGATIONS ....147

A. DIRECT PURCHASER CLASS ....147

B. INDIRECT PURCHASER PLAINTIFF CLASSES ....147

C. EXCLUSIONS, MODIFICATIONS, AND RULE 23 FACTORS ....148

CLAIMS FOR RELIEF ....152

VII. VIOLATION OF Federal Antitrust Law ....152

A. DIRECT PURCHASER PLAINTIFFS ....152

Count 1: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3) ....152

B. INDIRECT PURCHASER PLAINTIFS ....153

Count 2: Section 16 of the Clayton Act (15 U.S.C. §26) for Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1, 3 ....153

VIII. VIOLATIONS OF STATE ANTITRUST LAWS ALLEGED BY INDIRECT PURCHASER PLAINTIFFS ....154

Count 3: Violation of Arizona's Uniform State Antitrust Act, ....157

Count 4: Violation of California's Cartwright Act, ....158

Count 5: Violation of Colorado Antitrust Act, ....160

Count 6: Violation of Connecticut Antitrust Act, ....161

Count 7: Violation of District of Columbia Antitrust Act, ....162

Count 8: Violation of Hawaii Antitrust Act, ....164

Count 9: Violation of Illinois Antitrust Act, ....165

Count 10: Violation of Iowa Competition Law, ....166

Count 11: Violation of Kansas Restraint of Trade Act, ....167

Count 12: Violation of Maine's Antitrust Statute, ....168

Count 13: Violation of Maryland's Antitrust Statute, ....169

Count 14: Violation of the Michigan Antitrust Reform Act, ....171

Count 15: Violation of the Minnesota Antitrust Law, ....172

Count 16: Violation of the Mississippi Antitrust Statute, ....173

Count 17: Violation of the Montana Unfair Trade Practices Act – Unlawful Restraint of Trade ....175

Count 18: Violation of the Nebraska Junkin Act, ....178

Count 19: Violation of the Nevada Unfair Trade Practices Act, ....179

Count 20: Violation of New Hampshire's Antitrust Statute, ....180

Count 21: Violation of the New Mexico Antitrust Act, ....182

Count 22: Violation of the New Jersey Antitrust Act, ....183

Count 23: Violation of the Donnelly Act, ....184

Count 24: Violation of the North Carolina General Statutes, ....185

Count 25: Violation of the North Dakota Uniform State Antitrust Act, ....186

Count 26: Violation of the Oklahoma Antitrust Reform Act, ....188

Count 27: Violation of the Oregon Antitrust Law, ....190

Count 28: Violation of the Rhode Island Antitrust Act, ....191

Count 29: Violation of the South Dakota Antitrust Statute, ....193

Count 30: Violation of the Tennessee Trade Practices Act, ....194

Count 31: Violation of the Utah Antitrust Act, ....196

Count 32: Violation of the West Virginia Antitrust Act, ....197

Count 33: Violation of the Wisconsin Antitrust Act, ....199

IX. VIOLATION OF STATE CONSUMER PROTECTION STATUTES ....201

Count 34: Violation of the Arkansas Deceptive Trade Practices Act, ....203

Count 35: Violation of the California Unfair Competition Law, ....205

Count 36: Violation of the District of Columbia Consumer Protection Procedures Act, ....207

Count 37: Violation of Florida's Deceptive & Unfair Trade Practices Act, ....208

Count 38: Violation of the Massachusetts Consumer Protection Act, ....210

Count 39: Violation of the Minnesota Deceptive Trade Practices Act, ....211

Count 40: Violation of the Missouri Merchandising Practices Act, ....212

Count 41: Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, ....214

Count 42: Violation of the Nebraska Consumer Protection Act, ....216

Count 43: Violation of the Nevada Deceptive Trade Practices Act, ....217

Count 44: Violation of New Hampshire Consumer Protection Act, ....218

Count 45: Violation of the New Mexico Unfair Trade Practices Act, ....220

Count 46: Violation of the North Carolina Unfair and Deceptive Trade Practices Act, ....221

Count 47: Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, ....222

Count 48: Violation of the Rhode Island Deceptive Trade Practices Act, ....224

Count 49: Violation of the South Carolina Unfair Trade Practices Act, ....225

Count 50: Violation of the Vermont Consumer Protection Act, ....226

X. UNJUST ENRICHMENT ....228

Count 51: Unjust Enrichment ....228

PRAYER FOR RELIEF ....250

DEMAND FOR JURY TRIAL ....252

DESIGNATION OF PLACE OF TRIAL....252

Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs, on behalf of themselves and all other persons and entities similarly situated (as it relates to the Direct Purchaser Plaintiffs, the Direct Purchaser Class, and as it relates to the Indirect Purchaser Plaintiffs, the Nationwide Indirect Purchaser Class and the State Law Indirect Purchaser Class (collectively, the "Classes"), as defined below), bring this Consolidated Class Action Complaint against Defendants and allege the following upon personal knowledge as to themselves and their own actions, and upon information and belief, based on the investigation of counsel, as to all other matters.

**INTRODUCTION**

1. American farmers feed this country. They plant in the spring not knowing what they will get in the fall; they weather droughts, floods, winds, and market swings; and they do it year after year because feeding a nation is not just a business; it is a calling. For generations, American agriculture promised that a farmer who worked hard, managed well, and produced efficiently would have a fair shot at making a living. A small group of corporations destroyed that promise. They looked at everything farmers need to grow a crop and decided that need was an opportunity to exploit.

2. American farmers' planting decisions should turn on soil science and agronomic need. But for more than five years, something else has governed those decisions: a price-fixing conspiracy through which the fertilizer producers that control the U.S. market coordinated to keep fertilizer prices artificially elevated and supply constrained. Plaintiffs bring this action on behalf of American growers and other fertilizer purchasers who paid billions of dollars in supracompetitive fertilizer prices between 2021 and the present because five of the world's largest

fertilizer companies, Defendants Nutrien, Mosaic, CF Industries, Koch, and Yara, cheated instead of competing.[1]

3. Fertilizer is not a discretionary input. It is the foundation of American agricultural productivity, and no commercially viable substitute exists. Each year, U.S. farmers plant approximately 90 million acres of corn, 85 million acres of soybeans, and 40 million acres of wheat, among other crops. Those acres and millions of additional acres planted with a variety of crops require nitrogen, phosphorus, and potassium (collectively, "NPK") fertilizers at agronomically determined rates.[2] Without adequate fertilization, yields (which measure the amount of crop per acre or how productive a plot of land is) collapse by 20% to 40% or more. A farmer facing a price spike in fertilizer can neither shop elsewhere nor skip an application: the market is too concentrated, and the yield penalty is too severe. Nor can the farmer apply one nutrient but not the others. Defendants know this. Their executives tracked corn and soybean prices, calibrating fertilizer prices to what farmers could afford rather than to what production cost.

4. Defendants collectively control the American fertilizer supply chain from mine to farm. Beginning in or around 2021 and continuing through the present, Defendants conspired to

---

[1] Unless otherwise specified, references to "Nutrien" or "Nutrien Defendants" encompass Nutrien Ltd., Nutrien Ag Solutions, Inc., Nutrien US LLC, and PCS Sales (USA), Inc.; references to "Mosaic" or "Mosaic Defendants" encompass The Mosaic Company, Mosaic Fertilizer, LLC, Mosaic Global Sales, LLC, and Mosaic Canada Crop Nutrition, LP; references to "CF Industries" or "CF Industries Defendants" encompass CF Industries Holdings, Inc., CF Industries Nitrogen, LLC, and CF Industries Sales, LLC; references to "Koch" or "Koch Defendants" encompass Koch, Inc., Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, Koch Fertilizer Wever, LLC, Koch Fertilizer Beatrice, LLC, Koch Fertilizer Dodge City, LLC, Koch Fertilizer Enid, LLC, and Koch Fertilizer Canada, ULC; and references to "Yara" or "Yara Defendants" encompass Yara International ASA, Yara Freeport LLC, and Yara North America, Inc.

[2] An agronomic rate is the amount of a nutrient source (such as fertilizer) applied to land that supplies what the crop actually needs for a realistic yield, and no more. For all industry-related definitions please find a glossary attached hereto. *See* Appendix A: Glossary of Fertilizer Industry Terms.

fix, raise, and maintain fertilizer prices at supracompetitive levels and to restrict supply to sustain those prices. Defendants formed a conspiracy with a common goal that required full cooperation from each member: to charge the highest prices the market would bear for Fertilizer Products regardless of underlying costs or demand. To achieve that objective, Defendants coordinated their capacity, calibrating production and shipments so that the market was supplied only at levels that sustained elevated prices. Fertilizer prices tripled, quadrupled, and for some products quintupled from their 2020 baseline, generating record profits for every Defendant while imposing catastrophic input cost increases on American farmers. That is not competition. That is exploitation.

5. The consequences are visible in the data and audible in the testimony of the farmers living through it. In 2025, farmer bankruptcies in the United States rose 46%. Fertilizer now accounts for 40% of American farmers' total input costs. As Trent Kubik, President of the South Dakota Growers Association, testified before the U.S. Senate Agriculture Committee in May 2026, fertilizer companies "can disregard their own cost of production and simply set a price," because farmers have nowhere else to go and cannot afford not to buy. Senator Welch put it plainly at the same hearing: "American agriculture is in a crisis because an immense amount of wealth is being created by farmers who are not receiving it." And at an October 2025 Senate Judiciary Committee hearing, Mark Mueller, President of the Iowa Corn Growers Association, testified that farmers are being forced to choose between buying fertilizer and staying solvent.

6. The financial record is damning. Between 2020 and 2022, Nutrien's profits increased approximately 1,575%. Mosaic's net earnings rose approximately 438%, and CF Industries' profits increased more than 900%. These were not recoveries from pandemic-related losses because the industry was largely insulated from broader economic shutdowns. While

Defendants faced some operational disruptions in 2020, they realized a significant profit surge by 2021. From January 2021 to the present, each publicly reporting Defendant's average annual operating income quadrupled compared to the five years prior, and Defendants' operating income grew roughly eight to 14 times faster than their costs. These are cartel profits.

7. Defendants' own SEC filings document their coordination on price, standard econometric analysis confirms it, and Bloomberg's Green Markets ("Green Markets"), the authoritative weekly trade publication for the fertilizer industry, captured it in real time. For example, on July 24, 2023, Koch posted new ammonia fill prices at $465 to $470 per short ton ("/st") at U.S. terminals in the Eastern Cornbelt (Illinois, Ohio, and Indiana), and CF Industries followed the next day by posting $480 to $485/st. Nutrien then reposted at $485/st, matching CF Industries' ceiling. Each step in the sequence raised or held the price. No Defendant undercut. The market ratcheted upward through the sequence, the opposite of what competition produces. Indeed, prices remained at $465–485/st through August 11, 2023, before rising again towards $500/st.

8. This pattern, in which Defendants either posted identical prices or sequentially increased prices within hours or days, repeated itself at least 12 times during the Class Period (defined below), spanning each fertilizer nutrient and every major growing region in the United States. No competitive explanation accounts for that degree of pricing synchronization among independent producers of a fungible commodity. It is the market signature of coordinated pricing, not independent competition.

9. But Defendants did not merely price in parallel; they also suppressed supply in parallel. On a Q1 2021 earnings call, Nutrien declared that its strategy was explicitly "price over supply." From that point on, Defendants moved in lockstep: curtailing production, idling plants,

withholding capacity in concert, and practicing "disciplined capital allocation," each move reinforcing the others. On December 9, 2022, a Scotiabank analyst captured the coordinated logic precisely, remarking that, with Mosaic having taken the lead on curtailment, Nutrien "effectively holds a 'free' call option on tightening the potash market into the spring." On a Q1 2023 earnings call, Mosaic's CEO stated that he would not restore idled production because doing so would "destroy the market." That is not the language of a firm competing for market share. It is the language of a firm confident that supply discipline will hold.

10. The federal government appears to have reached the same conclusion. The U.S. Department of Justice ("DOJ") Antitrust Division's Chicago Office reportedly opened a formal investigation targeting each Defendant for possible civil and criminal antitrust violations. The Federal Trade Commission ("FTC") opened its own "major industrywide investigation into the precipitous rise of fertilizer prices in this country." In January 2026, U.S. Department of Agriculture ("USDA") Deputy Secretary Stephen Vaden publicly stated that Nutrien and Mosaic "collude" to constrain supply and drive up prices, describing their combined market position as a "duopoly" that has been playing a "cute little game" with fertilizer costs "for the last several years." And on August 3, 2026, Deputy Secretary Vaden confirmed that the DOJ and FTC investigations are moving forward and that he expects formal enforcement action "in due time."

11. Direct Purchaser and Indirect Purchaser Plaintiffs bring this action under Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1, 3, and the Indirect Purchaser Plaintiffs additionally bring this action under various state laws. Direct Purchaser Plaintiffs do so on behalf of American farmers and agricultural purchasers who bought Fertilizer Products[3] directly from

---

[3] "Fertilizer Products" means any single-nutrient fertilizer or multi-nutrient fertilizer blend containing nitrogen, phosphorus, potassium, or any combination thereof, including, but not limited to: (a) nitrogen fertilizers such as anhydrous ammonia, urea, urea ammonium nitrate (UAN) solutions, ammonium nitrate, and ammonium sulfate; (b) phosphate fertilizers such as

Defendants, while Indirect Purchaser Plaintiffs do so on behalf of two classes of American farmers and agricultural purchasers who bought Fertilizer Products indirectly. All Plaintiffs and the Classes they seek to represent purchased those Fertilizer Products at artificially inflated prices due to Defendants' illegal conspiracy during the Class Period. Plaintiffs seek to hold Defendants accountable for the billions of dollars they unlawfully extracted from American agriculture and to restore the competitive market conditions to which federal law and state laws entitle American farmers.

## I. PARTIES

### A. Plaintiffs

#### 1. Direct Purchaser Plaintiffs

12. The following allegations are made on behalf of the Direct Purchaser Plaintiffs:

a. Plaintiff Agrovalley, Inc. is a wholesale purchaser of Fertilizer Products in Colfax, North Dakota. Agrovalley, Inc. is a corporation organized and existing under the laws of North Dakota. During the Class Period, Agrovalley, Inc. purchased Fertilizer Products directly from one or more Defendants, including Defendant Koch Fertilizer, LLC, at prices artificially inflated by Defendants' price-fixing conspiracy.

b. Plaintiff Blake Drohman operates a farm in Hastings, Nebraska, and produces corn, soybeans, and milo. During the Class Period, Mr. Drohman purchased Fertilizer Products directly from one or more Defendants, including Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy.

---

diammonium phosphate (DAP), monoammonium phosphate (MAP), triple superphosphate (TSP), and phosphoric acid-based products; (c) potash fertilizers such as muriate of potash (MOP, also known as potassium chloride), sulfate of potash (SOP), and potassium magnesium sulfate; and (d) multi-nutrient blends, compound fertilizers, and custom-blended NPK products containing any combination of the foregoing nutrients in any ratio.

c. Plaintiff Farmer's Cooperative Grain & Seed Association is a wholesale purchaser of Fertilizer Products in Thief River Falls, Minnesota. Farmer's Cooperative Grain & Seed Association is a domestic cooperative organized in and existing under the laws of Minnesota. During the Class Period, Farmer's Cooperative Grain & Seed Association purchased Fertilizer Products directly from one or more Defendants, including Defendants Nutrien US LLC, Mosaic Global Sales, LLC, and Koch Fertilizer, LLC, at prices artificially inflated by Defendants' price-fixing conspiracy.

d. Plaintiff JS Farms, Inc. operates a farm in Delphi, Indiana, and produces corn and soybeans. JS Farms, Inc. is a corporation organized and existing under the laws of Indiana. During the Class Period, JS Farms, Inc. purchased Fertilizer Products directly from one or more Defendants, including Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy.

e. Plaintiff Justin D. Ashmore Revocable Trust (the "Ashmore Trust") operates a farm in Logan, Kansas, and produces corn, soybeans, wheat, and cattle feed. During the Class Period, the Ashmore Trust purchased Fertilizer Products directly from one or more Defendants, including Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy.

f. Plaintiff Michael Rumbold operates a farm in Wyoming, Illinois, and produces corn and soybeans. During the Class Period, Mr. Rumbold purchased Fertilizer Products directly from one or more Defendants, including Defendant Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy.

g. Plaintiff Red River Ag, LLC is a wholesale purchaser of Fertilizer Products in Plummer, Minnesota. Red River Ag, LLC is a company organized and existing under the laws of

Minnesota. During the Class Period, Red River Ag, LLC purchased Fertilizer Products directly from one or more Defendants, including Defendant Yara North America, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy.

h. Plaintiff Quimby Ag, LLC is a wholesale purchaser of Fertilizer Products in Quimby, Iowa. Quimby Ag, LLC is a company organized and existing under the laws of Iowa. During the Class Period, Quimby Ag, LLC purchased Fertilizer Products directly from one or more Defendants, including Defendants CF Industries Sales, LLC and Nutrien Ag Solutions, Inc., at prices artificially inflated by Defendants' price-fixing conspiracy.

i. Direct Purchaser Plaintiffs intend to purchase Fertilizer Products in the future.

**2. Indirect Purchaser Plaintiffs**

13. The following allegations are made on behalf of the Indirect Purchaser Plaintiffs:

a. Plaintiff HCM Farm Partners is an Arkansas partnership that operates a farm in Cross, Poinsett, and Independence Counties, Arkansas. Since 2021, Plaintiff HCM Farm Partners indirectly purchased Fertilizer Products in Arkansas from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff HCM Farm Partners intends to purchase Fertilizer Products in the future.

b. Plaintiff Generation Three Partnership is an Arkansas partnership that operates a farm in Jackson County, Arkansas. Since 2021, Plaintiff Generation Three Partnership indirectly purchased Fertilizer Products in Arkansas from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Generation Three Partnership intends to purchase Fertilizer Products in the future.

c. Plaintiff Bacon Lake Farm is an Arkansas partnership that operates a farm in Jackson and White Counties, Arkansas. Since 2021, Plaintiff Bacon Lake Farm indirectly purchased Fertilizer Products in Arkansas from Defendants at prices artificially inflated by

Defendants' price-fixing conspiracy. Plaintiff Bacon Lake Farm intends to purchase Fertilizer Products in the future.

d. Plaintiff Albert Mendes is a citizen of California who operates a farm in Crows Landing, California. Since 2021, Plaintiff Albert Mendes indirectly purchased Fertilizer Products in California from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Albert Mendes intends to purchase Fertilizer Products in the future.

e. Plaintiff Live Oak Farms, L.P. is a California limited partnership that operates a farm in Le Grand, California. Since 2021, Plaintiff Live Oak Farms, L.P. indirectly purchased Fertilizer Products in California from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Live Oak Farms, L.P. intends to purchase Fertilizer Products in the future.

f. Plaintiff Longs Peak Dairy, LLC is a Colorado limited liability company that operates a farm in Pierce, Colorado. Since 2021, Plaintiff Longs Peak Dairy, LLC indirectly purchased Fertilizer Products in Colorado from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Longs Peak Dairy, LLC intends to purchase Fertilizer Products in the future.

g. Plaintiff WoodHill, LLC is a Connecticut limited liability company that operates a farm in Hampton, Connecticut. Since 2021, Plaintiff WoodHill, LLC indirectly purchased Fertilizer Products in Connecticut from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff WoodHill, LLC intends to purchase Fertilizer Products in the future.

h. Plaintiff Milking R, Inc. is a Florida corporation that operates a farm in Okeechobee, Florida. Since 2021, Plaintiff Milking R, Inc. indirectly purchased Fertilizer

Products in Florida from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Milking R, Inc. intends to purchase Fertilizer Products in the future.

i. Plaintiff Po Boy Farms LLC is a Georgia limited liability company that operates a farm in Chula, Georgia. Since 2021, Plaintiff Po Boy Farms LLC indirectly purchased Fertilizer Products in Georgia from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Po Boy Farms LLC intends to purchase Fertilizer Products in the future.

j. Plaintiff Mike Campion is a citizen of Illinois, doing business as Campion Farms, who farms in Madison and Jersey Counties in Illinois. During the Class Period, Plaintiff Campion indirectly purchased Fertilizer Products in Illinois from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Campion intends to purchase Fertilizer Products in the future.

k. Plaintiffs Mitchel Eickmeyer and Eickmeyer Dairy, Inc. are an Illinois citizen and Illinois corporation, respectively, that operate farms in Hoyleton, Illinois. Since 2021, Plaintiffs Mitchel Eickmeyer and Eickmeyer Dairy, Inc. indirectly purchased Fertilizer Products in Illinois from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiffs Mitchel Eickmeyer and Eickmeyer Dairy, Inc. intend to purchase Fertilizer Products in the future.

l. Plaintiff Aaron Hasser is an Indiana citizen who operates a farm at Hasser Farms in Earl Park, Indiana. Since 2021, Plaintiff Aaron Hasser indirectly purchased Fertilizer Products in Indiana from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Aaron Hasser intends to purchase Fertilizer Products in the future.

m. Plaintiff Oberbroeckling Family Farms Ltd. is an Iowa corporation that operates farms in Clayton, Fayette, and Winneshiek Counties in Iowa. During the Class Period, Plaintiff Oberbroeckling Family Farms Ltd. indirectly purchased Fertilizer Products in Iowa from

Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Oberbroeckling Family Farms Ltd. intends to purchase Fertilizer Products in the future.

n. Plaintiff David Polifka is a citizen of Kansas who operates a farm as David Polifka Revocable Living Trust in Gove County, Kansas. Since 2021, Plaintiff David Polifka indirectly purchased Fertilizer Products in Kansas from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff David Polifka intends to purchase Fertilizer Products in the future.

o. Plaintiff Charles Frickey is a Kansas citizen who operates a farm as the Charles Frickey Revocable Trust in Oberlin, Kansas. Since 2021, Plaintiff Charles Frickey indirectly purchased Fertilizer Products in Kansas from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Charles Frickey intends to purchase Fertilizer Products in the future.

p. Plaintiff Melinda Matson is a Kansas citizen who operates a farm in Newton, Kansas. Since 2021, Plaintiff Melinda Matson indirectly purchased Fertilizer Products in Kansas from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Melinda Matson intends to purchase Fertilizer Products in the future.

q. Plaintiff Rocky Point Farms, Inc. is a Maryland corporation that operates a farm in Tuscarora, Maryland. Since 2021, Plaintiff Rocky Point Farms, Inc. indirectly purchased Fertilizer Products in Maryland from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Rocky Point Farms, Inc. intends to purchase Fertilizer Products in the future.

r. Plaintiff Michael Kosinski d/b/a North Country Harvests is a Massachusetts citizen who operates a farm in Westfield, Massachusetts. Since 2021, Plaintiff North Country Harvests indirectly purchased Fertilizer Products in Massachusetts from Defendants at prices artificially

inflated by Defendants' price-fixing conspiracy. Plaintiff Kosinski intends to purchase Fertilizer Products in the future.

s. Plaintiff Hardy's Holsteins, LLC is a Michigan limited liability company that operates a farm in Tipton, Michigan. Since 2021, Plaintiff Hardy's Holsteins, LLC indirectly purchased Fertilizer Products in Michigan from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Hardy's Holsteins, LLC intends to purchase Fertilizer Products in the future.

t. Plaintiff E-D Farms is a Michigan partnership operating a farm in Conklin, Michigan. Since 2021, Plaintiff E-D Farms indirectly purchased Fertilizer Products in Michigan from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff E-D Farms intends to purchase Fertilizer Products in the future.

u. Plaintiffs Chad Olsen and Pamela Olsen are citizens of Minnesota who operate a farm as a joint venture in Lincoln County, Minnesota. Since 2021, Plaintiffs Chad Olsen and Pamela Olsen indirectly purchased Fertilizer Products in Minnesota from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiffs Chad Olsen and Pamela Olsen intend to purchase Fertilizer Products in the future.

v. Plaintiff Johnson Farm Minnesota LLC is a Minnesota limited liability company that operates a farm in Grant and Douglas Counties, Minnesota. Since 2021, Plaintiff Johnson Farm Minnesota LLC indirectly purchased Fertilizer Products in Minnesota from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Johnson Farm Minnesota LLC intends to purchase Fertilizer Products in the future.

w. Plaintiff Blane Benedict is a Minnesota citizen who operates a farm doing business as Blane Benedict Farm in Sabin, Minnesota. Since 2021, Plaintiff Blane Benedict indirectly

purchased Fertilizer Products in Minnesota from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy.

x. Plaintiff Bryant Parrish Farms Partnership is a Mississippi partnership that operates a farm in Lexington, Mississippi. Since 2021, Plaintiff Bryant Parrish Farms Partnership indirectly purchased Fertilizer Products in Mississippi from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Bryant Parrish Farms Partnership intends to purchase Fertilizer Products in the future.

y. Plaintiff DSA Farms GP is a Missouri partnership that operates farms in Dunklin, New Madrid, Pemiscot, and Scott Counties in Missouri. Since 2021, Plaintiff DSA Farms GP indirectly purchased Fertilizer Products in Missouri from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff DSA Farms GP intends to purchase Fertilizer Products in the future.

z. Plaintiff John Weidenaar is a Montana citizen who operates a farm in Manhattan, Montana. Since 2021, Plaintiff John Weidenaar indirectly purchased Fertilizer Products in Montana from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff John Weidenaar intends to purchase Fertilizer Products in the future.

aa. Plaintiff David Schwaninger is a Nebraska citizen who operates a farm in Lancaster County, Nebraska. Since 2021, Plaintiff David Schwaninger indirectly purchased Fertilizer Products in Nebraska from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff David Schwaninger intends to purchase Fertilizer Products in the future.

bb. Plaintiffs Matt Bargen and Robin Bargen are citizens of Nebraska who operate a farm in Nuckolls County, Nebraska. Since 2021, Plaintiffs Matt Bargen and Robin Bargen indirectly purchased Fertilizer Products in Nebraska from Defendants at prices artificially inflated

by Defendants' price-fixing conspiracy. Plaintiffs Matt Bargen and Robin Bargen intend to purchase Fertilizer Products in the future.

cc. Plaintiff Patch Orchards, Inc. is a New Hampshire corporation that operates a farm in Lebanon, New Hampshire. Since 2021, Plaintiff Patch Orchards, Inc. indirectly purchased Fertilizer Products in New Hampshire from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Patch Orchards, Inc. intends to purchase Fertilizer Products in the future.

dd. Plaintiff Dunham Family Farms is a New York partnership that operates a farm in Medina, New York. Since 2021, Plaintiff Dunham Family Farms indirectly purchased Fertilizer Products in New York from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Dunham Family Farms intends to purchase Fertilizer Products in the future.

ee. Plaintiff Oakfield-Alabama Farms is a New York partnership that operates a farm in Oakfield, New York. Since 2021, Plaintiff Oakfield-Alabama Farms indirectly purchased Fertilizer Products in New York from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Oakfield-Alabama Farms intends to purchase Fertilizer Products in the future.

ff. Plaintiff Lake Shore Dairy LLC is a New York limited liability company that operates a farm in Oakfield, New York. Since 2021, Plaintiff Lake Shore Dairy LLC indirectly purchased Fertilizer Products in New York from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Lake Shore Dairy LLC intends to purchase Fertilizer Products in the future.

gg. Plaintiff Gar-mac Dairy, Inc. is a North Carolina corporation that operates a farm in Crouse, North Carolina. Since 2021, Plaintiff Gar-mac Dairy, Inc. indirectly purchased

Fertilizer Products in North Carolina from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Gar-mac Dairy, Inc. intends to purchase Fertilizer Products in the future.

hh. Plaintiff Qual Grain is a North Dakota partnership that operates a farm in Lisbon, North Dakota. Since 2021, Plaintiff Qual Grain indirectly purchased Fertilizer Products in North Dakota from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Qual Grain intends to purchase Fertilizer Products in the future.

ii. Plaintiff CD Acres LLC is a North Dakota limited liability company, whose members are citizens of North Dakota, that farms in Burleigh and Kidder Counties in North Dakota. Since 2021, Plaintiff CD Acres LLC indirectly purchased Fertilizer Products in North Dakota from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff CD Acres LLC intends to purchase Fertilizer Products in the future.

jj. Plaintiff Dewitz Feedlot, Inc. is a North Dakota corporation that operates farms in Burleigh and Kidder Counties in North Dakota. Since 2021, Plaintiff Dewitz Feedlot, Inc. indirectly purchased Fertilizer Products in North Dakota from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Dewitz Feedlot, Inc. intends to purchase Fertilizer Products in the future.

kk. Plaintiff Jay Ackley is an Ohio citizen who operates a farm in East Liberty, Ohio. Since 2021, Plaintiff Jay Ackley indirectly purchased Fertilizer Products in Ohio from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Jay Ackley intends to purchase Fertilizer Products in the future.

ll. Plaintiff Barnett's Dairy Farm, LLC is a Pennsylvania limited liability company that operates a farm in Todd, Pennsylvania. Since 2021, Plaintiff Barnett's Dairy Farm, LLC

indirectly purchased Fertilizer Products in Pennsylvania from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Barnett's Dairy Farm, LLC intends to purchase Fertilizer Products in the future.

mm. Plaintiff Ochsner Partnership is a South Dakota partnership farming in Marshall, Grant, Brown, Spink, Clark, Hand, McPherson, Edmunds, Corson, and Faulk Counties in South Dakota and Dickey, Sargent, and Sioux Counties in North Dakota. Since 2021, Plaintiff Ochsner Partnership indirectly purchased Fertilizer Products in South Dakota from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Ochsner Partnership intends to purchase Fertilizer Products in the future.

nn. Plaintiffs Collin Klebsch and Klebsch Farms, Inc. are a South Dakota citizen and South Dakota corporation, respectively, that operate farms in Spink, Dewey, Hughes, and Ziebach Counties, South Dakota. Since 2021, Plaintiffs Collin Klebsch and Klebsch Farms, Inc. indirectly purchased Fertilizer Products in South Dakota from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiffs Collin Klebsch and Klebsch Farms, Inc. intend to purchase Fertilizer Products in the future.

oo. Plaintiff Drumgoon Dairy Limited Partnership is a South Dakota limited partnership that operates a farm in Lake Norden, South Dakota. Since 2021, Plaintiff Drumgoon Dairy Limited Partnership indirectly purchased Fertilizer Products in South Dakota from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Drumgoon Dairy Limited Partnership intends to purchase Fertilizer Products in the future.

pp. Plaintiff Lyon Farms Partnership is a Texas partnership that operates a dairy farm in Morton, Texas. Since 2021, Plaintiff Lyon Farms Partnership indirectly purchased Fertilizer

Products in Texas from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Lyon Farms Partnership intends to purchase Fertilizer Products in the future.

qq. Plaintiff Christopher Fay is a Vermont citizen who operates a farm in Maidstone, Vermont. Since 2021, Plaintiff Christopher Fay indirectly purchased Fertilizer Products in Vermont from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Christopher Fay intends to purchase Fertilizer Products in the future.

rr. Plaintiff Chimney Point Farm Limited Partnership is a Vermont limited partnership that operates a farm in Addison, Vermont. Since 2021, Plaintiff Chimney Point Farm Limited Partnership indirectly purchased Fertilizer Products in Vermont from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Chimney Point Farm Limited Partnership intends to purchase Fertilizer Products in the future.

ss. Plaintiff Naedler Farms II LLC is a Wisconsin limited liability company that operates a farm in Clark County, Wisconsin. Since 2021, Plaintiff Naedler Farms II LLC indirectly purchased Fertilizer Products in Wisconsin from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Naedler Farms II LLC intends to purchase Fertilizer Products in the future.

tt. Plaintiff Lynn Kirschbaum is a Wisconsin citizen who operates a farm in Grant County, Wisconsin. Since 2021, Plaintiff Lynn Kirschbaum indirectly purchased Fertilizer Products in Wisconsin from Defendants at prices artificially inflated by Defendants' price-fixing conspiracy. Plaintiff Lynn Kirschbaum intends to purchase Fertilizer Products in the future.

14. Defendants

**3. The Nutrien Defendants**

15. Defendant Nutrien Ltd. is a corporation organized and existing under the laws of Canada, with its principal place of business in Saskatoon, Saskatchewan. Formed through the

January 2018 merger of Potash Corporation of Saskatchewan, Inc. (PotashCorp) and Agrium Inc., Nutrien Ltd. is a leading global producer of potash, nitrogen, and phosphate fertilizers. It produces and distributes approximately 27.5 million metric tons of Fertilizer Products globally each year. Through its wholly owned subsidiary, Potash Corporation of Saskatchewan, Inc., Nutrien Ltd. holds a 50% interest in Canpotex Limited. The Mosaic Company, through its wholly owned subsidiary, Mosaic Canada Crop Nutrition, LP, holds the other 50%. Through its subsidiaries, Nutrien Ltd. also directs and controls the mining, processing, and production of Fertilizer Products. Nutrien Ltd. also directs and controls the sale of Fertilizer Products in the United States, its largest market, and distributes and sets the pricing strategy for Fertilizer Products sold in the United States. *See infra* ¶¶103–7. As part of its U.S. operations, Nutrien Ltd. wholly owns and operates Nutrien Ag Solutions, through which it controls retail locations across the United States. The U.S. market accounted for approximately $16.3 billion, or 61%, of Nutrien's 2025 sales. Through its own senior officers, Nutrien Ltd. participated in U.S. forums where Defendants exchanged competitively sensitive information and coordinated their conduct. *See infra* ¶¶283-99. Nutrien Ltd. also avails itself of the U.S. legal and commerce systems. It is listed on the New York Stock Exchange ("NYSE"); files annual reports with the Securities and Exchange Commission ("SEC") and has designated an agent for service of process in New York; has sold SEC-registered, U.S.-dollar notes governed by a New York-law indenture, issuing 10 series of U.S.-dollar senior notes totaling U.S. $5.5 billion during the Class Period alone; owns 19 U.S. trademarks; and has sued as a plaintiff in U.S. courts.

16. Defendant Nutrien Ag Solutions, Inc. is a wholly owned subsidiary of Nutrien Ltd., organized and existing under the laws of Delaware, with its principal place of business in Loveland, Colorado. As the primary retail arm of Nutrien Ltd., it is the largest agricultural retailer

in the United States, accounting for approximately 21% of all U.S. agricultural retail sales through more than 1,000 retail locations, including 57 in Kansas. It is registered with the Kansas Department of Agriculture as the Registrant and Manufacturer of K-MAG Premium and other fertilizers. Nutrien Ag Solutions publicly advertises its sales of fertilizer, crop protection products, and seed throughout the country. Nutrien Ag Solutions leverages its parent company's production to drive most of its fertilizer sales, an arrangement that provides real-time downstream visibility into demand and pricing that flows back up to Nutrien Ltd.'s centralized pricing function. *See infra* ¶¶103–7. Nutrien Ltd.'s SEC filings report Nutrien Ag Solutions' results on a consolidated basis.

17. Defendant Nutrien US LLC is a wholly owned subsidiary of Nutrien Ltd., organized and existing under the laws of Colorado, with its principal place of business in Loveland, Colorado. Nutrien US LLC is a wholesale marketing and sales entity for Nutrien Ltd., selling Fertilizer Products to retailers, distributors, co-ops, and industrial buyers in the United States. It is the seller of record for most of Nutrien's U.S. nitrogen sales and some of its U.S. phosphate sales. Nutrien US LLC was renamed from Agrium U.S. Inc. in 2022.

18. Defendant PCS Sales (USA), Inc. is a wholly owned subsidiary of Nutrien Ltd., organized and existing under the laws of Delaware, with its principal place of business in Deerfield, Illinois. PCS Sales (USA), Inc. is a wholesale marketing and sales entity for Nutrien Ltd., selling Fertilizer Products to retailers, distributors, co-ops, and industrial buyers in the United States. It is the guarantor for all of Nutrien's U.S. potash sales, most U.S. phosphate sales, and some U.S. nitrogen sales.

19. The Nutrien Defendants operate as a single enterprise under the direction and control of Nutrien Ltd., which sets pricing strategy for its fertilizer operations in the United States;

its subsidiaries and joint ventures execute that strategy. Nutrien's own materials recognize as much. For example, Nutrien's 2024 Fact Book states "Nutrien operates the largest global direct-to-farmer agricultural retail distribution network – known as Nutrien Ag Solutions in the United States [and overseas]." It further explains that "Nutrien's Retail operations offer farmers a complete range of seed, liquid and dry fertilizer products[.]" Employees in management, director, and other senior roles regularly move between Nutrien Ltd. and Nutrien Ag Solutions, Inc. In its public SEC filings, Nutrien Ltd. confirms that "[t]he terms 'we', 'us', 'our', 'Nutrien' and 'the Company' refer to Nutrien and, as applicable, Nutrien and its direct and indirect subsidiaries on a consolidated basis." During the Class Period, Nutrien Ltd.'s executives have regularly spoken on behalf of Nutrien's "retail business" and from an "intercompany" perspective. Nutrien Ltd., Nutrien Ag Solutions, Inc., Nutrien US LLC, and PCS Sales (USA), Inc. therefore operate as a single economic unit with no independent pricing discretion at the subsidiary level.

20. Nutrien Ltd.'s senior executives have also simultaneously held top officer positions at the U.S. subsidiary Defendants throughout the Class Period. At the start of the Class Period, Nutrien Ltd.'s then-President and CEO, Charles Magro, served as CEO of Nutrien Ag Solutions, Inc. In 2023, Nutrien Ltd.'s Executive Vice President and President, Global Retail, Jeff Tarsi, served as President of Nutrien Ag Solutions, Inc. Nutrien Ltd.'s Executive Vice President and Chief Financial Officer, Pedro Farah, served as Treasurer of PCS Sales (USA), Inc.; Nutrien Ltd.'s Executive Vice President and President, Potash, Christopher Reynolds, served as President of PCS Sales (USA), Inc.; and Nutrien Ltd.'s Senior Vice President, General Counsel Securities & Corporate Secretary, Robert Kirkpatrick, served as Senior Vice President & Corporate Secretary of Nutrien Ag Solutions, Inc. and Secretary of PCS Sales (USA), Inc. Today, Reynolds serves as both Nutrien Ltd.'s Executive Vice President, Global Sales, a role in which he leads Nutrien's

wholesale sales and oversees its retail network, and President and CEO of Nutrien Ag Solutions, Inc., while Kelly Freeman serves as both Nutrien Ltd.'s Senior Vice President, Midstream, and a Senior Vice President of Nutrien Ag Solutions, Inc. Nutrien Ltd. thus directs its U.S. subsidiaries through its own senior executives.

21. The conspiracy alleged in this Complaint is not among or between the Nutrien Defendants; rather, Nutrien, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Nutrien Defendant is named individually because each manufactured, marketed, or sold Fertilizer Products in interstate commerce; set Fertilizer Product prices; and/or directed and controlled the strategy for the same, during the Class Period.

**Fig. 1. Nutrien Defendants' Structure[4]**




### 4. The Mosaic Defendants

22. Defendant The Mosaic Company is a corporation organized and existing under the laws of Delaware, with its principal place of business in Tampa, Florida. Formed in 2004 through the merger of IMC Global Inc. and the fertilizer businesses of Cargill, Inc., The Mosaic Company mines potash in Canada and, until April 2026, in New Mexico; it also produces phosphate in the

---

4 *See* Appendix B for full-page versions of all Figures.

United States. It distributes and sells those products in the United States. Indeed, The Mosaic Company advertises the sale of its Fertilizer Products in locations across all 50 states of the United States, including at least 53 locations in Kansas. The locations it advertises include many Nutrien Ag Solutions retail locations. It also employs a Regional Sales Agronomist based in Wichita, Kansas. The Mosaic Company is one of the world's leading producers of Fertilizer Products, accounting for 66% of North American phosphate production and 35% of North American potash production and generating $12 billion in revenue in 2025. The Mosaic Company, through its wholly owned subsidiary, Mosaic Canada Crop Nutrition, LP, holds a 50% interest in Canpotex Limited, and Nutrien Ltd., through its wholly owned subsidiary, Potash Corporation of Saskatchewan Inc., holds the remaining 50%. Although The Mosaic Company is primarily a phosphate and potash producer, nitrogen is a component of several of its principal U.S. Fertilizer Products. The Mosaic Company's two highest-volume phosphate fertilizers, diammonium phosphate ("DAP") and monoammonium phosphate ("MAP"), are produced by reacting phosphoric acid with anhydrous ammonia and contain 18% and 11% nitrogen by weight, respectively.

23. Defendant Mosaic Fertilizer, LLC, is a subsidiary of The Mosaic Company, organized and existing under the laws of Delaware, with its principal place of business in Tampa, Florida, and its mailing address in Plymouth, Minnesota. Mosaic Fertilizer, LLC, operates major phosphate fertilizer production facilities in Florida and Louisiana. It also manufactures ammonia at its Faustina, Louisiana, facility, which has an annual capacity of approximately 510,000 tons, and occasionally sells its surplus ammonia.

24. Defendant Mosaic Global Sales, LLC, is a wholly owned subsidiary of The Mosaic Company, organized and existing under the laws of Delaware, with its principal place of business

in Tampa, Florida. Mosaic Global Sales, LLC, sells Mosaic's Fertilizer Products in the United States and serves as the U.S. guarantor for Mosaic products, including K-MAG. Mosaic sells its Fertilizer Products directly to wholesale distributors, retail chains, cooperatives, independent retailers, and national accounts, as well as to industrial customers. The Kansas Department of Agriculture lists Mosaic Global Sales, LLC as the Registrant and Manufacturer of the K-MAG Standard and K-MAG Granular fertilizers.

25. Defendant Mosaic Canada Crop Nutrition, LP is a Manitoba Limited Partnership with its principal place of business in Regina, Saskatchewan. It is a wholly owned subsidiary of The Mosaic Company. Mosaic Canada Crop Nutrition, LP holds a 50% interest in Canpotex Limited, the export association through which Mosaic and Nutrien sell their Canadian potash outside the United States and Canada; Potash Corporation of Saskatchewan Inc., a wholly owned subsidiary of Nutrien Ltd. holds the other 50%. Mosaic Canada Crop Nutrition, LP directs Mosaic's Canadian potash business, including production at the Esterhazy, Colonsay, and Belle Plaine mines, which are held through other Mosaic Canadian subsidiaries, including Mosaic Canada ULC, Mosaic Potash Esterhazy Limited Partnership, and Mosaic Potash Colonsay ULC. It also serves as the Canadian guarantor of the muriate of potash that Mosaic Global Sales, LLC sells in the United States.

26. Mosaic Canada Crop Nutrition, LP, as Mosaic's Canpotex shareholder, approves Canpotex's annual export budget with Nutrien, fixing how much potash each company will supply for export measured against its production capability; updates that budget throughout the year through rolling production schedules and forecasts shared with Nutrien; and receives the same average realized price as Nutrien on their combined export sales. Through Canpotex, Mosaic and Nutrien thus exchange competitively sensitive information about each other's production, export

commitments, inventories, demand, and pricing. Because potash not committed to Canpotex is sold in Canada and the United States, those export decisions directly affect how much Mosaic and Nutrien potash remains available to U.S. purchasers. Mosaic Canada Crop Nutrition, LP also holds an indirect interest in Portland Bulk Terminals, L.L.C., Canpotex's wholly owned export terminal at the Port of Portland, Oregon. Mosaic Canada Crop Nutrition, LP's conduct has had a direct, substantial, and reasonably foreseeable effect on the availability and price of Fertilizer Products in the United States.

27. The Mosaic Defendants operate as a single enterprise under the direction and control of The Mosaic Company, which sets pricing strategy for its fertilizer operations in the United States; its subsidiaries and joint ventures execute that strategy. Mosaic Canada Crop Nutrition, LP oversees Canadian production, including distributions to Canpotex, while Mosaic Fertilizer, LLC oversees production in the United States. Mosaic Fertilizer, LLC and Mosaic Global Sales, LLC are wholly owned subsidiaries that sell in the United States the fertilizer that The Mosaic Company prices and markets. All three U.S. companies have the same corporate address. In public SEC filings, The Mosaic Company states, "We conduct our business through wholly-and majority owned subsidiaries" and "'we,' 'us,' and 'our' refer to Mosaic and its direct and indirect subsidiaries, individually or in any combination." Employees regularly move between The Mosaic Company and Mosaic Fertilizer, LLC. The Mosaic Company controls production, logistics, and pricing across its subsidiaries through an integrated operational infrastructure that runs from mine through finished granule and port terminal. *See infra* ¶¶108–9. Mosaic Fertilizer, LLC's and Mosaic Global Sales, LLC's wholesale transactions to distributors and agricultural retail networks operate pursuant to pricing and supply strategies set by The Mosaic Company, with no independent pricing discretion at the subsidiary level.

28. The conspiracy alleged in this Complaint is not among or between the Mosaic Defendants; rather, Mosaic, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Mosaic Defendant is named individually because each manufactured, marketed, or sold Fertilizer Products in interstate commerce; set Fertilizer Product prices; and/or directed and controlled the strategy for the same, during the Class Period.

**Fig. 2. Mosaic Defendants' Structure**




**5. The CF Industries Defendants**

29. Defendant CF Industries Holdings, Inc., is a corporation organized and existing under the laws of Delaware, with its principal place of business in Northbrook, Illinois. One of the world's largest producers of nitrogen, with an extensive production and manufacturing network located primarily in North America, it is the ultimate parent of CF Industries Sales, LLC, CF Industries Nitrogen, LLC, and foreign subsidiaries responsible for producing Fertilizer Products outside the United States (Canadian Fertilizers Limited, Terra International (Canada) Inc., and CF Industries (UK) Limited). It also holds a 50% ownership interest in Point Lisas Nitrogen Limited, a company based in Trinidad and Tobago that annually produces hundreds of thousands of tons of anhydrous ammonia, an essential upstream input for the nitrogen fertilizers sold into the United States. Koch Fertilizer, LLC, holds the other 50% ownership interest.

30. Defendant CF Industries Nitrogen, LLC, is a subsidiary of CF Industries Holdings, Inc., organized and existing under the laws of Delaware, with its principal place of business in Northbrook, Illinois. CF Industries Holdings, Inc., owns 89% of it, and CHS Inc. owns the remaining 11%. A leading producer of nitrogen fertilizers in the United States, it operates major nitrogen complexes in Donaldsonville, Louisiana; Sergeant Bluff, Iowa; Claremore, Oklahoma; Yazoo City, Mississippi; Woodward, Oklahoma; Waggaman, Louisiana; and other domestic locations.

31. Defendant CF Industries Sales, LLC is a wholly owned subsidiary of CF Industries Holdings, Inc., organized and existing under the laws of Delaware, with its principal place of business in Northbrook, Illinois. CF Industries Sales, LLC sells nitrogen Fertilizer Products to cooperatives, retailers, independent distributors, traders, wholesalers, and industrial users in the United States. The Kansas Department of Agriculture lists CF Industries Sales, LLC as the Registrant and Manufacturer of Anhydrous Ammonia, TNC Amtrate Ammonium Nitrate, UAN 28-0-0, UAN 32-0-0, UAN with Sulfur, and Urea, and lists CF Industries Nitrogen, LLC as the Registrant and Manufacturer of UAN 32% and Urea.

32. The CF Industries Defendants operate as a single enterprise under the direction and control of CF Industries Holdings, Inc., which sets pricing strategy for its fertilizer operations in the United States; its subsidiaries and joint ventures execute that strategy. CF Industries Holdings, Inc., owns 89% of CF Industries Nitrogen, LLC, the primary domestic nitrogen producer, and 100% of CF Industries Sales, LLC, its primary U.S. sales subsidiary. CF Industries Nitrogen, LLC, operates major nitrogen complexes across seven domestic locations with access to a 2,000-mile ammonia pipeline system, and distributes the products those facilities produce through terminal and storage assets across the Corn Belt and Gulf Coast. *See infra* ¶¶110-11. No individual

CF Industries subsidiary independently determines the price its nitrogen products will carry; CF Industries Holdings, Inc. sets pricing centrally and implements it through the integrated production, pipeline, and distribution network its subsidiaries operate.

33. The conspiracy alleged in this Complaint is not among or between the CF Industries Defendants; rather, CF Industries, acting as a single enterprise, conspired with the other Defendant families identified herein. Each CF Industries Defendant is named individually because each manufactured, marketed, or sold Fertilizer Products in interstate commerce; set Fertilizer Product prices; and/or directed and controlled the strategy for the same, during the Class Period.

**Fig. 3. CF Industries Defendants' Structure**




### 6. The Koch Defendants

34. Defendant Koch, Inc. is a corporation organized under the laws of Kansas, with its principal place of business in Wichita, Kansas. Koch, Inc. is the ultimate parent company of Defendant Koch Ag & Energy Solutions, LLC. Through it, Koch, Inc. indirectly owns and controls the Koch subsidiaries that take part in Koch's fertilizer business. It also indirectly holds Koch, Inc.'s interest in Point Lisas Nitrogen Limited, a joint venture with CF Industries Holdings, Inc.

35. Defendant Koch Ag & Energy Solutions, LLC, is a Delaware limited liability company with its principal place of business in Wichita, Kansas. It is a wholly owned subsidiary of Koch, Inc. Koch Ag & Energy Solutions, LLC wholly owns each of the other Koch entities

named as Defendants below. It directs the production, sale, and distribution of Koch's Fertilizer Products.

36. Defendant Koch Fertilizer, LLC, is a Kansas limited liability company, with its principal place of business in Wichita, Kansas. It is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC. Koch Fertilizer, LLC, together with its affiliates, runs Koch's worldwide nitrogen fertilizer production, distribution, and trading businesses. It sells Fertilizer Products directly to agricultural purchasers in the United States. Koch Fertilizer, LLC, together with its affiliates, holds 50% of the stock of Point Lisas Nitrogen Limited ("PLNL"); CF Industries Holdings, Inc. holds the other 50%. The Kansas Department of Agriculture lists Koch Fertilizer, LLC as the Registrant and Manufacturer of Ammonium Polyphosphate, Ammonium Thiosulfate, Anhydrous Ammonia, Di-Ammonium Phosphate, Mono-Ammonium Phosphate, Muriate of Potash, Potassium Thiosulfate, NPS6 Fertilizer Grade, NPS7 Fertilizer Grade, NPS7ZN Ammonium Phosphate-Sulfate+Zinc, SuperU 46-0-0, and various Urea formulations.

37. Defendants Koch Fertilizer Wever, LLC, Koch Fertilizer Beatrice, LLC, Koch Fertilizer Dodge City, LLC, and Koch Fertilizer Enid, LLC (together, the "Plant Subsidiaries") are Delaware limited liability companies with their principal places of business in Wichita, Kansas. Each is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC. They produce nitrogen fertilizer at the Koch facilities in Wever, Iowa; Beatrice, Nebraska; Dodge City, Kansas; and Enid, Oklahoma, respectively.

38. Defendant Koch Fertilizer Canada, ULC ("Koch Canada") is an unlimited liability company organized and existing under the laws of Nova Scotia, Canada, with its principal place of business in Brandon, Manitoba. It is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC. Koch Canada produces nitrogen fertilizer at Koch's facility in Brandon,

Manitoba. It sells that fertilizer to farmers in Western Canada and to customers in the United States, including the Northern Plains. The Kansas Department of Agriculture lists Koch Canada as the manufacturer of Ammonium Polyphosphate, Ammonium Thiosulfate Solution, and several Urea Ammonium Nitrate formulations. Additionally, Koch Canada holds commercial fertilizer licenses in Georgia, Pennsylvania, and Illinois.

39. The Koch Defendants operate as a single enterprise. Koch, Inc. directs and controls them through Koch Ag & Energy Solutions, LLC. Koch Ag & Energy Solutions, LLC sets the pricing and supply strategy for Koch's fertilizer sales in the United States. Its subsidiaries and its joint venture, PLNL, carry out that strategy. Koch Fertilizer, LLC, Koch Canada, and PLNL sell Fertilizer Products into the U.S. market under Koch Ag & Energy Solutions, LLC's pricing strategy. The Plant Subsidiaries and Koch Canada produce nitrogen fertilizer at their facilities in the United States and Canada under Koch Ag & Energy Solutions, LLC's pricing and supply strategy. None of them has independent discretion over U.S. pricing. As alleged below, Koch Ag & Energy Solutions, LLC coordinates production, common carrier pipeline logistics, and terminal infrastructure across this network under unified management. That includes substantial shipping capacity on a primary Gulf Coast-to-Corn Belt ammonia pipeline and access to more than 50 terminals worldwide. *See infra* ¶112.

40. The conspiracy alleged in this Complaint is not among or between the Koch Defendants; rather, Koch, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Koch Defendant is named individually because each manufactured, marketed, or sold Fertilizer Products in interstate commerce; set Fertilizer Product prices; and/or directed and controlled the strategy for the same, during the Class Period.

**Fig. 4. Koch Defendants' Structure**




### 7. The Yara Defendants

41. Defendant Yara International ASA ("Yara International") is a corporation organized and existing under the laws of Norway, with its principal place of business in Oslo, Norway. Yara International is the world's largest producer of nitrates and compound NPK premium products and one of the largest fertilizer companies globally. Yara International traces its origins to Norsk Hydro, founded in 1905, and has operated as an independent entity since 2004. Yara International has operations in more than 60 countries, including the United States, and sells into more than 140 markets. Yara International transacts substantial commerce in Fertilizer Products directly in the United States and is subject to U.S. antitrust law for its conduct affecting U.S. commerce. Yara International's CEO announced production curtailments alleged herein, which reduced output at plants that supply the United States, with the direct and foreseeable result of increasing prices for Fertilizer Products in the United States. Yara International also avails itself of the U.S. legal system and participates in U.S. commerce. It sponsors American Depositary Receipts in the United States under a deposit agreement in which it submits to the non-exclusive jurisdiction of New York courts and appoints Yara North America, Inc. ("Yara North America")

as its agent for service of process; it has marketed to U.S. qualified institutional buyers through U.S.-dollar note offerings; in 2025, its board visited Yara's Tampa business and Washington, D.C., to meet with "partners, key stakeholders, and government officials in order to garner insights into the developments in the US of relevance for Yara's business"; it routinely presents at the BMO Farm to Market Conference in New York; and it has sued as a plaintiff in United States courts. Yara International also produces ammonia and sells Fertilizer Products in the United States through its subsidiaries. Product labels that Yara North America filed with the Kansas, Arkansas, and Georgia Departments of Agriculture identify Yara North America, Inc. as the guarantor of the products for Yara International, and many state that the products were made at Yara's foreign facilities in Norway, the Netherlands, and Finland.

42. Defendant Yara North America, Inc. is a Delaware corporation with its principal place of business in Tampa, Florida, and a wholly owned subsidiary of Yara International ASA. Under the direction of Yara International ASA, it produces ammonia and urea fertilizers and sells Fertilizer Products to customers in the United States. The Kansas Department of Agriculture lists Yara North America as the Registrant and Manufacturer of at least 38 different Fertilizer Products.

43. Defendant Yara Freeport LLC is a joint venture in which Yara International, through Yara North America, holds at 68% interest and BASF holds the remaining 32%. Yara Freeport LLC's Freeport, Texas facility has a capacity of 750,000 metric tons of ammonia per year. Yara International, through Yara North America, centrally directs and controls Yara Freeport LLC's manufacturing operations, product off-take allocations, and domestic supply strategies as part of its integrated global enterprise. Yara International distributes and sells Fertilizer Products in the United States through its subsidiary, Yara North America. Yara North America's activities

range from nitrogen production to commodity trading and selling highly specialized agricultural and industrial products.

44. The Yara Defendants operate as a single enterprise under the direction and control of Yara International ASA, which sets pricing strategy for its fertilizer operations in the United States; its subsidiaries and joint ventures execute that strategy. As alleged below, Yara International ASA can direct product from its global production network, which operates in more than 60 countries, into or away from the U.S. market depending on pricing conditions. That capability gives it structural control over domestic supply levels that neither Yara Freeport LLC nor Yara North America, Inc. could exercise independently. *See infra* ¶113. Yara Freeport LLC's production and Yara North America's terminal network and direct-to-retailer distribution relationships operate pursuant to pricing and supply strategies set by Yara International ASA.

45. The conspiracy alleged in this Complaint is not among or between the Yara Defendants; rather, Yara, acting as a single enterprise, conspired with the other Defendant families identified herein. Each Yara Defendant is named individually because each manufactured, marketed, or sold Fertilizer Products in interstate commerce; set Fertilizer Product prices; and/or directed and controlled the strategy for the same, during the Class Period.

**Fig. 5. Yara Defendants' Structure**




**B. Agents and Co-Conspirators**

46. Defendants' respective officers, agents, employees, or representatives authorized, ordered, or performed the anticompetitive and unlawful acts alleged in this Complaint while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

47. Each corporate Defendant's agents operated under the authority and apparent authority of their respective principals, and each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified economic entity.

48. Other persons and firms not named as defendants may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance of the conspiracy.

**II. JURISDICTION AND VENUE**

49. This Court has subject matter jurisdiction over Plaintiffs' federal antitrust claims under 28 U.S.C. §§1331, 1337 and Sections 4 and 16 of the Clayton Antitrust Act of 1914 ("Clayton Act"), 15 U.S.C. §§15, 26. The claims asserted herein arise under Sections 1 and 3 of the Sherman Antitrust Act of 1890 ("Sherman Act"), 15 U.S.C. §§1, 3. This Court has subject

matter jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. §1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Classes each contain more than 100 members; at least one member of each proposed Class is a citizen of a State different from that of at least one Defendant; and at least one member of each proposed Class is a citizen of a State while at least one Defendant is a citizen or subject of a foreign state. 28 U.S.C. §1332(d)(2)(A), (C). This Court also has supplemental jurisdiction over the state-law claims under 28 U.S.C. §1367(a) because they arise from the same nucleus of operative facts as the federal claims.

50. The Sherman Act reaches the foreign conduct alleged herein because that conduct was meant to produce and did in fact produce some substantial effect in the United States. Defendants' conspiracy was meant to, and did, fix, raise, maintain, and stabilize the prices of Fertilizer Products sold to purchasers in the United States and restrict the supply of Fertilizer Products available to the U.S. market. Plaintiffs and members of the Classes purchased Fertilizer Products in the United States, and they seek relief only for those purchases. The conspiracy's effects on U.S. commerce were intended, substantial, and foreseeable, and they are the source of Plaintiffs' injuries.

51. The Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. §6a, does not limit Plaintiffs' claims. The FTAIA does not apply to import trade or import commerce. Nor does the FTAIA apply to conduct that has a direct, substantial, and reasonably foreseeable effect on domestic commerce that gives rise to a Sherman Act claim. The conspiracy alleged herein had a direct, substantial, and reasonably foreseeable effect on U.S. domestic or import commerce. Defendants' conduct also involved U.S. import trade and import commerce, which the

FTAIA expressly excludes from its reach. The United States imports more than 90% of the potash it consumes, and Canada supplies approximately 80% of those imports.

52. Venue is proper in this District pursuant to the Order of the Judicial Panel on Multidistrict Litigation transferring related actions to this District ("Related Actions"). *See In re Nitrogen, Phosphorus, and Potassium (NPK) Fertilizer Antitrust Litig.*, MDL No. 3187, Dkt. 177 (U.S. Jud. Pan. Mult. Lit. June 9, 2026).

53. Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C. §1391(b), (c) because one or more Defendants resided in, transacted business in, are licensed to do business in, or are doing business in this District, and because a substantial part of the events giving rise to Plaintiffs' claims occurred here. For example, Defendants Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, and Koch Fertilizer Dodge City, LLC maintain their principal places of business in Wichita, Kansas.

54. Venue is also proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22, because each corporate Defendant transacts business of a substantial character in this District, including by selling, shipping, distributing, and marketing Fertilizer Products to purchasers located in Kansas, as alleged herein. Venue is proper under 28 U.S.C. §1391(c)(3) as to each Defendant not resident in the United States, which may be sued in any judicial district. Venue was likewise proper in each District in which an action against a Defendant was originally filed, as alleged herein.

55. This Court has personal jurisdiction over each Defendant to the same extent that the transferor court had personal jurisdiction in each Related Action, pre-transfer. Each Defendant, acting directly and through affiliates, agents, and co-conspirators, intentionally targeted purchasers of Fertilizer Products in Kansas and each transferor District. Defendants sold, or caused the sale

of, Fertilizer Products at prices fixed and inflated by the conspiracy, resulting in injury to Plaintiffs and Class members in those forums. Plaintiffs' claims arise from and relate to these targeted contacts. Personal jurisdiction over each Defendant is supported by each of the independent grounds alleged below, pleaded in the alternative.

56. Section 12 of the Clayton Act, 15 U.S.C. §22, authorizes nationwide service of process on any corporation sued under the antitrust laws in any district where the corporation is an inhabitant, may be found, or transacts business. Through Federal Rule of Civil Procedure 4(k)(1)(C), Section 12 supplies personal jurisdiction over each corporate Defendant as to Plaintiffs' federal antitrust claims. Each corporate Defendant transacts business of a substantial character in this District and in each District in which an action against it was originally filed, including through the sale, shipment, distribution, and marketing of Fertilizer Products to purchasers located there, as alleged below. Each Defendant also manufactures, imports, markets, or sells Fertilizer Products throughout the United States. Litigating in this District imposes no constitutionally significant burden on any Defendant, each of which is a large, sophisticated enterprise engaged in interstate and international commerce, with ready access to counsel, and whose documents and witnesses are located in multiple states and countries regardless of forum.

57. Under Federal Rule of Civil Procedure 4(k)(1)(A), this Court also has personal jurisdiction over each Defendant under the Kansas long-arm statute, Kan. Stat. Ann. §60-308(b), which reaches to the full extent permitted by the Due Process Clause. Each Defendant, in person or through an agent or instrumentality, including its co-conspirators: (a) transacted business in Kansas, including by selling and distributing Fertilizer Products to Kansas purchasers; (b) committed tortious acts within Kansas, including by selling Fertilizer Products in Kansas at prices

fixed and inflated by the conspiracy and causing economic injury to Kansas purchasers; and (c) committed or caused acts in furtherance of the conspiracy in Kansas, as alleged below.

58. In addition, each Defendant that is registered to do business in Kansas, including Koch Ag & Energy Solutions, LLC, Koch Fertilizer Dodge City, LLC, Nutrien Ag Solutions, Inc., Nutrien US LLC, CF Industries Sales, LLC, and Yara North America, Inc., has expressly consented in writing to suit in the courts of Kansas under Kan. Stat. Ann. §17-7931. Plaintiffs plead consent by registration as an independent and alternative basis for jurisdiction; the Kansas contacts alleged herein independently support specific jurisdiction over each Defendant.

59. **Koch Defendants**. Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, and Koch Fertilizer Dodge City, LLC are registered to do business in Kansas, maintain their principal places of business or operations in Kansas, and employ personnel in Kansas. The Koch Defendants made and directed their nitrogen Fertilizer Product pricing, production, and output decisions during the Class Period, including the price postings and fill-program offers alleged herein, from Koch's headquarters in Wichita, Kansas. Koch Fertilizer Dodge City, LLC operates a nitrogen fertilizer production facility in Dodge City, Kansas. Koch Fertilizer, LLC and Koch Canada have registered Fertilizer Products with the Kansas Department of Agriculture for sale in Kansas, including urea ammonium nitrate, ammonium thiosulfate, and ammonium polyphosphate, among others. According to tonnage reports filed with the Kansas Department of Agriculture, Koch Fertilizer, LLC sold Fertilizer Products into Kansas during the Class Period.

60. **Nutrien Defendants**. According to tonnage reports filed with the Kansas Department of Agriculture, Nutrien Ag Solutions, Inc., Nutrien US LLC, and PCS Sales (USA), Inc. sold and/or shipped Fertilizer Products into Kansas during the Class Period. Nutrien Ag Solutions, Inc. is registered to do business in Kansas and operates numerous retail locations in

Kansas through which it sells Fertilizer Products directly to Kansas farmers at the supracompetitive prices alleged herein. Nutrien Ltd. directs and controls the pricing and supply of the Fertilizer Products sold through its subsidiaries. Nutrien Ltd. describes its upstream manufacturing, midstream distribution, and downstream retail operations as integrated, with its midstream function optimizing the "internal sourcing of our upstream manufactured fertilizer sales volumes" to its retail and wholesale customers, and, as alleged below, Nutrien Ag Solutions retail locations source a significant majority of their fertilizer from Nutrien's own production facilities. Nutrien Ltd. reports on the results of Nutrien Ag Solutions, Inc. on a consolidated basis, and the benefits of its subsidiaries' Kansas sales flow to Nutrien Ltd.

61. **CF Industries Defendants**. CF Industries supplies nitrogen Fertilizer Products to Kansas purchasers, including through a distribution terminal that CF Industries designates as the primary supply point for Nebraska and Kansas. According to tonnage reports filed with the Kansas Department of Agriculture, CF Industries Nitrogen, LLC and CF Industries Sales, LLC sold and/or shipped Fertilizer Products into Kansas during the Class Period. Both CF Industries Nitrogen, LLC and CF Industries Sales, LLC have registered Fertilizer Products, including UAN 32% and urea, with the Kansas Department of Agriculture for sale in Kansas. CF Industries Holdings, Inc. directs the pricing, production, and sales of its subsidiaries' Fertilizer Products, including those sold in Kansas, and reports their results on a consolidated basis.

62. **Yara Defendants**. Yara North America, Inc. is registered to do business in Kansas and has registered Fertilizer Products with the Kansas Department of Agriculture for sale in Kansas. According to tonnage reports filed with the Kansas Department of Agriculture, Yara North America, Inc. sold and/or shipped Fertilizer Products into Kansas during the Class Period. The product labels that Yara North America, Inc. filed with the Kansas Department of Agriculture

identify Yara North America, Inc. as the guarantor of the products for Yara International ASA of Norway. Yara International ASA directs Yara's North American pricing and production, including the North American production curtailments alleged herein, and reports Yara North America, Inc.'s results on a consolidated basis.

63. **Mosaic Defendants**. The Mosaic Company markets its Fertilizer Products to Kansas purchasers, identifies Kansas retail locations at which its Fertilizer Products may be purchased, and employs personnel in Kansas. Mosaic Global Sales, LLC is the registrant and manufacturer of record with the Kansas Department of Agriculture for Fertilizer Products sold in Kansas. According to tonnage reports filed with the Kansas Department of Agriculture, Mosaic Global Sales, LLC sold and/or shipped Fertilizer Products into Kansas during the Class Period. The Mosaic Company has also registered products with the Kansas Department of Agriculture in its own name since 2024 and has consistently filed Kansas tonnage reports.

64. Each Defendant is also subject to personal jurisdiction in Kansas because it knowingly joined a conspiracy that was directed at Kansas and was carried out in part in Kansas. Kansas is among the largest fertilizer-consuming states in the United States, and when each Defendant joined the conspiracy, it knew and intended that the conspiracy would reach Kansas farmers and other Kansas purchasers. Co-conspirators took substantial steps in furtherance of the conspiracy in Kansas, including: (a) the Koch Defendants' pricing and output decisions made and announced from Wichita, Kansas; (b) production and output decisions at the Koch Fertilizer Dodge City, LLC facility in Dodge City, Kansas; (c) the sale of Fertilizer Products at supracompetitive prices through Nutrien Ag Solutions, Inc.'s Kansas retail locations; and (d) each Defendant family's sales of Fertilizer Products into Kansas, directly or through distributors and retailers, at prices fixed and inflated by the conspiracy. Plaintiffs and Class members, including Plaintiffs

located in Kansas, suffered injury in Kansas when they purchased Fertilizer Products at those inflated prices. Because each co-conspirator acted as the agent of the others in furtherance of the conspiracy, the Kansas acts of each are attributable to all.

65. This Court also has personal jurisdiction over each Defendant as to Plaintiffs' state-law claims, which arise from the same nucleus of operative facts as Plaintiffs' federal claims. In the alternative, to the extent any Defendant organized under the laws of a foreign country, including Nutrien Ltd., Yara International ASA, and Koch Canada, is not subject to jurisdiction in the courts of general jurisdiction of any state, this Court has personal jurisdiction over that Defendant as to Plaintiffs' federal claims under Federal Rule of Civil Procedure 4(k)(2), because each such Defendant purposefully directed its Fertilizer Product sales and the conspiracy toward the United States as a whole.

66. Actions now coordinated in this proceeding were originally filed in this District and in the Northern District of Illinois, Western District of Missouri, District of Colorado, Eastern District of California, Northern District of California, District of Connecticut, District of New Hampshire, District of Minnesota, Western District of Wisconsin, Northern District of Iowa, Northern District of Mississippi, and the Eastern District of Texas. Each Defendant was subject to personal jurisdiction, and venue was proper under 15 U.S.C. §22 and 28 U.S.C. §1391, in each District in which an action against it was originally filed, for the reasons alleged above and the following.

67. **Northern District of Illinois.** CF Industries Holdings, Inc., CF Industries Nitrogen, LLC, and CF Industries Sales, LLC maintain their principal place of business in Northbrook, Illinois. Nutrien Ag Solutions, Inc. is registered to do business in Illinois, maintains a corporate office in Deerfield, Illinois, operates warehouses in Marseilles and Mount Carroll,

Illinois, and operates retail locations in the Northern District of Illinois, including in Dixon, Amboy, and Mount Carroll. CF Industries and Koch posted ammonia prices for terminals in Illinois, as alleged herein. Like Nutrien, Koch advertises that it sells Fertilizer Products in seven locations across the state of Illinois, including one in Rockford, Illinois. The Mosaic Company also advertises that it sells its Fertilizer Products in more than 100 locations throughout the state of Illinois, many of them Nutrien Ag Solutions retailers. Mosaic Global Sales, LLC holds an Illinois commercial fertilizer license covering multiple distribution sites in Illinois. Yara North America, Inc. employs a Regional Sales Manager responsible for serving clients throughout Illinois. According to tonnage reports filed with the Illinois Department of Agriculture, Nutrien Ag Solutions, Inc., CF Industries Nitrogen, LLC, Koch Fertilizer, LLC, and Yara North America, Inc. sold and/or shipped Fertilizer Products into Illinois during the Class Period.

68. **Eastern District of California.** Nutrien Ag Solutions, Inc. is registered to do business in California and maintains extensive operations in the state, including warehouses, a corporate office, and a fertilizer blending facility in Fresno; warehouses in Modesto and Vernalis; a terminal in Bakersfield; and a broad network of retail and sales locations throughout the Eastern District. The Mosaic Company delivers Fertilizer Products directly to purchasers in the Eastern District of California through Mosaic Direct and advertises sales in more than 23 locations in the District, including through Nutrien Ag Solutions retailers. Koch Fertilizer, LLC openly promotes its Fertilizer Products in Chico, California. Yara employs three dedicated sales representatives in California. CF Industries Nitrogen, LLC previously registered its Urea and Urea Ammonium Nitrate Solution with the California Department of Food and Agriculture, demonstrating intent to distribute products in the state, though those registrations have since expired.

69. **District of Colorado**. Nutrien Ag Solutions, Inc. maintains its principal place of business in Loveland, Colorado, and is duly registered to conduct business within the state. The Mosaic Company operates multiple retail locations in Colorado, including Burlington, Henderson, and Brighton, where its Fertilizer Products are available for purchase, and employs personnel within the state. Koch Fertilizer, LLC maintains an active sales location in Burlington, Colorado, offering its Fertilizer Products directly to local purchasers. Yara North America, Inc. employs a sales representative dedicated to serving purchasers in Colorado, further evidencing its commercial presence in the state. Throughout the Class Period, Nutrien Ag Solutions, Inc., Koch Fertilizer, LLC, Koch Fertilizer Canada, ULC, Mosaic Global Sales, LLC, CF Industries Sales, LLC, CF Industries Nitrogen, LLC, and Yara North America, Inc. each registered Fertilizer Products with the Colorado Department of Agriculture for sale in Colorado.

70. **Northern District of Iowa**. Nutrien Ag Solutions, Inc. is registered to do business in Iowa and maintains a broad network of retail and sales locations throughout the state, including 34 retail locations in Anthon, Dunlap, Carroll, Danbury, Garnavillo, and Boone, all in the Northern District of Iowa. The Mosaic Company maintains an operational hub in Hubbard, Iowa. This site is part of Mosaic's North America business, which includes mining, processing, and distribution facilities that supply crop nutrients to farmers and ag retailers. The Mosaic Company also operates numerous retail locations in Iowa, where its products are available for purchase, and where it employs personnel within the state, including through Nutrien Ag Solutions retailers. Koch Fertilizer, LLC maintains 11 active sales locations in Iowa, including locations in Stacyville and Garner, which are both located in the Northern District of Iowa and offer its Fertilizer Products directly to local purchasers. Yara North America, Inc. employs five sales representatives dedicated to serving purchasers in the central region of the United States: one of those representatives is

specifically assigned to provide service to Iowa purchasers, further evidencing its commercial presence in the state.

## III. FACTUAL ALLEGATIONS

### A. Overview of the U.S. Fertilizer Market: Three Primary Types, Their Applications, and Agronomic Role

71. Modern commercial agriculture depends on three primary plant macronutrients: nitrogen (N), phosphorus (P), and potassium (K). Because each harvest permanently removes these nutrients from the soil, farmers must replenish them by applying fertilizer. Without added fertilizer, soil loses fertility, yields decline, and crop quality deteriorates.

#### 1. Nitrogen Fertilizers

72. Nitrogen is the most widely consumed fertilizer nutrient by volume, accounting for approximately 59% of total U.S. fertilizer consumption. It drives vegetative growth, protein synthesis, and chlorophyll production, making it the primary determinant of crop yield. Because nitrogen is removed from each harvest through volatilization, farmers must replenish it every growing season, creating consistent and inelastic annual demand.

73. The principal nitrogen Fertilizer Products include: (a) Anhydrous Ammonia ($NH_3$), the most concentrated nitrogen fertilizer at 82% nitrogen by weight, applied as a pressurized gas directly into the soil and used primarily for corn and wheat production in the Midwest; (b) Urea ($CO(NH2)_2$), containing approximately 46% nitrogen and the most widely traded solid nitrogen fertilizer globally, used across virtually all major crop types, including corn, wheat, rice, sugarcane, cotton, and vegetables; (c) Urea Ammonium Nitrate (UAN), a liquid fertilizer solution containing 28% to 32% nitrogen used in fertigation and surface application for corn and wheat; (d) Ammonium Nitrate (AN), a dry granular product with approximately 34% nitrogen used in grain production; and (e) Ammonium Sulfate (AS), a by-product of industrial processes containing

21% nitrogen and 24% sulfur, used on crops with high sulfur demand such as corn, soybeans, and canola.

74. Each Defendant sells nitrogen fertilizers in the United States.[5]

**2. Phosphate Fertilizers**

75. Phosphate fertilizers account for approximately 19% of total U.S. fertilizer consumption by volume and are essential for root development, energy transfer, seed formation, and crop maturation. Unlike nitrogen, phosphate does not volatilize from soil; it binds tightly to soil particles. Because each harvest removes significant quantities, farmers must continuously replenish it. Phosphate fertilizers are derived from mined phosphate rock, a non-renewable resource; the United States holds important reserves of phosphate rock, primarily in Florida, North Carolina, Idaho, and Utah.

76. The principal phosphate Fertilizer Products include: (a) Diammonium Phosphate (DAP), the world's most widely traded phosphate fertilizer, containing 18% nitrogen and 46% P2O5 (phosphoric acid equivalent), applied at planting for corn, soybeans, wheat, canola, and cotton; (b) Monoammonium Phosphate (MAP), containing 11% nitrogen and 52% P2O5, used much like DAP and often preferred in alkaline soils and for fall application; (c) Triple Superphosphate (TSP), containing approximately 46% $P2O_5$, used for high-phosphorus soils and specialty crops; (d) Single Superphosphate (SSP), a lower-concentration product containing 18% to 22% $P2O_5$ used in cost-sensitive markets; and (e) Phosphoric Acid, the industrial intermediate used both in fertilizer manufacturing and in the production of processed foods and industrial chemicals.

---

[5] Mosaic Fertilizer, LLC also manufactures ammonia at its Faustina, Louisiana phosphate production facility, which has annual capacity of approximately 510,000 metric tons, and occasionally sells its surplus ammonia.

77. Mosaic and Nutrien are the primary phosphate producers and sellers in the United States. Mosaic has one of the largest global production capacities for phosphate fertilizers, and its North American output exceeds the aggregate capacity of its three nearest competitors. Mosaic alone accounts for approximately 66% of North American annual production of phosphate crop nutrients. Through its joint venture with OCP, Koch sources phosphate from Morocco, and Yara also sells phosphate in the United States in its imported compound Fertilizer Products.

**3. Potash Fertilizers**

78. Potash fertilizers account for approximately 22% of total U.S. fertilizer consumption by volume. Potassium governs water regulation, disease resistance, fruit quality, and overall plant health, and, as with phosphorus, each harvest removes it in significant quantities. Potash is mined from underground potassium-bearing mineral deposits and is irreplaceable as a crop input.

79. The principal potash Fertilizer Products include: (a) Muriate of Potash (MOP), also known as potassium chloride (KCl), the most widely used potash fertilizer at approximately 60% $K_2O$ content, applied to corn, soybeans, wheat, cotton, and virtually all major row crops; (b) Sulfate of Potash (SOP), a premium product containing 50% $K_2O$ and 17% sulfur, used for chloride-sensitive crops such as fruits, vegetables, nuts, and tobacco, where MOP's chloride content would harm yield or quality; and (c) Sulfate of Potash Magnesia (SOPM or K-Mag), a specialty product used on high-value crops that require simultaneous potassium, magnesium, and sulfur supplementation.

80. Nutrien and Mosaic, two of the five Defendant families, produce and sell potash, and together control the majority of commercially relevant North American potash production capacity. The United States depends almost entirely on imports for potash, obtaining approximately 80% of its supply from Canada. Saskatchewan contains the world's largest known

potash reserves, and Nutrien, the dominant producer there, operates six mines with more than 20 million metric tons of annual production capacity. Mosaic accounts for roughly 35% of North American potash output. Koch imports potash into the United States, and Yara also sells it in the United States as a component of its imported compound Fertilizer Products.

### 4. Fertilizer Used by American Farmers

81. Fertilizer costs are among the largest variable expenses American farmers bear regardless of crop type, and no commercially viable substitute for nitrogen, phosphate, and potash exists. The resulting inelastic demand makes the fertilizer market particularly vulnerable to Defendants' abuse.

82. Farmers typically do not purchase raw elemental nitrogen, phosphorus, or potassium, nor do they buy unprocessed ore. They rely instead on finished Fertilizer Products from producers such as Defendants. Those products are chemically processed, granulated, or liquefied so that they can be safely transported, stored, blended, and applied with modern equipment, and they are engineered to flow through spreaders, dissolve in sprayers, or be injected into soil without damaging equipment or creating safety hazards.

83. Nor can farmers rely on a single-nutrient fertilizer to grow crops. A farmer cannot, for example, grow corn on nitrogen alone. Farmers instead buy a mix of single-nutrient fertilizers and multi-nutrient blends depending on crop needs and soil conditions. Single-nutrient fertilizers supply one primary nutrient and serve as the building blocks for more complex fertilizer programs. However, even single-nutrient fertilizers involve other nutrients. For example, the major phosphate fertilizers also contain nitrogen: producing one metric ton of DAP requires 0.219 metric tons of ammonia. Moreover, they are manufactured to permit blending with other nutrients. For example, granular potash is made to be "easily blended with solid nitrogen and phosphate fertilizers."

84. Because farmers need all three nutrients, the products are often sold and applied together.

85. Consequently, farmers commonly buy pre-mixed Fertilizer Products that contain all three major nutrients in specific ratios. The numbers on an NPK label represent the percentage by weight of nitrogen (N), phosphate (P), and potash (K). A 20-10-10 blend, for example, contains 20% nitrogen, 10% phosphate, and 10% potash. The remaining 60% is filler material that ensures safe handling, prevents clumping, and allows even application across a field.

86. Nitrogen, phosphate, and potash are complementary products; each nutrient enhances the effectiveness and yield contribution of the others applied during a growing season. A farmer therefore cannot respond to a significant, non-transitory price increase in a single-nutrient fertilizer by declining to purchase that nutrient for the season, because doing so would risk lower yields or outright crop failure. Farmers must buy nitrogen, phosphate, and potash fertilizers, in the appropriate quantities, every growing season to maximize crop yield.

87. As Nutrien describes it, “potash supports water uptake and efficiency of other nutrients, nitrogen improves crop yield and quality and phosphate aids root development,” and “[t]ogether, they enable farmers to improve crop intensity and achieve higher yields.” The nutrients also work through one another: potassium plays a role in “aiding nitrogen uptake.” A shortage of any one nutrient limits a crop’s yield no matter how much of the others a farmer applies. Farmers growing the major U.S. row crops therefore buy all three. Fertilizer use on the principal U.S. row crops shows this. According to USDA survey data reported by Nutrien, farmers applied the following rates of each nutrient, in pounds per treated acre, and treated the following shares of planted acres:

**Table 1. NPK Application Rates on Major U.S. Row Crops**

| Crop | Nitrogen | Phosphate ($P_2O_5$) | Potash ($K_2O$) |
|---|---|---|---|
| Corn | 150 lbs on 95% of acres | 64 lbs on 75% of acres | 77 lbs on 65% of acres |
| Soybeans | 22 lbs on 30% of acres | 57 lbs on 44% of acres | 88 lbs on 46% of acres |
| Cotton | 95 lbs on 71% of acres | 51 lbs on 46% of acres | 77 lbs on 37% of acres |

88. Each harvest also removes all three nutrients from the soil, and farmers must replace them to sustain yields. A 181-bushel-per-acre corn crop removes about 121 pounds of nitrogen, 63 pounds of phosphate, and 45 pounds of potash from each acre. A 52-bushel-per-acre soybean crop removes about 38 pounds of phosphate and 62 pounds of potash. Corn and soybeans, the two largest U.S. row crops, are commonly grown in rotation. In the 2023/24 crop year, U.S. farmers planted them on roughly 95 million and 84 million acres, respectively. A farm rotating the two buys heavy nitrogen for its corn, and phosphate and potash for both crops. U.S. farmers as a whole applied about 11.8 million metric tons of nitrogen, 3.8 million metric tons of phosphate, and 5.0 million metric tons of potash in the 2024/25 fertilizer year.

89. USDA's Economic Research Service tracks fertilizer as a single cost category. A dollar a farmer spends on one nutrient is a dollar unavailable for the others. The three nutrients therefore compete for the same fertilizer dollar, and an agreement limited to one nutrient would not have remained profitable. Although a farmer cannot stop buying any one nutrient, a farmer working within a fixed fertilizer budget can trim application rates at the margin, where soil reserves allow, to absorb a price increase on another nutrient. An agreement to inflate prices on all three nutrients together removes that opportunity to adjust. It lets each Defendant collect an overcharge without eroding the others' sales.

90. A conspirator that agreed to hold the price of one nutrient could still win business by discounting the other components of a blend, a bundled order, or a prepay program, in ways its

rivals could not readily detect. Fixing prices across all three nutrients closed off that route for cheating.

91. Nutrien's presence across all three nutrients also facilitates the Defendants' conspiracy. Nutrien should be competing for U.S. sales in potash and phosphate with Mosaic, Koch, and Yara, and with all four other Defendants in nitrogen. Instead, Defendants coordinate on the price to sell Fertilizer Products in the United States and have agreed to fix and maintain prices across all three macronutrients, not for any one in isolation.

**B. U.S. Market Size and Structural Trends over Time**

92. The U.S. fertilizer market is one of the largest in the world, valued at approximately $30 billion in 2025 and projected to reach $40 billion by 2031.

93. From 2016 to 2020, yearly U.S. consumption of nitrogen, phosphate, and potash remained stable, ranging from approximately 19.7 million to 21.0 million metric tons of nutrient. In 2021, total fertilizer consumption fell to 18.7 million metric tons. Consumption then rebounded to 20.5 million metric tons in 2022 and reached 20.7 million metric tons in 2024, the same level as in 2016. Preliminary estimates show 2025 consumption falling slightly to approximately 20.2 million metric tons.

**Fig. 6. U.S. Fertilizer Consumption, 2016–2025[6]**




94. Decades of consolidation reduced the number of U.S. fertilizer producers and increased market concentration. Federal investigations and academic analyses have long raised concerns that a shrinking number of firms have significant influence over fertilizer production.

95. The January 2018 merger of PotashCorp and Agrium, at the time the largest corporate transaction in Canadian history, created Nutrien and sharply increased concentration in the potash and phosphate markets. The parties announced the deal in September 2016, during a period of depressed fertilizer prices. At the time, industry analysts observed that the combined entity would possess substantially greater pricing power. The FTC initially raised competition concerns before approving the transaction in December 2017, conditioning approval on the divestiture of two production facilities, a wholly inadequate remedy. Nutrien emerged as the world's largest potash producer and one of the largest producers of nitrogen and phosphate in North America, paving the way for the anticompetitive conduct alleged herein.

---

6 Sources: IFA (FASTAT; 2025(e): Mosaic Q4 2025 earnings call & Form 10-K; Nutrien 2025 Annual Report (Form 40-F); TFI. 2025(e) hatched is estimated: IFA 2024 adjusted by industry and company data: phosphate -15% (Mosaic, U.S. phosphate shipments), potash -1% (Nutrien, North American potash sales), nitrogen +1% (TFI). IFA 2025 data are not yet released.

96. Mosaic was built the same way. The merger of IMC Global, a dominant North American phosphate producer, with Cargill's crop nutrition division combined the two largest phosphate operations in North America. Mosaic then acquired CF Industries' phosphate operations, including CF Industries' Florida phosphate processing infrastructure, for approximately $1.4 billion in 2013.

97. Defendants hold dominant market shares, measured by production capacity, in each of the three primary fertilizer types.

**Fig. 7. U.S. Nitrogen Fertilizer Production Capacity Market Share, 2026**[7]




98. CF Industries is the dominant U.S. nitrogen producer with approximately 43% of total domestic capacity. Koch holds 17%, Nutrien 15%, and Yara 5%; together, the four Defendants hold 80% of U.S. nitrogen production capacity. Mosaic also produces nitrogen at its facility in Faustina, Louisiana. Additionally, Nutrien, CF Industries, Yara, and Koch control close to 95% of Canada's nitrogen production capacity and, until Nutrien shut down its Trinidad facility

7 Yara's purchase of the Gulf Coast Ammonia plant (Texas City, 1.3 Mt/yr ammonia) was announced in July 2026 and is pending regulatory approval but is included in this market share analysis.

(production stopped in October 2025 and the shutdown was made indefinite a year later), controlled 66% of the production capacity of ammonia nitrogen in Trinidad and Tobago, the second-largest foreign source of ammonia nitrogen for the U.S. market (behind Canada). That concentration, combined with high capital barriers to new entry and the energy-intensive cost structure of ammonia synthesis, gives Defendants substantial collective power over domestic nitrogen prices. According to Nutrien, building a new nitrogen facility from the ground up (a "greenfield" project) would take at least four years and $3.5 billion.

**Fig. 8. North American Phosphate Fertilizer Production Capacity Market Share, 2026**




99. Mosaic controls approximately 66% of North American phosphate fertilizer production, and Nutrien holds 20%. Koch and Yara produce phosphate abroad and import it into the United States. High entry barriers protect Defendants' market power: according to Nutrien, a greenfield phosphate complex would take at least six years to build and would cost at least $6.2 billion.

**Fig. 9. North American Potash Fertilizer Production Capacity Market Share, 2026**




100. The United States imports approximately 80% of the potash it consumes from Canada. Nutrien and Mosaic dominate the North American potash market, holding approximately 54% and 35% of production capacity, respectively, for a combined share of approximately 89%. Additionally, in 2015, K+S, a German company and one of Europe's largest suppliers of potash, agreed to supply potash exclusively to Koch for Koch's U.S. customers from K+S's Saskatchewan mine, which opened in 2017. Yara also sells potash in the United States as a component of its imported compound Fertilizer Products. Nutrien and Mosaic control the majority of Canadian potash export capacity, which gives them an unparalleled ability to manage potash supply and pricing, a power they exercised throughout the Class Period. According to Nutrien, a greenfield potash mine in Canada would take at least ten years to build and ramp up at a minimum cost of $6 billion. Nutrien and Mosaic's joint ownership of Canpotex reinforces that barrier to entry. Canpotex handles the offshore marketing and export logistics for Canadian potash, and a new Canadian producer would therefore need either access to an export channel controlled by its two

largest competitors or its own rail and port infrastructure. As a result, Defendants are able to set potash prices for every U.S. farmer without facing meaningful competition.

### C. Vertical Integration and Distribution Channel Control

101. Defendants' control does not stop at the mine or the manufacturing plant. Through decades of mergers and acquisitions, Defendants built vertically integrated systems that reach the farm gate. That integration, spanning production facilities, terminal networks, wholesale distribution, and direct retail, carries pricing signals and supply discipline strategies directly to end users with no independent intermediary to challenge them. It also gives each Defendant real-time visibility into downstream demand, competitor inventory levels, and retail pricing across the market. That continuous intelligence stream makes coordinated pricing easier to implement and monitor and makes any deviation harder to conceal.

102. Farmers themselves have identified this structure as the source of the problem. In January 2023, the USDA published the results of the public comments it received in response to its Public Request for Information on Access to Fertilizer. Of the 1,494 comments submitted, 87% raised concerns about soaring prices and 72% raised concerns about the power of fertilizer manufacturers. Farmers attributed price increases to a few unaccountable fertilizer manufacturers that exercise extensive control over retail, transport, and production markets, and over "every step in the process." One commenter stated that "[e]xcessive price increase of fertilizer appears to be fueled by greed within the small group of fertilizer manufacturers."

103. Commenters explained that some manufacturers operate business lines as both fertilizer seller and retailer buyer, which gives them the power to "force other [retailers dependent on the manufacturer's product] to buy at inflated prices." On distribution, the USDA reported one commenter's account that "'large distributors' are 'acquiring small manufacturers'; and 'effectively lock[] up retail locations from being approached' by competitor manufacturers, by

'eliminating competing products from [acquired manufacturers' catalog and consolidate to one product]' and 'forc[e downstream] retail locations to place large minimum orders.'"

### 1. Nutrien

104. Nutrien is the world's most extensively vertically integrated fertilizer company and controls its full supply chain from the mine to the farmer's gate. That supply chain produces approximately 27.5 million metric tons of Fertilizer Products annually and generates billions of dollars in annual sales from Nutrien's retail operations.

105. Nutrien Ltd. mines and processes potash through its wholly owned holding company subsidiaries Potash Corporation of Saskatchewan, Inc. and Agrium Potash, Ltd. Nutrien Ltd. operates six potash mines in Saskatchewan with more than 20 million metric tons of annual capacity and ships potash from those mines to U.S. customers through approximately 370 potash distribution points, including warehouses and storage facilities in the United States.

106. U.S. holding company subsidiaries, including Cominco Fertilizer Partnership, PCS Nitrogen Fertilizer, L.P., and PCS Phosphate Company, Inc., that Nutrien Ltd. owns, control $15.7B in U.S. assets, including nitrogen and phosphate plants in Georgia, Texas, Louisiana, Ohio, Washington, North Carolina, and Florida. Nutrien Ltd. also owns the largest agricultural retail network in the United States, through which it directs the production, distribution, pricing, and sales of Fertilizer Products. Through various holding company subsidiaries, including Nutrien (Canada) Holdings ULC, Agrium Canada Partnership, and PCS Nitrogen Trinidad Limited, Nutrien Ltd. also owns six Canadian nitrogen plants and a nitrogen plant in Trinidad and Tobago. Nutrien ships more than 25% of its annual Canadian nitrogen production to the United States.

107. Nutrien Ag Solutions, Inc. alone accounts for approximately 21% of all U.S. agricultural retail sales and generates a significant majority of its Fertilizer Product sales from Nutrien Ltd.'s own production, a self-reinforcing structure that entrenches Nutrien's market

power. Nutrien also sells Fertilizer Products to cooperatives, retailers, independent distributors, traders, wholesalers, and industrial users in the United States through PCS Sales (USA), Inc. and Nutrien US LLC.

108. That structure has direct anticompetitive consequences. Nutrien Ag Solutions retail locations source a significant majority of their fertilizer from Nutrien's own production facilities. As a result, when Nutrien raises wholesale fertilizer prices, as it did throughout the Class Period, its retail arm simultaneously transmits those increases to hundreds of thousands of farmers, and no independent retail competitor can undercut it with lower-cost alternative supply. No independent hand touches the increase at any point between Nutrien's mine and the farmer's gate. Nutrien's retail operations also provide granular, real-time visibility into national and regional fertilizer demand, competitor product presence at the farm level, and farmer purchasing behavior, a proprietary intelligence stream that tells Nutrien precisely what the market will bear and whether any competitor is deviating from coordinated price levels.

**2. Mosaic**

109. Mosaic is vertically integrated at the production, logistics, and international distribution levels. The merger that created it combined IMC Global's mining and processing operations with Cargill's distribution infrastructure and customer network, giving Mosaic control over both production and downstream delivery of North American phosphate from its first day of operation.

110. Mosaic owns domestic and foreign phosphate mines through its subsidiaries, including South Ft. Meade Land Management, Inc., and Compañía Minera Miski Mayo S.R.L. (a joint venture with Mitsui & Co., Ltd.). Mosaic owns and operates ammonia terminal facilities at the Port of Tampa and Port Sutton, Florida, where it receives and processes the ammonia inputs for its phosphate manufacturing operations. Those facilities give Mosaic control over a critical

production input that would otherwise depend on third-party infrastructure. Mosaic held and operated a U.S. potash mine, through its subsidiary Mosaic Potash Carlsbad, Inc., until it sold the mine in April 2026. Its network of crop nutrient blending and bagging facilities spanning the United States, Canada, Brazil, and other international markets provides downstream reach that independent fertilizer distributors cannot easily replicate. Mosaic's operations run from mine through finished granule and port terminal, an infrastructure network that gives it structural advantages over any new entrant attempting to compete on a production-only basis.

### 3. CF Industries

111. CF Industries operates nitrogen plants itself and through its subsidiaries, including Terra Nitrogen, L.P., Terra International (Oklahoma) LLC, CF Industries East Point, LLC, Canadian Fertilizers Limited, Terra International (Canada) Inc., and CF Industries (UK) Limited, in the United States, Canada, and the United Kingdom.

112. CF Industries achieves vertical integration through strategically positioned production facilities, pipeline assets, and distribution terminals that give it direct control over the movement and pricing of nitrogen fertilizers from production to sale. Its Donaldsonville, Louisiana, complex, the largest ammonia production complex in the world, connects to an extensive pipeline system that feeds nitrogen products directly into the Midwest market. CF Industries has access to a 2,000-mile ammonia pipeline and owns terminal and storage facilities across the Midwestern United States that allow it to supply multiple terminal locations without depending on third-party logistics. Those facilities include storage and distribution terminals across the Corn Belt and Gulf Coast in which CF Industries operates or holds interests.

### 4. Koch

113. Koch is similarly vertically integrated, allowing it to sell potash, phosphate, and nitrogen in the United States. In addition to its U.S. nitrogen facilities, it imports nitrogen from

Trinidad and Tobago through its joint venture with CF Industries, PLNL. In 2017, Koch began marketing K+S potash in the United States under a long-term supply agreement. In 2022, Koch acquired a 50% interest in Jorf Fertilizers Company III, a phosphate fertilizer joint venture with Morocco's OCP Group, since renamed Kofert. Customs records show that between March 2024 and May 2026 the joint venture shipped at least 14 cargoes of phosphate fertilizer from Jorf Lasfar, Morocco, to U.S. ports, typically about 33,000 metric tons each, and identified Koch as the customer on at least six of them. Koch continued its vertical expansion in 2024 by completing the acquisition of a nitrogen fertilizer plant in Wever, Iowa. The acquisition gave Koch control of one of the largest nitrogen facilities in the world. Koch also maintains a global network of more than 50 terminals that lets it source product from its own facilities or from third-party suppliers.

**5. Yara**

114. Yara achieves vertical integration in the U.S. market by owning and operating the Freeport, Texas, nitrogen production complex and a network of distribution terminals across the United States and Canada. Yara North America's terminal network lets it control the timing and pace of product releases into the domestic market, giving it the same structural ability to manage supply and support price levels that characterizes the vertical infrastructure of its co-conspirators. As the world's largest nitrogen fertilizer producer, Yara can also source product from its global production network and direct it toward, or withhold it from, the U.S. market depending on pricing conditions, which gives it leverage over domestic nitrogen prices well beyond its Freeport capacity. Yara North America's direct-to-retailer distribution relationships likewise give it access to the same downstream commercial intelligence about demand, inventory, and competitor pricing that its co-Defendants obtain through their own vertically integrated distribution systems, further enabling coordinated conduct.

### D. Defendants' Conspiracy Drove Fertilizer Prices to Supracompetitive Levels that Cannot Be Explained by Supply and Demand or Other Legitimate Market Forces

#### 1. Defendants' Parallel Pricing Caused Fertilizer Costs to Skyrocket

##### a. The Price Surge: Magnitude, Synchrony, and Persistence

115. Defendants' common goal was to charge the highest prices American farmers could bear for all three nutrients, and the pricing record shows that they achieved that goal. Fertilizer prices vary cyclically with global supply, energy costs, and crop demand. The increases that began in early 2021 and accelerated through 2021 and 2022 were different: extraordinary in scale, simultaneous across all three nutrient categories, and persistent long after every conventional cost-based explanation had been exhausted. Figure 10 below charts the quarterly average price per short ton ("/st") for ammonia, urea, phosphate, and potash in the United States from 2016 through 2026.

**Fig. 10. U.S. Fertilizer Prices, 2016–2026**[8]




116. Fertilizer Product prices moved in synchrony through the Class Period: sharp, coordinated escalation beginning in 2021; a peak in early 2022 at prices that were multiples of the pre-conspiracy 2019 average baselines; a partial decline that never returned prices to baseline; and a steady increase into 2026. Nitrogen, phosphate, and potash tracked one another through the same inflection points with near-identical timing, a hallmark of coordinated market behavior rather than independent responses to separate competitive forces.

117. All four products reached their peak in the first quarter of 2022: nitrogen ammonia at $1,425/st, a 254% premium over the 2019 average baseline; nitrogen urea at $950/st, a 233% premium; phosphate at $1,014/st, a 202% premium; and potash at $812/st, a 179% premium.

118. That synchronization across all nutrients within the same quarter constitutes powerful circumstantial evidence of coordinated pricing. No natural market mechanism, not

---

[8] Bloomberg Quarterly U.S. Cornbelt Price Data; phosphate is the average of DAP and MAP prices.

weather, not a single input-cost shock, not any discrete geopolitical event, simultaneously accelerated the prices of a natural-gas-intensive product (ammonia and urea), a sulfuric-acid- and phosphate-rock-intensive product (phosphate), and a mining-intensive product (potash) within the same quarter. Russia's invasion of Ukraine on February 24, 2022, the geopolitical disruption most likely to be offered as an alternative explanation, cannot account for prices that were more than double their 2019 average baselines in the fourth quarter of 2021: ammonia had already risen 242% above its 2019 average baseline, urea 191%, potash 148%, and phosphate 136%.

119. The post-peak behavior of prices is equally probative of coordination. After reaching their 2022 highs, prices declined through 2023 and into 2024, but none returned to pre-conspiracy levels. By the fourth quarter of 2024, ammonia stood at $597/st (48% above the 2019 average baseline); urea at $385/st (35%); phosphate at $644/st (92%); and potash at $315/st (8%).

120. Then, in 2025, rather than completing their return to competitive equilibrium, U.S. Fertilizer Product prices resumed an upward trajectory and by the third quarter of 2026 prices were higher still. This pattern of partial retreat followed by renewed coordinated escalation is the signature of an ongoing conspiracy, not of a competitive market.

121. From 2016 through 2020, prices for the Fertilizer Products were only modestly correlated: the pairwise correlations in price levels ranged from 0.11 to 0.54, including just 0.11 for potash and DAP, 0.28 for ammonia and DAP, and 0.33 for ammonia and potash. Beginning in 2021, however, those relationships changed dramatically. From 2021 through 2025, the corresponding correlations increased to 0.61, 0.75, and 0.84, respectively, while correlations among the other fertilizer pairs likewise rose to between 0.74 and 0.83. Thus, across all six pairings, price-level correlations increased substantially after 2020. This abrupt shift from relatively independent pricing to highly synchronized pricing across the NPK complex is

consistent with a common pricing strategy rather than merely independent responses to product-specific supply-and-demand conditions.

**Table 2. Price Correlations Among U.S. Fertilizer Products, 2016–2020 v. 2021–2025**

| Correlation (r) | 2016–2020 | 2021–2025 |
|---|---|---|
| Potash-DAP | 0.11 | 0.61 |
| Potash-Urea | 0.54 | 0.74 |
| DAP-Urea | 0.50 | 0.77 |
| Ammonia-Potash | 0.33 | 0.84 |
| Ammonia-DAP | 0.28 | 0.75 |
| Ammonia-Urea | 0.40 | 0.83 |

122. Prices across products made from different raw materials and through different industrial processes became substantially more synchronized during the Class Period than during the preceding five years. Considered together with Defendants' concentrated and overlapping market positions, parallel price announcements, coordinated supply restrictions, expanded margins, and repeated opportunities to exchange information, that synchronization is economic evidence consistent with coordinated pricing.

123. Green Markets reports weekly benchmark prices for each Fertilizer Product across the United States, from the U.S. Gulf, Central Florida, the Eastern and Western Cornbelt, the Great Lakes, the Northern and Southern Plains, the South Central and Southeast regions, the Northeast, California, and the Pacific Northwest. Prices can differ slightly from one region to another, largely reflecting the cost of transporting product, but they move together as any significant price variance can be arbitraged away. As shown in Table 3 below, from June 2022 through October 2026, the average correlation between weekly prices in any two U.S. regions for the same Fertilizer Product ranged from 0.92 for ammonia to 0.98 for potash.

**Table 3. Correlation of U.S. Regional Fertilizer Prices, Weekly, June 2022 to October 2026**

| Product | U.S. Regions | Average correlation between regions |
|---|---|---|
| Ammonia | 9 | 0.92 |
| Urea | 11 | 0.94 |
| DAP | 10 | 0.97 |
| MAP | 11 | 0.93 |
| Potash | 11 | 0.98 |

124. Defendants' conspiracy affected Fertilizer Product prices throughout the United States, not in separate regional markets. The same Defendants supply purchasers in every region through overlapping production facilities, pipelines, terminals, and distribution networks, and the inflated prices they set reached purchasers in every part of the country.

125. These inflated prices have persisted and are harming American farmers now. Farmer bankruptcies in the United States rose 46% in 2025. In July 2025, the Argus Fertilizer Affordability Index stood at 0.71, "well below the baseline of 1," meaning that a farmer had to sell 206 bushels of corn to afford one short ton of DAP, compared with the historical average of 133 bushels.

### b. Defendants Implemented Parallel Price Increases and Inflated Prices to Supracompetitive Levels During the Class Period

126. Defendants' public financial disclosures show that they raised prices in parallel. From 2021 through 2026, average realized prices for nitrogen, phosphate, and potash products moved in near-perfect parallel across Nutrien, CF Industries, and Mosaic.[9] Figure 11 below plots those movements.

[9] Koch Fertilizer is a private company and Yara International is a foreign entity; neither discloses price data.

**Fig. 11. Defendants' Average Realized NPK Fertilizer Prices, 2016–2026**[10]




127. Industry trade reporting corroborates the parallel pricing shown in Defendants' own financial disclosures. Green Markets reports provide contemporaneous evidence of Defendants'

---

[10] All prices have been converted from per metric-ton to per short-ton prices where necessary. For Nutrien, the analysis covers average realized prices across all three of its primary fertilizer product lines—potash, phosphate, and nitrogen. The potash price data reflects North American sales only, consistent with Nutrien's segment reporting. Nutrien's phosphate price data reflects the entire company, as its phosphate operations are heavily concentrated in North America and supplemented by exports to global agricultural markets. Nutrien's nitrogen price data likewise reflects the entire company; however, Nutrien sells the substantial majority of its nitrogen products within North America, making its total nitrogen figures a reliable proxy for its North American market pricing. The Nutrien pro forma data was calculated by creating a weighted average of average realized prices of PotashCorp and Agrium based on each company's respective sales volumes during the pre-merger period from 2016 through 2017.

For Mosaic, the price analysis is limited to Mosaic's North America segment (which encompasses its potash and phosphate sales operations in the United States and Canada) and excludes Mosaic's South America segment, known as Fertilizantes, which operates as a distinct regional business serving different agricultural markets. The North America segment does include a portion of exports to Asia, but the dominant share of its sales activity is directed to North American agricultural markets.

For CF Industries, the analysis reflects average realized prices across the entire company's nitrogen product lines. CF Industries is the most geographically concentrated of the three public

coordinated pricing conduct. As Green Markets documented throughout the Class Period, Defendants repeatedly made parallel pricing announcements, across multiple fill cycles, nutrient categories, and regions within the United States. These episodes confirm that the parallel pricing reflected in Defendants' SEC filings was not a statistical artifact but the product of repeated coordinated pricing.

128. Nutrien and Mosaic, which together control more than 80% of North American potash and phosphate production capacity, reported average realized prices that tracked each other almost exactly throughout the Class Period.

Defendants, with the substantial majority of its production and sales conducted in North America; the United States typically accounts for the largest share of CF Industries' sales volumes. CF Industries does operate nitrogen production assets in the United Kingdom and sells that product into European markets, but those operations represent a modest share of total company output and do not materially affect the North American pricing trends documented herein.

**Fig. 12. Nutrien v. Mosaic Average Realized Potash Fertilizer Prices, 2016–2026**




129. Nutrien's average realized potash price rose from $174/st in Q4 2020 to $621/st in Q1 2022, a 256% increase over six quarters. Mosaic's average realized potash price rose from $160/st to $528/st over the same six quarters, a 231% increase. Both producers reached their absolute peaks in the same quarter, Q2 2022: Nutrien at $661/st and Mosaic at $615/st, a spread of only 7.5% between the two dominant producers at the height of the market.

130. Green Markets reporting confirms that Nutrien and Mosaic moved potash prices in tandem. On June 22, 2022, Mosaic announced that its potash prices were approximately $91/st to $109/st higher in the second quarter of 2022 than in the first. Potash fill pricing at Midwest terminals for orders placed by August 3, 2022, ranged from $760/st to $765/st. "After that date, both Nutrien and Mosaic said pricing for new orders will be up $35/st." On December 16, 2022, as NOLA potash barge prices fell to $480/st to $490/st from $490/st to $500/st the previous week, Mosaic posted its NOLA-equivalent price at $500/st to push prices back up. On January 27, 2023,

the potash market in the Northeast United States stood at $470/st to $495/st, "with the upper end reflecting Nutrien's posted fill level in mid-January."

131. Nutrien and Mosaic did not merely price in parallel; their public messaging matched as well. On Nutrien's Q1 2024 earnings call, an analyst "noticed that Mosaic and [Nutrien] had identical messaging on potash pricing."

132. On January 8, 2026, Nutrien and Mosaic both announced potash winter-fill prices of approximately $350/st –355/st at Midwest terminals, one day after Canpotex, their jointly owned potash export organization, announced that its sales were fully committed through March 31, 2026. Nutrien announced a further $20/st increase on January 22, 2026.

133. As of Q3 2026, Nutrien's average realized potash price of $281/st remained 28% above its pre-conspiracy 2019 average of $220/st, and Mosaic's price of $250/st remained 16% above its 2019 average of $215/st. Two dominant potash producers pricing independently would have strong incentives to undercut each other to capture share at historically profitable prices. Instead, their average realized prices moved in lockstep throughout the conspiracy period, rising together, peaking together, and declining together, without meaningful divergence.

134. The same pattern holds for phosphate.

**Fig. 13. Nutrien v. Mosaic Average Realized Phosphate Fertilizer Prices, 2016–2026**




135. Nutrien's average realized phosphate price rose from $277/st in Q1 2020 to a peak of $806/st in Q2 2022, a 191% increase. Mosaic's price rose from $249/st to a peak of $835/st over the same period, a 236% increase. Both producers reached their absolute peaks in the same quarter.

136. On June 22, 2022, Mosaic announced that its phosphate prices were approximately $118/st to $136/st higher in the second quarter of 2022 than in the first.

137. As of Q3 2026, Nutrien's average realized phosphate price of $709/st remained 112% above its pre-conspiracy 2019 average of $335/st, and Mosaic's price of $760/st remained 159% above its 2019 average of $293/st. The lowest post-peak phosphate price either producer recorded, Nutrien's $428/st in Q3 2023, was still 28% above Nutrien's 2019 average, and Mosaic's post-peak low of $442/st, also in Q3 2023, remained 51% above its 2019 average.

138. The nitrogen price data tells the same story for Nutrien and CF Industries, and price announcements show that Koch joined their coordinated pricing.

**Fig. 14. Nutrien v. CF Industries Average Realized Ammonia Fertilizer Prices, 2016–2026**




139. Nutrien's average realized ammonia price rose from $196/st in Q4 2020 to a peak of $1,050/st in Q2 2022, a 436% increase. CF Industries' average realized ammonia price rose from $273/st to a peak of $1,077/st over the same period, a 295% increase. At their absolute peaks, reached in the same quarter, the two largest U.S. nitrogen producers were separated by only $27/st, approximately 3%.

140. Green Markets reporting shows that Koch priced in parallel alongside Nutrien and CF Industries. On October 14, 2022, the last confirmed offers from CF Industries and Koch terminals in the Eastern Cornbelt were both within the $1,275–1,300/st range. On December 9, 2022, ammonia prices ranged from $1,210/st to $1,260/st in the Western Cornbelt (Iowa, Nebraska, and South Dakota), with "the high reflecting the last offers from Koch and CF [Industries] terminals."

141. As fertilizer prices fell in 2023 from their 2022 peak, Defendants coordinated their pricing to hold prices above competitive levels. On February 8, 2023, CF Industries and Koch

both posted ammonia prices for March through June shipments to terminals in Indiana and Illinois at $840/st to $850/st. On March 8, 2023, CF Industries and Koch both posted ammonia prices of $725/st for terminals in Indiana and Illinois.

142. Even during the price decline, Defendants successfully coordinated to push fertilizer prices up. According to Green Markets, "[a]mmonia prices firmed to $465–$485/st FOB in the Eastern Cornbelt for prompt or prepay tons, up from $445–[$]455/st FOB last week, with the low reflecting new offers from Koch on July 24 FOB Wood River, Ill. CF [Industries] reportedly followed on July 25, pushing its prices to $480/st FOB in Illinois and $485/st FOB in Indiana, with Nutrien reposting at $485/st FOB Lima, Ohio."

143. The sequence shows the price rising as each Defendant posted in succession. In a competitive market, firms undercut each other to capture share. Here, CF Industries, Koch, and Nutrien coordinated to raise the price.

144. The pattern repeated in October 2023. In early October, CF Industries' Eastern Cornbelt ammonia price was $725/st; by October 13, Koch reportedly had increased its Illinois and Indiana prices to $740/st–750/st, and reported offers remained in that range through October 27.

145. Defendants continued to raise prices in 2024. On March 8, 2024, Green Markets reported that CF Industries "raised [ammonia] prices first to $635/st FOB and then to $645/st FOB in the [Eastern Cornbelt] region, while Koch was quoted at the $635/st FOB level at most terminals." On June 20, 2024, CF Industries and Koch announced July and August ammonia fill program offers of $410/st at terminals in Illinois and Indiana and $390/st to $395/st in the Western Cornbelt. On August 15, 2024, CF Industries and Koch reportedly increased prices to $545/st or

higher at ammonia terminals in Illinois and Indiana after both companies had offered $535/st earlier that week.

146. On June 25, 2025, CF Industries and Koch both launched summer fill and fall prepay ammonia prices of $560/st for June through August and $640/st for October through December. At the time, the Tampa import benchmark stood at $378/st, putting the summer-fill price approximately $182/st above that benchmark. Rather than narrowing the gap, CF Industries raised its Illinois and Indiana fill prices to $585/st by July 4, 2025.

147. As of Q3 2026, Nutrien’s average realized ammonia price of $418/st remained 87% above its pre-conspiracy 2019 average of $223/st, and CF Industries’ price of $532/st remained 73% above its 2019 average of $308/st. Even at their lowest post-peak levels, both in Q3 2023, neither producer’s price fell below its 2019 average.

148. The gap between Nutrien’s and CF Industries’ ammonia prices also narrowed. From Q1 2021 through Q3 2026, the average quarterly ammonia price difference between the two producers fell to approximately 14% of their average price, down from approximately 22% during the pre-conspiracy period from Q1 2016 through Q4 2020 (using, for 2016 and 2017, the sales-volume-weighted average of the prices reported by Nutrien’s predecessors). That tightening occurred precisely as prices tripled and the financial incentive to undercut a competitor was greatest.

**Fig. 15. Nutrien v. CF Industries Average Realized Urea Fertilizer Prices, 2016-2026**




149. For urea, Nutrien's average realized price rose from $245/st in Q4 2020 to a peak of $710/st in Q1 2022, a 190% increase. CF Industries' average realized urea price rose from $247/st to a peak of $705/st in Q2 2022, a 185% increase. The two producers peaked within one quarter of each other.

150. As of Q3 2026, Nutrien's average realized urea price of $441/st remained 59% above its pre-conspiracy 2019 average of $278/st, and CF Industries' price of $423/st remained 54% above its 2019 average of $275/st. The lowest post-peak urea price either producer recorded, CF Industries' $330/st in Q3 2024, was still 20% above CF Industries' 2019 average, and Nutrien's post-peak low of $359/st in Q3 2023 remained 29% above its 2019 average.

151. In the pricing episodes outlined in this section, no single Defendant consistently set the price. In ammonia, Koch moved first in July and October 2023, and CF Industries moved first in March 2024 and July 2025. In potash, Mosaic moved first in December 2022 and Nutrien in January 2026. Nor did the Defendant that moved second simply match the first. In July 2023, CF Industries posted $480/st to $485/st after Koch offered $465/st, and Nutrien then matched CF

Industries' higher price. In October 2023, Koch raised its price above CF Industries' $725/st. In many other episodes, no Defendant moved first at all. CF Industries and Koch posted the same ammonia prices in February and March 2023, June and August 2024, and June 2025, including identical summer-fill and fall-prepay prices for two separate delivery windows. Nutrien and Mosaic announced the same potash increase in August 2022 and the same fill prices in January 2026. A rotating first mover, second movers that priced above the first, and repeated identical prices posted by competitors are difficult to reconcile with independent firms reacting to the price of a single dominant producer and are consistent with a shared understanding of where prices should go.

#### c. Defendants' Parallel Pricing During the Class Period Is Confirmed by Statistical Analysis

152. The parallel pricing documented in Defendants' own SEC filings is not merely a visual pattern; it is statistically demonstrable. Standard econometric analysis of Defendants' average realized price data across all four product categories confirms that Nutrien, CF Industries, and Mosaic priced their Fertilizer Products in near-perfect coordination throughout the Class Period.

153. The most fundamental measure of pricing coordination is the Pearson correlation coefficient, which measures how closely two variables move together over time: 1.0 indicates perfect parallel movement, and 0.0 indicates no relationship. For ammonia, the correlation between Nutrien's and CF Industries' average realized prices across the Class Period is 0.983, reflecting near-perfect parallel pricing. For urea, it is 0.972. For potash, the correlation between Nutrien and Mosaic is 0.978. For phosphate, it is 0.960. Every product comparison yields a correlation at or above 0.96, confirming that these companies were not pricing independently of one another.

154. For every product, those correlations are also higher than the correlations between the same producers' prices during the pre-conspiracy period from Q1 2016 through Q4 2020: the ammonia correlation rose from 0.784 to 0.983, the potash correlation from 0.790 to 0.978, the phosphate correlation from 0.678 to 0.960, and the urea correlation from 0.931 to 0.972. Because Nutrien was formed on January 1, 2018, through the merger of PotashCorp and Agrium, these pre-conspiracy comparisons use, for 2016 and 2017, the sales-volume-weighted average of PotashCorp's and Agrium's reported prices.

155. Price gap stability supplies another probative measure of coordination. In competitive markets, the price gap between two producers of the same fungible commodity fluctuates significantly over time as each responds to its own cost pressures, capacity utilization, and competitive position. A stable, narrow gap that persists across years and across dramatically different absolute price levels is inconsistent with independent pricing. For ammonia, the mean price gap percentage is only 14.2%, with a coefficient of variation of 0.53, which indicates that the gap is not only narrow but stable relative to its mean. For phosphate, where Mosaic's phosphate fertilizer capacity is more than four times Nutrien's, the mean percentage gap is just 4.2%, down from approximately 11% from 2016 through 2020, with a coefficient of variation of only 0.61. Two producers of such different scale maintained an average price gap of less than 5% across 23 quarters, a span in which their absolute prices ranged from approximately $386/st to $835/st. Pricing alignment this close between producers of fundamentally different scale is not a feature of competitive markets. It is the signature of coordination.

156. Key pricing episodes during the Class Period further illustrate the coordinated nature of Defendants' conduct. From Q1 2021 through Q4 2021, the initial escalation phase of the conspiracy, Nutrien raised its average realized ammonia price from $252/st to $595/st, a 136%

increase, while CF Industries simultaneously raised its ammonia price from $302/st to $659/st, a 118% increase. Both producers then reached their absolute ammonia price peaks in the same quarter, as set forth above, and neither attempted to capture share by undercutting the other at the peak. The descent was equally synchronized: from Q3 2022 through Q4 2023, Nutrien's ammonia price fell from $841/st to $377/st while CF Industries' fell from $826/st to $460/st, and neither producer cut aggressively to gain share.

157. The urea episode mirrors the ammonia pattern precisely. From Q1 2021 through Q4 2021, Nutrien raised urea prices from $298/st to $608/st, a 104% increase, while CF Industries simultaneously raised urea prices from $302/st to $650/st, a 115% increase. That near-identical escalation occurred in a product whose price, in a competitive market, should turn on each producer's independent cost and capacity position.

158. For potash and phosphate, Nutrien's and Mosaic's prices surged in near unison over the eight quarters from Q1 2021 through Q4 2022 (potash by 148% for Nutrien and 190% for Mosaic, and phosphate by 55% and 69%, respectively). Finally, the most recent data, from Q1 2025 through Q3 2026, confirms that the conspiracy remains ongoing: Nutrien maintained ammonia prices between $363/st and $552/st while CF Industries maintained prices between $418/st and $677/st, reflecting continued price discipline with minimal competitive divergence.

159. Taken together, the price correlation, price gap stability, and key episode analyses constitute a statistically rigorous and mutually reinforcing body of evidence that Defendants' Class Period pricing was coordinated rather than independent. No combination of shared input costs, common demand conditions, or rational oligopolistic awareness can explain correlation coefficients of 0.96 to 0.98 and mean price gaps of approximately 4% to 14% between producers whose production levels, cost structures, and operational circumstances differed materially

throughout the period. Defendants priced their Fertilizer Products in coordination, not in competition.

#### d. Raw Material and Supply Chain Costs Cannot Explain the Dramatic Price Surge

160. Defendants have at times attributed Class Period prices to a series of overlapping supply shocks, but the regression analysis illustrated in Figure 16 below, which accounts for natural gas costs, demand, seasonal factors, and the effects of the war in Ukraine, shows that they cannot account for the size or persistence of the Class Period price increases. At best, they supplied a convenient pretext for price increases caused by Defendants' underlying conspiracy.

161. Figure 16 below compares actual fertilizer prices with the prices that supply-and-demand fundamentals would predict. The analysis is an ordinary least squares regression using 200 months of data, from January 2010 through August 2026. It measures fertilizer prices using the producer price index for fertilizer manufacturing reported by the Federal Reserve Bank of St. Louis (FRED) and controls for: (i) the cost of natural gas, measured by the monthly Henry Hub spot price; (ii) fertilizer demand, measured by U.S. corn acres planted each year as reported by the USDA's National Agricultural Statistics Service; (iii) the April-through-June spring planting season; and (iv) the effects of Russia's invasion of Ukraine, through a variable beginning in March 2022. The model also includes a variable beginning in January 2021, the start of the Class Period, which measures how far prices departed from the model's predictions once the conspiracy began.[11]

[11] FRED series PCU3253132531 (fertilizer manufacturing producer price index) and MHHNGSP (Henry Hub natural gas spot price), downloaded October 20, 2026; USDA NASS annual corn acres planted. The Ukraine variable equals one beginning in March 2022; the Class Period variable equals one beginning in January 2021.

**Fig. 16. U.S. Fertilizer PPI Actual Price vs. Supply-and-Demand Predicted Price, January 2010-August 2026**




162. The model captures the principal economic forces that determine fertilizer prices in a competitive market. It explains approximately 74% of the variation in fertilizer prices over the period, and each control variable has the expected effect and is statistically significant: higher natural gas costs, more corn acres planted, the spring planting season, and the war in Ukraine are each associated with higher fertilizer prices.

163. After accounting for all of those factors, fertilizer prices during the Class Period were approximately 45 index points higher than the model predicts, a result that is statistically significant at the 1% level. That premium is in addition to the separate increase of approximately 30 index points that the model attributes to the war in Ukraine beginning in March 2022. The divergence is also persistent. Actual prices exceeded the model's predicted prices in 96% of the months from January 2021 through August 2026, compared with 44% of the months from January

2010 through December 2020. Before the Class Period, actual prices fluctuated around the model's predictions; during it, they remained above those predictions almost without interruption, consistent with coordinated conduct rather than normal market forces.

164. Defendants' own prices track the government's producer price indices for nitrogen and phosphate fertilizer. During the Class Period, the correlation between the FRED nitrogen fertilizer producer price index and Defendants' quarterly realized prices was 0.96 for CF Industries' ammonia, 0.92 for Nutrien's ammonia, 0.91 for CF Industries' urea, and 0.93 for Nutrien's urea. The FRED phosphate fertilizer index likewise tracked Mosaic's and Nutrien's realized phosphate prices, with correlations of 0.92 and 0.87, respectively. The FRED price indices used in the regression therefore reflect the prices Defendants actually charged.

165. Corn acres planted, the model's demand variable, is a reliable measure of fertilizer demand: corn is the largest user of fertilizer in the United States, and acreage is a statistically significant predictor of fertilizer prices in the model. Figure 17 below compares the fertilizer price index with U.S. corn acres planted from January 2010 through August 2026. From 2010 through 2020, corn plantings ranged from roughly 86 to 97 million acres, and the fertilizer price index generally stayed between roughly 150 and 240.

**<u>Fig. 17. Fertilizer PPI and Corn Acres Planted, 2010-2026</u>**




166. Beginning in 2021, that relationship broke down. Corn plantings stayed within a similar range of roughly 88 to 99 million acres, while the fertilizer price index more than doubled, from roughly 160 in 2020 to more than 350 in 2022, and has remained above 220 since. A change in demand of that size cannot explain a price increase of that magnitude, and the breakdown of the historical relationship between fertilizer prices and their principal demand driver is further evidence that factors other than normal supply-and-demand conditions drove prices during the Class Period.

167. Natural gas is the dominant variable-cost input for nitrogen fertilizers. When natural gas prices were high in 2021, CF Industries CEO W. Anthony Will admitted that "the steeper global cost curve increases margin opportunities for low-cost producers such as CF" and other major fertilizer producers. Yet throughout the Class Period, Defendants publicly attributed fertilizer price increases to rising natural gas costs. Figure 18 tests that claim directly, quantifying

the disconnect between natural gas input costs and urea prices in the U.S. market and demonstrating that Defendants' cost-pass-through explanation cannot account for either the magnitude or the persistence of the Class Period price increases.

**Fig. 18. Actual U.S. Urea Prices vs. Expected Urea Prices Based on U.S. Natural Gas Changes, 2016-2026**[12]




---

[12] Figure 16 uses an index of Bloomberg series GCFPURCA, GCFPURWS, GCFPURMC, GCFPURNP, GCFPURNE, GCFPURPW, GCFPURSC, GCFPURSE, GCFPURSP, and GCFPURGL from Q1 2016 to Q3 2026 and IMF series PNGASUSUSD Q. The US Henry Hub natural gas price in USD per mmBtu is multiplied by 20 to determine its approximate impact on the cost of urea production, then shifted so that it has the same average level as the U.S. urea price index during 2016 through 2020.

168. While Defendants do produce nitrogen fertilizers outside the United States, the net import reliance for nitrogen fertilizer is only 6%. Figure 18 compares actual U.S. urea prices paid by fertilizer purchasers (red line) with the price urea should have cost based on changes in the price of natural gas in the United States, its primary raw material (blue line). The shaded gray area between the two lines represents the portion of urea prices that natural gas cost changes cannot explain. Across the Class Period, the U.S. urea price exceeded the gas-cost-predicted price by an average of $236 per ton, a persistent gap borne across the millions of tons of urea sold to American purchasers.

169. From 2016 through 2020, before the conspiracy, the red and blue lines both stay between roughly $225 and $340 per ton, with actual prices running slightly above the gas cost prediction at times and slightly below at others. Those deviations were normal, short-lived, and consistent with competitive commodity pricing.

170. That pattern broke in early 2021, when actual urea prices diverged sharply from the cost-predicted price. By early 2022, some fertilizer purchasers were paying nearly $1,000 per ton for urea even though natural gas cost increases justified no more than $400 per ton, a gap of roughly $600 per ton. Rising natural gas costs, the justification Defendants repeatedly offered for the 2021 and 2022 price spikes, explain only a fraction of the increase; the remainder reflects a substantial and sustained departure from cost-based pricing.

171. The period after the 2022 peak is more telling still. Natural gas prices fell sharply, and the gas-cost-predicted urea price dropped accordingly, back to roughly $300 per ton. Yet actual urea prices remained between $385 and $530 per ton through 2025, a persistent premium of approximately $100 to $200 per ton for three consecutive years. In 2026, the gap widened: actual urea prices rose as high as $770 per ton while cost-predicted prices held at roughly $300 per ton.

172. A regression analysis of Defendants' own urea prices confirms that natural gas costs and demand conditions do not explain the Class Period increase. The analysis uses CF Industries' and Nutrien's quarterly realized urea prices from the first quarter of 2010 through the third quarter of 2026 and controls for the cost of natural gas, corn acres planted, spring planting-season demand, and the supply disruption caused by Russia's invasion of Ukraine.[13] After accounting for those factors, Defendants' urea prices during the Class Period were approximately $104 to $144 per ton higher than the model predicts, and the result is statistically significant at the 1% level. That premium is not explained by the cost and demand factors Defendants have cited, and it is consistent with the coordinated conduct alleged in this Complaint.

173. A temporary cost shock produces a gap that narrows over time. A coordinated pricing strategy produces a gap that persists or grows. Defendants priced urea far above cost-justified levels for years, creating a sustained and expanding margin that natural gas costs cannot explain.

174. Independent economic research reaches the same conclusion. In 2024, economists at Texas A&M University's Agricultural and Food Policy Center published a paper examining fertilizer market conditions and concluded that "increases in the cost of natural gas prices explained less than 20% of the increase in fertilizer prices paid by producers in 2022."

175. Defendants' own financial reports concede that increased natural gas prices had minimal impact. Yara's 2021 third quarter report stated that the rise in natural gas prices had a "limited" "impact on finished fertilizer production." In its 2022 quarterly reports, Yara reported

---

13 The model is an ordinary least squares regression of 134 quarterly price observations. It uses the Henry Hub natural gas spot price reported by the Federal Reserve Bank of St. Louis (FRED), quarterly U.S. corn acres planted from the USDA National Agricultural Statistics Service, an indicator for the April–June planting season, an indicator for the period beginning in the second quarter of 2022, and an indicator for the Class Period beginning in the first quarter of 2021.

that it enjoyed similarly inflated profit margins because of “higher ammonia prices” and “higher production margins on ammonia.”

176. In May 2022, Nutrien likewise reported increased profitability in its Nitrogen segment, which it attributed to “higher net realized selling prices that more than offset higher natural gas costs.”

177. In its 2022 Annual Report, CF Industries reported a 265% increase in net earnings from 2021 to 2022, which it claimed was “due primarily to higher average selling prices, partially offset by higher natural gas costs,” i.e., an admission that it raised prices above input costs.

178. Defendants also admit that they use natural gas derivatives and other financial mechanisms to hedge against increased natural gas prices. In 2024, for example, CF Industries acknowledged that it “utilize[s] natural gas derivatives to hedge [its] financial exposure to the price volatility of natural gas[.]” Mosaic similarly discloses in its annual reports that it uses “financial derivative contracts to manage the pricing on portions of our natural gas requirements” and that its “natural gas derivatives . . . are used to manage the risk related to significant price changes in natural gas.” Yara goes further still, disclosing that it “minimize[s]” its energy risk through “global purchasing activities” and that at some of its plants it has “the operational flexibility to reduce gas purchases and import ammonia for fertilizer production if gas prices peak.” Yara further acknowledges that it “benefit[s] from a natural hedge in the correlation between nitrogen fertilizer prices and global energy prices.” Yara thus admits that its own financial position benefits from the same correlation between energy costs and fertilizer prices that Defendants publicly cite as the cause of price increases. That admission confirms that rising natural gas prices were not a burden Defendants were forced to pass through, but a market dynamic their pricing strategies were engineered to exploit.

179. Natural gas is the main input cost in nitrogen fertilizer. If CF Industries' prices simply passed through its costs, natural gas prices should explain most of the movement in those prices. They explain only part of it. From 2021 through 2026, Nutrien's prices alone account for about 97% of the variation in CF Industries' quarterly ammonia price and about 94% of the variation in its urea price. The Henry Hub natural gas price alone accounts for only about 61% and 47% of CF Industries' ammonia and urea prices, respectively. That is, CF Industries' nitrogen prices tracked Nutrien's prices much more closely than they tracked CF Industries' largest input cost.

180. This disconnect between Defendants' input costs and prices extends beyond natural gas and nitrogen.

181. Mosaic admitted in 2022 that although it paid $840 million more for the raw materials used in phosphate fertilizer production (sulfur and ammonia), the gross profit margin of its Phosphates segment had increased by approximately $500 million since 2021. Nutrien likewise reported that profitability in its Phosphate segment increased in 2022 primarily because of "higher net realized selling prices" for phosphate fertilizer products, which more than offset increases in production costs.

182. Nutrien and Mosaic reported similar disparities between their sales price increases and their input costs for potash. Mosaic reported that its Potash segment's MOP selling price rose to $666 per metric ton in Q3 2022 from $290 per metric ton in Q3 2021, while its gross margin per metric ton rose to $373 from $131. Mosaic simultaneously admitted that its cost of production rose only modestly, from $67 per metric ton in 2021 to $78 per metric ton in 2022 and conceded that a portion of that increase consisted of "higher price-related royalties," i.e., a byproduct of its own increased prices.

183. Nutrien's 2022 Annual Report tells the same story. The company attributed its year-over-year 2022 EBITDA gains in the Potash segment to higher sales prices while acknowledging that the bulk of its increased costs were royalties tied to those higher prices: its "Natural gas costs and carbon taxes" for "product manufactured" rose modestly from $51 million in 2021 to $62 million in 2022, a 21% increase, while "royalties" linked to increased sales prices rose from $107 million to $190 million, a 77.6% increase.

184. Supply chain, transportation, and logistics disruptions likewise fail to explain the price increases in Fertilizer Products. The disruptions Defendants have invoked in their public statements share a common deficiency: each was temporary or limited in scope, yet the pricing effects persisted years beyond the underlying event. Winter Storm Uri struck in February 2021 and lasted less than a week. Chinese fertilizer export restrictions began in mid-2021 but primarily affected trade flows to Asia and Latin America; the United States produces the vast majority of its phosphate domestically through Mosaic and imports virtually none from China. Belarus potash sanctions disrupted some global trade routes but did not eliminate supply, because Belarus and Russia found alternative export channels. And as set forth above, fertilizer prices had already doubled or tripled from their 2019 baselines before the February 24, 2022 invasion of Ukraine. None of these disruptions explain why, by late 2024, with U.S. natural gas prices below 2019 levels and no new supply shocks, all four fertilizer products remained above their pre-conspiracy baselines and were rising again. Temporary supply disruptions do not produce permanent price floors. And to the extent that supply disruptions caused increased prices in the United States, the evidence in Section IV(E) below shows that Defendants themselves authored those disruptions.

185. Defendants' more recent excuses follow the same pattern. In August 2026, Mosaic announced that it would idle, curtail, or reduce production at all of its U.S. facilities because

conflicts in the Middle East introduced challenges "related to the availability and affordability of sulfur, an essential input for phosphate fertilizer production." Mosaic's own filings, however, state that it purchases "the majority" of its sulfur from North American refiners and that its sulfur logistics give it "a competitive advantage compared to other producers in cost and access to sulfur." U.S. sulfur is overwhelmingly a byproduct of domestic oil and gas refining, and domestic supply was comparatively insulated from the Middle East disruption. The conflict raised the price Mosaic pays for sulfur, but its North American suppliers continued to produce it. As USDA Deputy Secretary Stephen Vaden said in criticizing Mosaic's idling of its Brazilian plants, reducing output in a high-price market is contrary to basic supply-and-demand economics. Mosaic also ended 2025 with $3.36 billion in inventory, up from $2.55 billion a year earlier, and in April 2026, while U.S. supply was tight, it exported roughly 201,000 tons of DAP and MAP outside North America.

#### e. Domestic Fertilizer Prices Developed a Persistent Premium Over Foreign Benchmarks

186. A comparison of foreign and import prices demonstrates that purported foreign supply disruptions do not explain elevated domestic Fertilizer Product prices.

187. U.S. phosphate prices diverged from relevant foreign prices during the Class Period. From 2016 through 2020, the average price difference between MAP delivered to New Orleans ("NOLA") and MAP delivered to Brazil was approximately zero dollars per metric ton. From 2021 through 2025, NOLA MAP averaged approximately $37 per metric ton, or 7.4%, above the delivered Brazil benchmark. Figure 19 shows this relationship.

**Fig. 19. MAP Prices: NOLA vs. CFR Brazil ($/metric ton), 2016-2025**[14]




188. The change is significant because the Brazil benchmark is a cost-and-freight price that includes delivery to Brazil, whereas the NOLA price is a domestic U.S. benchmark. Before the Class Period, the two series moved closely together with no average domestic premium. During the Class Period, a persistent positive NOLA premium emerged and continued after the 2022 peak. This divergence is consistent with the exercise of market power in the concentrated U.S. phosphate market and inconsistent with an explanation based solely on common global supply conditions.

189. DAP exhibits the same structural break. From 2016 through 2020, the average difference between NOLA DAP and delivered DAP in India was effectively zero, approximately

---

14 Source: Bloomberg. Bottom panel: weekly gap = NOLA price minus CFR Brazil price in the same week (blue = NOLA higher). Red lines = period averages; % is of the CFR Brazil price. NOLA converted from $/short ton (x.1.10231).

negative 0.2%. From 2021 through 2025, NOLA DAP averaged approximately $28 per metric ton, or 5.7%, above the delivered India price.

**Fig. 20. DAP Prices: NOLA vs. CFR India ($/metric ton), 2016-2025[15]**




190. MAP and DAP are phosphate products sold into two separate foreign markets, yet each shows the same change: no meaningful average U.S. premium from 2016 to 2020, followed by a persistent positive NOLA premium from 2021 to 2025. This pattern across both principal phosphate products is inconsistent with the proposition that uniform global commodity shocks affecting a globally priced product explain elevated Class Period U.S. prices. Instead, it corroborates the domestic supracompetitive pricing that Defendants' realized prices and margins show.

15 Source: Bloomberg. Bottom panel: weekly gap = NOLA price minus CFR India price in the same week (blue = NOLA higher). Red lines = period averages; % is of the CFR India price. NOLA converted from $/short ton (x1.10231).

191. U.S. ammonia prices also rose above foreign benchmarks during the Class Period. Ammonia delivered to Tampa, the principal U.S. import benchmark, was historically cheaper than ammonia delivered to India, reflecting North America's natural gas cost advantage: from 2016 through 2020, Tampa ammonia averaged 12% below the Indian price and exceeded it in only three of 20 quarters. During the Class Period, that relationship reversed. Tampa ammonia prices averaged 19% above the Indian price, or about $102 per metric ton, and exceeded it in 17 of 23 quarters.

192. Potash shows a similar shift. Because most U.S. potash comes overland from Saskatchewan, while Brazil relies on imported potash shipped by sea, potash at the U.S. Gulf historically sold at a discount to potash delivered to Brazil. From 2016 through 2020, the U.S. Gulf price averaged 10% below the Brazil price and exceeded it in only two of 20 quarters. During the Class Period, that discount disappeared: U.S. Gulf potash sold at roughly the same price as potash delivered to Brazil and was priced higher in 12 of 23 quarters. Since 2023, U.S. Gulf potash has averaged approximately 4.5% above the Brazil price, exceeding it in nine of 15 quarters, even though Brazil is one of the five largest export markets for Canpotex, the joint venture through which Nutrien and Mosaic sell their potash outside North America. U.S. purchasers thus lost the price advantage that their proximity to Canadian supply had long provided.

#### f. Defendants Pegged Their Prices to Farmers' Maximum Ability to Pay, Not to Legitimate Market Forces

193. Perhaps the most economically revealing feature of Defendants' pricing conduct is the systematic correlation between fertilizer prices and corn prices during the Class Period. That correlation is the product of Defendants' common shift to an ability-to-pay pricing model.

194. In a competitive market, the price of a commodity such as fertilizer is determined primarily by the cost of production (natural gas for nitrogen, phosphate rock and sulfuric acid for

DAP, and mining and processing costs for potash), not by what farmers can afford to pay. If the fertilizer market were competitive, fertilizer prices would not systematically track the price of downstream crops such as corn, because a corn farmer's profitability does not change Defendants' cost of production, such as the cost of synthesizing ammonia from natural gas. In a competitive industry, no producer can charge more than its cost plus a normal return, because rivals would undercut it and capture its customers.

195. A coalition of 24 agricultural organizations, including the Indiana, Ohio, and Wisconsin Farmers Unions, submitted formal comments to the USDA documenting their finding that fertilizer companies peg prices to the sale price of grain rather than to production costs: "In effect, these corporations are tying the price of their products to the farmer's ability to pay, rather than to supply and demand—which equates to an abuse of the market. Such abuses allow concentrated corporations to extract maximum profit out of the supply chain, leaving the farmer with no hope of profitability." That practice severs the link between raw material costs and Defendants' finished product prices.

196. One farmer told the USDA directly: "The price of fertilizer today is set by the producers depending on what the price of corn and beans happens to be." That observation matches what economic theory predicts when a firm with market power practices demand-based pricing; it prices not to cost but to what the market will bear.

197. A 2022 Farm Action Special Report found that "[w]hat appears much likelier than global shortages is that [Fertilizer] price hikes are aligned with the rising prices farmers are able to get their grain harvests[,]" and concluded that "[i]f these corporations are tying the price of their products to the farmer's ability to pay, rather than to supply and demand, that equates to an abuse of the market."

198. Consistent with that ability-to-pay pricing, nitrogen fertilizer prices correlate more strongly with corn prices during the Class Period than they did during the preceding period from December 2014 through December 2020.[16]

199. Defendants have publicly attributed the Class Period price increases in part to increased demand driven by rising crop prices: higher corn and soybean prices, they contend, gave farmers an incentive to plant more acres, which increased fertilizer demand and justified higher fertilizer prices. The empirical record contradicts that defense.

200. The American Antitrust Institute ("AAI") has published research finding that fertilizer pricing behavior is more consistent with coordinated oligopoly than with competition and observing that corn growers face a "margin squeeze," paying higher prices to a small group of powerful input suppliers while selling into commodity markets where prices fluctuate independently. Because Midwestern farmers spent nearly $4 of every $10 of corn production costs on fertilizer in 2021, the ability-to-pay pricing mechanism transferred a massive and disproportionate share of farmers' commodity price gains directly to Defendants' bottom lines.

201. Statements by Defendants' executives on earnings calls corroborate their common scheme to extract as much as possible from farmers. In Q1 2021, Mosaic's CEO publicly acknowledged that "price increases for the integrated producers have largely outpaced production cost increases" and that "grower demand for fertilizer is relatively price inelastic[.]" CF Industries' CEO admitted that market conditions created "a very good platform for a very healthy floor level,

---

[16] The correlation between the U.S. Producer Price Index by Industry for Nitrogenous Fertilizer Manufacturing: Synthetic Ammonia, Nitric Acid, Ammonium Compounds, and Urea compiled by the U.S. Bureau of Labor Statistics, and the Producer Price Index by Commodity: Farm Products: Corn compiled by the BLS is 0.5321 during the Class Period versus 0.4046 prior to the Class Period.

probably higher than what people are anticipating," and that the floors "will be positive" for large producers such as CF Industries and the other Defendants.

202. On a Q2 2021 earnings call, when asked about desired potash pricing going forward, Nutrien's CEO Mayo Schmidt responded: "[W]e are enjoying some prices and we want to continue to enjoy these prices and that's how we are going to think about servicing our growers, to keep them in the game and price accordingly." He thereby calibrated fertilizer prices to farmers' capacity to absorb increases rather than to Nutrien's own production costs.

203. On a Q3 2021 earnings call, Mosaic's CEO said that the market's combination of high demand and low supply meant "further upside in realized pricing for phosphates and potash[]" and "implies higher earnings in the fourth quarter and . . . very strong results continuing into 2022." On CF Industries' Q3 2021 call, its CEO similarly celebrated the "favorable supply-demand dynamics" for large fertilizer producers and a "very, very healthy dynamic that leads to a much longer period of positive fundamentals for our business[]" if it continued "into 2023 and probably beyond." He added that farmers facing rising input costs would not cut back on fertilizer: "if you're a farmer, you can look at different options. But that's not going to come at the expense of nitrogen and probably even at fertilizer. It's going to come at some other issues."

204. On a Q4 2022 earnings call, CF Industries' CEO said, "[l]ooking ahead, we believe that the global nitrogen supply-demand balance and global energy cost structure will continue to present attractive margin opportunities for our cost-advantaged network."

205. On a Q2 2023 earnings call, Yara's CEO expressly pointed to the cereal-to-urea index (which shows affordability of fertilizers for farmers) as a factor for Yara's pricing.

206. On a Q2 2024 earnings call, CF Industries stated that it believed North American nitrogen channel inventories for all products were below average following strong urea and UAN

demand that spring and higher-than-expected planted corn acres. It noted that UAN and ammonia fill programs "achieved prices above 2023 levels despite softening farm economics" caused by falling corn and soybean prices. CF Industries thus acknowledged that fill program prices rose above prior-year levels even as farmer purchasing power declined. In a competitive market, prices fall when buyer purchasing power decreases. CF Industries' prices went up.

207. Neither changes in input costs nor changes in demand explain the magnitude of the increases in ammonia prices beginning in 2021. From 2016–2020 period to the 2021–2025 period, Midwest ammonia prices increased 97%, compared with only 38% for U.S. natural gas and 51% for Illinois corn. Natural gas and corn prices also retreated substantially from their 2022 peaks, while ammonia remained materially above its pre-2021 level. That persistent divergence shows that fertilizer prices after 2020 cannot be explained simply by higher production costs or ordinary commodity-market fundamentals. According to a regression analysis, Midwest ammonia prices reflected an average premium of 40% above natural gas (input costs) and corn prices (demand) ), a result that is statistically significant at the 95% confidence level.

**Fig. 21. Midwest Ammonia, Illinois Corn, and Natural Gas, January 2016-December 2025**




208. Taken together, these statements and the economic evidence corroborate that Defendants collectively used temporary supply disruptions to shift to an ability-to-pay pricing strategy, premised on the shared understanding that farmers have no viable alternative but to accept the prices Defendants collectively set.

**g. The Financial Proof: Defendants' Own Financial Statements**

209. The most compelling proof that cost factors cannot explain Class Period pricing appears in Defendants' own financial statements. In a competitive commodity market, producers facing rising input costs can at best pass those increases on to customers on a roughly one-to-one basis, allowing revenues to rise proportionally while margins remain stable. More often they cannot fully pass through higher costs without risking the loss of customers to lower-priced rivals, so they absorb part of the increase and their margins compress. Margin expansion (profits growing

substantially faster than costs) is not a competitive outcome. It is the economic signature of pricing power exercised above competitive levels.

210. Figure 22 shows the stark difference between the gross margins that the publicly reporting Defendants enjoyed during the five years of the conspiracy period and the margins they enjoyed during the five years before it. Drawn from Defendants' own financial statements, these figures show that the price increases beginning in 2021 did more than offset higher costs; they produced a sustained and simultaneous expansion of CF Industries', Nutrien's, and Mosaic's gross margins. Comparing the five years preceding the Class Period with the five Class Period years for which complete annual data are available eliminates the possibility that the result reflects an anomalous quarter or a single unusually weak baseline year.

**Fig. 22. Defendants' Average Gross Margins Percent, 2016-2020 vs. 2021-2025**




211. As Figure 22 demonstrates, each company achieved materially higher average gross margins from 2021 to 2025 than during the preceding five-year period. That CF Industries, Mosaic, and Nutrien expanded margins simultaneously and to similar degrees is powerful evidence of coordinated pricing, not independent competitive responses to separate cost shocks.

**Fig. 23. Incremental Revenue from Margin Gain, 2021-2025 vs. 2016-2020[17]**




212. Figure 23 shows that Defendants' margin gains were not confined to 2021 and 2022, when prices rose rapidly. The scale of the margin expansion can be measured by applying each company's annual gross-margin increase over its 2016 to 2020 average to that company's annual sales revenue. On that basis, CF Industries generated approximately $8.2 billion, Nutrien approximately $12.1 billion, and Mosaic approximately $6.3 billion in incremental revenue associated with margin gains from 2021 to 2025, for a combined total of approximately $26.6 billion. These gains continued to generate revenue associated with above-baseline margins in later years, including 2024 and 2025. That persistence is consistent with a supracompetitive price structure that outlasted the temporary disruptions invoked to justify the original increases.

213. The breadth and duration of this margin expansion refute any contention that Class Period price increases merely passed on temporary increases in energy, transportation, or raw-

[17] Source: SEC Filings. Margin gain (%) is computed as annual margin (for the 2021-2025 time period) minus the 2016-2020 average margin. Margin gain (%) is then multiplied by company sales revenue each year to get the $ margin gain.

material costs. A cost increase that is simply passed through ordinarily preserves, rather than substantially expands, a seller's percentage margin. Here, the three public Defendants sustained materially higher average margins over a five-year period, even though they produced different fertilizer nutrients using different principal inputs.

214. In a competitive market, margin expansion by one producer would attract supply expansion by competitors seeking share, which would compress margins back toward competitive levels. That discipline never materialized here. All three of these Defendants expanded margins simultaneously, sustained them through 2022, and then allowed them to contract only partially and gradually, moving in lockstep on the way up and on the way down. No Defendant was willing to cut price to capture share at historically profitable margins, which is precisely the behavior a coordinated agreement predicts.

215. Another way to separate legitimate cost pass-through from supracompetitive pricing is to compare how quickly a company's costs rise with how quickly its profits rise. When a firm is merely covering higher input costs, profit growth should roughly mirror cost growth (a ratio close to 1:1), because rivals would undercut prices raised well beyond cost increases and capture share. Ratios substantially above 1:1 signal a breakdown of competitive constraints: a ratio of 5:1 or 10:1 means the firm captures $5 or $10 of additional profit for every $1 of additional cost, an outcome possible only when competitors are not effectively challenging its pricing.

216. Figure 24 applies that diagnostic test, comparing year-over-year changes in cost of goods sold to changes in operating income for Nutrien, Mosaic, and CF Industries across two consecutive periods, 2020 to 2021 and 2021 to 2022. Operating income is the appropriate measure because it reflects core fertilizer profitability, excluding non-operating items such as interest expense, foreign currency effects, and taxes that vary for reasons unrelated to fertilizer pricing.

**<u>Fig. 24. The Cost-Price Disconnect: % Change in COGS v. % Change in Operating Income, by Defendant (2020-2021 and 2021-2022)</u>**




217. The results are striking. Measured against the pre-conspiracy year 2020, the 2020 to 2021 period reveals the most dramatic disconnect. Nutrien's costs rose 17% while its operating income surged 593%, a ratio of 35.3:1, meaning Nutrien captured $35 of additional operating profit for every $1 of additional cost. Nutrien's own executives publicly described the company's strategy during this period as "price over supply." Mosaic's costs rose 20% while its operating income surged 498%, a ratio of 24.6:1. CF Industries' costs rose 25% while its operating income rose 178%, a ratio of 7.1:1. Despite the largest percentage cost increase of the three Defendants, CF Industries grew operating profits at seven times the rate of its cost increases. On August 5, 2024, when natural gas prices were at historic lows, CF Industries' CEO W. Anthony Will said, "Longer term, we expect the global energy cost structure to continue to provide significant margin opportunities for our North American production network[.]"

218. Building on already supracompetitive pricing levels, the pattern persisted from 2021 to 2022. CF Industries' cost of goods sold rose 28% while its operating income rose 212%,

a ratio of 7.5:1. Nutrien's cost of goods sold rose 23% while its operating income rose 142%, a ratio of 6.2:1. Mosaic's cost of goods sold rose 46%, the steepest cost increase of any Defendant in either period, while its operating income rose 94%, a ratio of 2:1. During that period, Defendants publicly attributed the price increases to cost pressures from the Russia-Ukraine conflict. Yet all three Defendants maintained ratios well above the 1:1 competitive benchmark, confirming that the increases went far beyond what cost pass-through required.

219. Across all six company-year observations, every ratio was at least 2:1 and the average ratio was approximately 13.8:1, meaning these Defendants' operating income grew nearly 14 times faster than their costs throughout 2021 and 2022. No plausible cost-based explanation, whether natural gas prices, supply chain disruptions, or geopolitical shocks, accounts for operating profits rising 14 times faster than costs across three companies operating in three nutrient categories with distinct production processes, feedstock inputs, and geographic exposures. If the price increases were independent responses to separate cost shocks, some ratios would approach 1:1. None did. That result is a clear financial signature of coordinated supracompetitive pricing.

220. The same disconnect between costs and profits persisted across the Class Period as a whole. Figure 25 compares each Defendant's average annual cost of goods sold and average annual operating income during the five years before the Class Period (2016 through 2020) with the same averages during the Class Period (2021 through the 12 months ending September 30, 2026). Measured over these longer periods, average costs rose by 31% for CF Industries, 47% for Mosaic, and 36% for Nutrien. These Defendants' average operating income rose by 386%, 662%, and 294%, respectively. For each Defendant, operating income grew roughly eight to 14 times faster than costs.

**<u>Fig. 25. Defendants' Average Cost of Goods Sold and Operating Income, 2016-2020 vs. 2021-2026[18]</u>**




221. Figure 25 confirms that the pattern shown in Figure 24 was not confined to 2021 and 2022, or to a comparison against a single unusual base year. Averaged over five years before the Class Period and more than five years during it, the gap between cost growth and profit growth remains wide for all three Defendants, even though they produce different nutrients from different inputs and faced different cost pressures. If higher prices had merely passed through higher costs, operating income would have grown roughly in line with costs. If the three producers had competed for share, rising margins would have attracted additional supply and price cuts, pushing margins back toward historical levels. Instead, each Defendant's profits grew several times faster than its costs and stayed elevated for the full Class Period. That sustained, parallel expansion is

[18] Bloomberg annual company financials (2016–2025); CF Industries Q3 2026 results; Mosaic Q3 2026 Form 10-Q; Nutrien Q3 2026 results; Agrium and PotashCorp 2016 annual reports. The 2026 figure is trailing 12 months through September 30, 2026 (fiscal year 2025 plus the first nine months of 2026, less the first nine months of 2025). For 2016 and 2017, Nutrien's figures combine PotashCorp and Agrium. Cost of goods sold is sales minus gross profit; figures are reported total-company values.

difficult to explain as independent responses to market conditions and is consistent with coordinated pricing.

**E. Defendants Coordinated Supply Curtailments and Capacity Reductions**

222. Charging the highest possible prices for all three nutrients required one more thing: that no Defendant add the supply that would bring prices down. Throughout the Class Period, Defendants engaged in a sustained pattern of supply restriction using a range of levers: curtailing production, idling plants, underutilizing existing capacity, refusing to restore idled facilities, abandoning announced expansions or declining to add capacity, permanently withdrawing capacity from the markets, and diverting output away from U.S. purchasers, all while fertilizer demand was strong and margins reached historic highs. Read together with Defendants' public statements, that conduct forms a coherent and mutually reinforcing strategy: suppress supply to sustain supracompetitive prices. Defendants claim that their high prices resulted from input prices and international supply disruptions beyond their control, but those explanations were pretextual and served to obscure their coordination.

223. An agreement entered before the Class Period facilitated Defendants' supply coordination. In 2013, CF Industries and Mosaic entered a long-term agreement under which CF Industries supplied the majority (approximately two-thirds) of Mosaic's ammonia needs. When the companies struck the deal, Mosaic stated that one benefit was that it would not have to build its own production facility: "In light of these supply arrangements, Mosaic has decided to forego its proposed ammonia manufacturing plant at its Faustina, La. phosphate facility, saving approximately $1.1 billion in future capital expenditures." The agreement remained in effect until January 2025. The arrangement allowed both companies to avoid adding domestic ammonia capacity: Mosaic abandoned a $1.1 billion plant and CF Industries committed a portion of its domestic output to a co-Defendant rather than offering it to the open market.

224. On its Q4 2021 earnings call, after Defendants began coordinating on supply and price in the wake of the COVID pandemic, CF Industries' CEO expressed confidence that the extraordinary price environment would persist for years. He dismissed any competitive threat that might compress North American producers' margins, stating that he was "not afraid of this boogie man out there that's going to come and dump excess product into the global marketplace," and projected that North American producers would enjoy "three or four years of these huge margin opportunities."

225. Defendants knew they had a multi-year window of unprecedented energy spreads. Yet they chose not to expand production capacity to serve U.S. purchasers at competitive prices. Instead, they directed record cash flows toward share buybacks and export-oriented joint ventures, including CF Industries' Blue Point project, whose output will not begin until 2029 and is slated for international markets, while domestic supply remained constrained and margins remained elevated through 2025. Nutrien, for its part, abandoned its announced potash ramp-up and deferred its planned nitrogen brownfield expansions.

226. Analysts and Defendants' executives alike described the strategy in plain terms. After Nutrien announced in 2023 that it would slow potash production below capacity, an analyst from Raymond James called the strategy "implied supply discipline." On a Q2 2023 earnings call, Nutrien's CEO framed the simultaneous pause of potash and ammonia production expansion as a "commitment to disciplined capital allocation." And on a Q3 2024 earnings call, CF Industries confirmed that domestic "supply and inventories, whether that be with retailers or with producers, is limited[]" and that "sets up a positive environment" for North American producers.

227. Defendants' thinly veiled supply restrictions did not go unnoticed. At the Senate Agriculture Committee hearing on high fertilizer prices held on May 12, 2026, Trent Kubik,

President of the South Dakota Growers Association, testified that U.S. nitrogen manufacturers were not expanding production or capacity utilization as they would in a truly competitive environment: "A resulting rise in margins for U.S. manufacturers should, in theory, encourage expansion of production and higher capacity utilization for the industry. Instead, market power has allowed manufacturers to maintain higher prices while also limiting efforts to use existing manufacturing capacity, at the expense of U.S. farmers." Federal data bear this out: in 2025, U.S. plants actively producing ammonia operated at only about 80% of rated capacity, and one plant was idle for the entire year.

228. Defendants also controlled much of the import supply itself. Between 2021 and 2024, approximately 96% of U.S. ammonia imports came from Canada and Trinidad and Tobago, where Nutrien, CF Industries, Koch, and Yara operated major nitrogen facilities during the Class Period. Defendants' withdrawal of that capacity, including Nutrien's shutdown of its Trinidad operations in October 2025, made indefinite in October 2026, removed import supply that would otherwise have disciplined domestic prices.

229. Defendants took the following steps to restrict the supply of Fertilizer Products to the U.S. market during the Class Period, notwithstanding the record margins on offer:

a. On its Q1 2021 earnings call, Nutrien disclosed that its strategy was explicitly "price over supply," a public declaration that Nutrien would manage production to maximize price rather than to serve farmer demand.

b. On a Q1 2021 earnings call, Mosaic reported that it would decline to restart idled potash production capacity at its Colonsay facility despite admitting that demand for potash was strong, explaining that a restart "will also require a sustained price, probably a little higher than

what it is even today." Consistent with that statement, Mosaic did not bring Colonsay back online until August 2021, and it thereafter curtailed the mine repeatedly, as alleged below.

c. On a Q2 2021 call, Nutrien disclosed that it was "sold out for a period of time" in potash while "continuing to look at the strong prices," and projected that new supply would remain "relatively limited . . . [for] the next couple of years."

d. In September 2021, CF Industries temporarily shut down its two U.K. nitrogen and ammonia production facilities, which the President of the U.K.'s National Farmers Union stated was "likely to further restrict global supply."

e. In its Q4 2021 earnings disclosure, Yara reported that it had reduced European ammonia production to approximately 65% of capacity and would "continue to optimize its operating rates" in 2022, language that, like Nutrien's "price over supply" declaration, signals deliberate market management. Yara International's CEO Svein Tore Holsether publicly described the operating rate reductions as "a responsible response to current market conditions."

f. In June 2022, CF Industries closed its Ince ammonia production facility in the United Kingdom.

g. On a Q2 2022 earnings call, CF Industries admitted that it had deliberately limited its domestic UAN fill program as a strategic choice to prioritize exports.

h. Industry-wide, U.S. ammonia exports rose nearly fivefold between 2021 and 2025, while apparent domestic consumption remained essentially flat.

i. On its Q2 2022 earnings call, Nutrien stated that it had been exporting more UAN from the United States than it previously had and was pursuing opportunities to export more ammonia.

j. In June 2022, Yara took its nitrogen ammonia plant at Belle Plaine, Saskatchewan, one of its principal North American nitrogen production facilities, offline "for a turnaround," during the summer fill pricing window when growers were seeking fertilizer inventory. Yara also operated at 57% of production capacity in Europe during Q3 2022, down from its more typical rate of 80% to 90%. The curtailments removed 1.7 million metric tons of Yara's ammonia capacity and 900,000 metric tons of its finished fertilizer production capacity from the market. In February 2023, Yara International's CEO stated that Yara had opted for "proactive curtailment to optimally manage market conditions" in 2022; Yara's 2022 cut to ammonia output represented 35% of European capacity.

k. In August 2022, CF Industries announced it would "temporarily halt ammonia production at the Billingham [UK] Complex due to market conditions."

l. In December 2022, Mosaic announced a production curtailment at Colonsay, after walking back its claim earlier in the year that it was "ramping up . . . to a targeted 1.8mn–2mn t/year by late 2023." Analysts read the curtailment as a price signal. A BMO analyst observed that "[h]istorically, Nutrien or Mosaic announcing curtailments was typically a positive development for price," likened the market to a game of chicken between suppliers and growers, and read the move as signaling that Mosaic would not produce potash merely for the sake of production.

m. In 2023, Mosaic admitted that its "ability to produce processed phosphates has been less than our annual operational capacity."

n. In May 2023, Yara shut down its Ferrara, Italy, ammonia plant just three weeks after bringing it back online.

o. In August 2023, Nutrien announced that it would "indefinitely pause its ramp-up plans for potash production and halt work on its clean ammonia project at Geismar, Louisiana." Less than a year earlier, Nutrien had announced plans to increase its potash capacity to 18 million metric tons by 2025, a 40% increase over 2020. Nutrien attributed the potash pause to "market conditions," even as it reported that demand was strengthening in North America and that North American channel inventories had ended the first half of 2023 at multi-year lows. At the same time, Nutrien deferred spending on select nitrogen brownfield expansions and projected a reduction of approximately $200 million in 2023 capital expenditures.

p. In 2023, CF Industries ceased operations at the Billingham ammonia facility, the largest ammonia complex in the United Kingdom. The permanent closure eliminated approximately 595,000 short tons of annual ammonia capacity.

q. In its Q4 2023 report, Yara disclosed that "[s]ubdued demand led Yara to curtail some of its European production, totaling 11% of both finished fertilizers and ammonia capacity in the quarter."

r. In February 2024, Mosaic announced that it was "[p]lanning to curtail [potash] production from Colonsay to respond to the market conditions." Mosaic previously curtailed the mine in December 2022, citing inventory sufficient to meet near-term demand; restarted it in July 2023 to ostensibly offset planned maintenance at Esterhazy; and announced a further curtailment in February 2024 in response to "current potash market conditions."

s. In October 2025, Nutrien completed a controlled shutdown of its nitrogen facility in Trinidad, which produced approximately 85,000 metric tons of ammonia and 55,000 metric tons of urea per month. Trinidad and Tobago was the second-largest source of U.S. ammonia imports in 2024, and Nutrien exported more than 220,000 metric tons of ammonia from Trinidad in the

first quarter of 2025 alone; it exported none in the first quarter of 2026. At year-end 2025 it ceased production at its facility in New Madrid, Missouri, which it had used since 2010 to upgrade ammonia and urea into Environmentally Smart Nitrogen ("ESN"), a polymer-coated urea product. Nutrien's 2026 guidance assumes no production from either facility, which together accounted for approximately 1.6 million metric tons of nitrogen sales volumes in 2025, and projects total nitrogen sales volumes of 9.2 to 9.7 million metric tons, down from 10.89 million metric tons in 2025, notwithstanding planned debottlenecks. Nutrien did not claim that the facilities could not operate; it stated that they "contributed marginal free cash flow." And at year-end 2025, Nutrien tested the Trinidad facility for impairment and recognized none, concluding that its recoverable amount, based on ten years of projected cash flows, exceeded its carrying amount.

t. On December 16, 2025, Mosaic began idling single superphosphate ("SSP") production, a phosphate fertilizer produced by reacting phosphate rock with sulfuric acid, at its Fospar and Araxa facilities in Brazil, which together accounted for approximately 30% of its Brazilian production, and suspended future purchases of sulfur. In January 2026, Mosaic extended the curtailment.

u. In April 2026, Mosaic announced that it would shutter two Brazilian phosphate plants. USDA Deputy Secretary Stephen Vaden commented, "[y]ou take a million tons of supply out of the international market, that affects the price worldwide," and "[i]t will only lead to one thing—higher prices."

v. In May 2026, Mosaic withdrew its 2026 phosphate production guidance and announced that it had begun partially curtailing production at its Louisiana and Bartow, Florida facilities and was further scaling back production in Brazil, attributing the reductions to record sulfur prices. Mosaic then curtailed further. By August 2026, Mosaic had idled its Louisiana

phosphate production entirely and was operating its Bartow, Florida, facility at approximately 40% of its targeted rate. Mosaic further disclosed that it was taking, and might continue to take, steps to curtail additional phosphate production in North America and Brazil during the third quarter of 2026.

w. In October 2026, Mosaic announced that it would lay off 199 workers at its South Fort Meade, Florida, phosphate operation after shutting the facility indefinitely, again citing the availability and cost of sulfur. Mosaic said production would resume "when market conditions allow." The curtailments occurred while Central Florida phosphate was described as "sold out for the season" and while U.S. phosphate exports increased sharply.

x. In October 2026, Yara reported that it had "actively managed its European production footprint" in response to high gas prices. As of October 16, 2026, Yara's curtailments were running at 270,000 metric tons of ammonia and 140,000 metric tons of finished products per quarter.

y. In October 2026, Nutrien announced that its Point Lisas nitrogen operations, which often shipped nitrogen to the United States and had been idle since October 2025, would remain shut down indefinitely.

230. Defendants not only pulled back production at their existing facilities; they also failed to take meaningful steps to expand capacity and arrested expansion already underway, despite strong demand and record profits. Defendants' parallel production curtailments, together with their refusal to increase production in the face of strong demand and record prices, are evidence of an agreement to keep prices high.

**F. Government Investigations**

231. Defendants' anticompetitive conduct has drawn sustained attention from federal agencies, Congress, and state officials.

232. In September 2025, the DOJ and the USDA signed a Memorandum of Understanding formalizing their cooperation on competition issues across agricultural input markets, including fertilizers. The memorandum committed the agencies to "protecting American farmers from the burdens imposed by high and volatile input costs[.]" That interagency coordination reflected the federal government's growing concern about structural competition failures in the fertilizer industry.

233. In December 2025, President Trump signed an executive order directing the DOJ and the FTC each to establish a "Food Supply Chain Security Task Force" with authority to aggressively investigate price fixing and anticompetitive practices across the food sector, explicitly calling out fertilizer manufacturers.

234. Congressional concern has mirrored executive branch action. Senator Chuck Grassley of Iowa reintroduced the Fertilizer Research Act, a bipartisan measure requiring the USDA to study pricing and competition across the fertilizer market. On October 28, 2025, the Senate Judiciary Committee held a hearing entitled "Pressure Cooker: Competition Issues in the Seed and Fertilizer Industries," at which farmers testified about the devastating effects of increasing fertilizer pricing and market concentration, and senators from both parties expressed concern and signaled legislative action. U.S. Secretary of Agriculture Brooke Rollins confirmed that the USDA study would proceed in coordination with the DOJ investigation, "to take a look at whether farmers truly have fair choices when buying the inputs that feed the nation."

235. At the October 28, 2025 hearing, Mark Mueller, President of the Iowa Corn Growers Association ("ICGA"), testified that fertilizer costs are crushing corn growers in Iowa and across the country and forcing them to choose between buying fertilizer and staying solvent. He attributed those costs to two decades of unchecked consolidation that left only a few major

companies—Defendants here—controlling each segment of the U.S. fertilizer industry. Dr. Diana Moss, Vice President and Director of Competition Policy at the Progressive Policy Institute, testified that changes in demand for crop commodities and changes in input costs, such as the natural gas needed to produce nitrogen, do not account for fertilizer price changes over the last 25 years, and that "price patterns marked by an unexplainable price spike, followed by a price decrease, then another price spike, may well indicate anticompetitive coordination." Dr. Moss further testified that such dynamics may reflect the formation of a tacit or explicit agreement among producers, its breakdown through defection, and its reconstitution. She added that an analysis of collusive behavior would consider the possibility of regional cartels or a global "super" cartel among fertilizer producers, or the more complex interaction among private companies, government-sanctioned export cartels, and governments themselves.

236. In January 2026, USDA Deputy Secretary Stephen Vaden publicly stated that Nutrien and Mosaic "collude" to limit U.S. fertilizer supply and control prices, and he described their combined market position as a "duopoly" that "constrained fertilizer supply in this country" and "drove up the cost that farmers are paying." Deputy Secretary Vaden added that the administration would not allow these companies to undermine new market entrants or continue their anticompetitive conduct, and he promised to "break up the cute little game that Mosaic and Nutrien have been playing for the last several years." In March 2026, he reiterated that Nutrien and Mosaic were engaging in "duopoly" behavior.

237. In February 2026, the ICGA and the Texas Corn Producers Association each sent letters to then-U.S. Attorney General Pam Bondi asking what the DOJ was doing to pursue possible antitrust actions against the fertilizer industry. As Bloomberg Green Markets reported, the letters

reflected farmers' growing frustration over lower crop returns while fertilizer prices remain "artificially inflated."

238. On March 4, 2026, news outlets reported that the DOJ Antitrust Division's Chicago Office had launched a formal investigation into whether major fertilizer producers colluded or coordinated to raise the prices charged to U.S. farmers. The investigation reportedly targets the Defendants in this action: Nutrien, CF Industries, Mosaic, Koch, and Yara.

239. On March 12, 2026, U.S. Senator Josh Hawley sent letters to the CEOs of CF Industries, Mosaic, Koch, Nutrien, and Yara. Senator Hawley wrote that although the Iranian conflict had recently disrupted the global fertilizer market, including through bottlenecks in the Strait of Hormuz, the price run-ups American farmers face far outpace any disruption from those events, and the share of U.S. fertilizer supply affected by the Strait appears minimal compared with the sudden change in prices. He wrote that "[t]hese latest price hikes are especially troubling because the fertilizer industry is highly concentrated," and he noted public reporting that a small group of firms dominates the domestic market for nitrogen, phosphate, and potash and that the DOJ has been investigating whether leading fertilizer producers coordinated to raise prices. He warned that record retail nitrogen pricing could cripple American corn production after the historic run-ups of 2021 and 2022, and that Congress would not ignore a company using the overseas conflict as a "pretext to raise prices beyond what market conditions justify[.]"

240. Following reports of recent Departmental action, Senator Hawley sent a further letter to then-Attorney General Bondi urging the DOJ to formally investigate recent increases in fertilizer prices. He noted the USDA's finding that fertilizer prices paid by U.S. farmers increased more than 60% overall in 2021, including a 95% increase in nitrogen fertilizer prices and an increase of more than 70% in potash prices. He urged the DOJ to act swiftly if firms are using a

foreign crisis as cover to impose unjustified price increases, restrict supply, or coordinate market behavior.

241. On March 20, 2026, a bipartisan group of senators introduced the Fertilizer Transparency Act of 2026, which would mandate weekly public reporting of fertilizer prices, production volumes, and sales volumes. The sponsors introduced the bill because "rising fertilizer costs and low commodity prices are continuing to erode farmers' profitability."

242. On April 11, 2026, President Trump posted on Truth Social: "The United States will not accept PRICE GOUGING from the fertilizer monopoly! American farmers, we have your back!"

243. The U.S. Senate Agriculture Committee held a hearing on May 12, 2026, titled "Perspectives on the Fertilizer Industry: Ensuring a Stable and Affordable Supply for American Producers." The hearing centered on the high cost of Fertilizer Products sold in the United States, and the testimony showed how Defendants' consolidation and practices produced those prices. Senator Amy Klobuchar opened the hearing by explaining that stubbornly high fertilizer prices have been an issue for years in a market with a handful of domestic suppliers and little transparency into pricing, and that four producers control 77% of Fertilizer Product sales in the United States. The first witness, Trent Kubik, President of the South Dakota Growers Association, testified that the price increase farmers presently face differs from earlier increases because the 2020 price increase did not track an increase in natural gas prices. He testified that undue concentration levels and associated anticompetitive exclusionary practices explain the difference, highlighting the need for increased market transparency and antitrust enforcement. Mr. Kubik further testified that "the market power of fertilizer companies gives them the ability to control the price we pay and restrict supply when it suits their financial needs and without regard to competitive pressure."

244. Other witnesses and Committee members echoed these concerns. Andy Green, Principal and Senior Advisor for Center Market Strategies and former Senior Advisor for Fair and Competitive Markets at the USDA, testified that fertilizer markets' tendency toward anticompetitive behavior is not a new problem and that competition concerns were heightened even before the most recent war. He testified that the current pricing trend is so pronounced that it raises significant questions about whether prices reflect the exercise of fertilizer companies' market power rather than the supply of, and demand for, fertilizer and the costs of inputs. Pointing to the supranormal profits Defendants earned over the past several years, he testified that antitrust enforcers should revisit the mergers and the other conduct and bring enforcement cases.

245. Eddie Melton, President of the Kentucky Farm Bureau, asked the President and Congress for improved research into fertilizer pricing. He testified that opaque pricing and limited options leave producers unable to respond effectively, that 2026 marks the fourth year of decline driven by persistently low commodity prices and elevated fertilizer costs, that 26 farms had filed for Chapter 12 bankruptcy in the first quarter of 2026, and that weakening domestic food production capacity and increasing reliance on foreign supply chains pose a risk to national security. When Senator Peter Welch asked what farmers need, Mr. Melton answered that all farmers ask is to purchase their inputs in a competitive market.

246. Senator Roger Marshall observed that fertilizer costs now amount to 40% of American farmers' total input costs and that American farmers are paying monopoly prices for inputs with no pricing power. Senator Tina Smith stated that fertilizer companies raise their prices because they can, and that this is the market power they have. Citing the Institute for Agriculture and Trade Policy in Minnesota, she stated that the nine largest fertilizer companies made an estimated $84 billion in profits in 2021 and 2022 and that in 2022 major fertilizer companies such

as Mosaic and Nutrien saw profits increase by 100% to 200%. Mr. Kubik responded that farmer profits had not risen at the same rate and that farmers feel taken advantage of because fertilizer companies can disregard their own cost of production and simply set a price. Senator Welch stated that American agriculture is in a crisis because an immense amount of wealth is being created by farmers who are not receiving it, and that farmers whose input costs march upward step by step as the price of corn or oats rises are at the mercy of a consolidated market.

247. On May 28, 2026, the FTC announced that it had opened a "major industrywide investigation into the precipitous rise of fertilizer prices in this country." Announcing the investigation, FTC Chairman Andrew Ferguson said that "USDA data has shown the single largest increase in input costs of farmers across the United States since 2020 has come from fertilizer" and that "these continued price increases are not something our nation, much less our farmers, can continue to ignore." Appearing on Fox News the same day, Chairman Ferguson said that "where there are very few manufacturers it's often good evidence that there's very poor competition," that "farmers deserve the benefit of a free market and free competition, and if they're not getting it, then the FTC needs to fix it," and that "antitrust laws were originally written largely at the behest of farmers who were sick of giant trusts preventing them from getting the benefit of competition and that's what we're gonna make sure is not happening again."

248. On August 3, 2026, USDA Deputy Secretary Stephen Vaden announced that the DOJ and FTC investigations into agricultural input manufacturers were moving forward, that he "expect[s] there to be announcements coming forward in due time that will show that there's some 'there there[,]'" and that the federal government will take "formal action."

249. On September 11, 2026, Deputy Secretary Vaden held a hearing in Iowa with more than 170 farmers from 13 states to discuss fertilizer prices. He told the farmers that USDA leaders

are working as a conduit from farmers to the DOJ and FTC to continue pressing the case that federal antitrust action against the fertilizer industry is needed, and that any forthcoming action would ensure prices reflected "competition instead of collusion." The ICGA specifically named Mosaic, Nutrien, CF Industries, and Koch as the companies responsible for inflated fertilizer prices.

250. On October 5, 2026, U.S. Attorney General Todd Blanche and USDA Secretary Brooke Rollins co-signed an expanded Memorandum of Understanding between the two agencies, escalating to the cabinet level their September 2025 commitment to investigating anticompetitive conduct with respect to food and agricultural inputs, including fertilizer.

251. State authorities have also begun to investigate. On August 13, 2026, Missouri Attorney General Catherine Hanaway met with farmers at the Missouri State Fair and announced that her office, in addition to the federal government, was investigating rising fertilizer costs.

### G. Plus Factors Supporting the Inference of Unlawful Conspiracy

252. Under controlling antitrust law, a plaintiff may establish a Section 1 conspiracy through circumstantial evidence of conscious parallelism augmented by "plus factors," additional facts that, taken together, render an inference of coordinated conduct more plausible than independent action. "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."

253. Recognized plus factors include: (i) market concentration that makes coordination feasible; (ii) conduct against individual self-interest that makes sense only as part of a coordinated scheme; (iii) opportunities for collusion through trade associations and industry meetings; (iv) high barriers to entry that protect coordination from competitive erosion; (v) inelastic demand that enables sustained supracompetitive pricing; (vi) product interchangeability that facilitates uniform

pricing; and (vii) prior antitrust violations reflecting an established culture of anticompetitive conduct. As set forth below, all seven plus factors are present here.

### 1. Extreme Market Concentration

254. Market concentration bears directly on the plausibility of an antitrust conspiracy. The U.S. fertilizer market is one of the most concentrated markets in the American economy. This concentration supplies the structural precondition that makes coordinated pricing feasible and effective.

255. A 2024 Texas A&M University study titled "Concentration and Competition in the United States Fertilizer Industry" reported Herfindahl-Hirschman Index ("HHI") values in the United States of 3,455 for potash, 2,382 for nitrogen fertilizer, and 4,553 for phosphate fertilizer. The HHI equals the sum of the squares of each firm's market share. The DOJ and the FTC treat markets with an HHI value above 1,800 points as highly concentrated.

256. In comments submitted to the USDA, U.S. farmers described an asymmetric power dynamic in the fertilizer industry. They reported being held "hostage while we have no other options" and left "at the mercy of the large conglomerates" that could cause "artificial product shortages" through their "ownership of fertilizer resources."

257. That power dynamic follows from extreme concentration. In nitrogen fertilizer, a market that had "46 firms making Nitrogen" in 1984, CF Industries, Nutrien, Koch, and Yara account for approximately 80% of market share. The United States has only two major potash suppliers, Nutrien and Mosaic, and those two firms likely control a high share of imports as well. In phosphate, the number of producers fell from 11 phosphoric acid producers with 12 million metric tons of capacity to four U.S. phosphate producers with 7.5 million metric tons of capacity in 2021, and Mosaic controls 66% of that capacity.

1. Oligopolistic interdependence neither explains nor justifies Defendants' conduct. A growing chorus of competition literature has critiqued an expansive application of interdependence theory in price-fixing cases. One author, Christopher R. Leslie, explains in a recent article that oligopolists in concentrated markets need conspiratorial agreements for several reasons, including that:

> firms may find it difficult to agree on a single fixed price without inter-competitor discussions, especially when different firms have different profit-maximizing prices. Merely following the leader – as interdependence theory suggests – will not work under such circumstances, which makes actual negotiations necessary.

In the market for Fertilizer Products, Defendants' parallel price increases and sustained price elevation cannot simply be written off as follow-the-leader conduct.

2. Oligopolistic interdependence theory also fails to account for the safeguards that conspiratorial agreement provides against miscommunication between firms. Without an agreement, a firm may misread a rival's innocent price change as cheating and respond with price cuts that unravel parallel pricing. One researcher notes that "[p]rice-fixing conspirators minimize this risk by having frequent collusive conversations to prevent such misunderstandings. Consequently, fixed prices are more stable than interdependent prices." Defendants' elevated prices proved stable across the Class Period.

3. Nor does interdependence explain how Defendants overcame the first-mover problem, in which a firm that raises its price alone risks losing sales if rivals do not follow, a risk an agreement eliminates by assuring each Defendant in advance that its increase will be matched, as Defendants' increases consistently were in the episodes alleged above.

258. Beyond theory, empirical research has undercut the view that firms in highly concentrated markets do not need an explicit agreement to raise prices because they can do so interdependently. One study of actual price-fixing conspiracies found that conspiratorial

agreements are "most likely to occur and endure when numbers are small, concentration is high and the product is homogeneous." Another examination of mid-twentieth-century cartels reports that "[m]arket share, independent of profits, shows a significant association with collusion . . . as firms possessing large shares of their industry's market are more prone to collude than firms with relatively low shares." Leslie notes that "[o]f the dozens and dozens of felonious price-fixing conspiracies that have resulted in convictions over the last several years, most happened in oligopoly markets." And University of Florida Law Professor William H. Page observed, "most durable cartels have occurred in highly concentrated markets, so express conspiracy must often be necessary to coordinate pricing effectively, even in oligopolies." Because conspiracies are easier to form, manage, and conceal in concentrated markets, the concentration of the fertilizer industry makes Defendants' coordinated price increases, rotating first moves, identical postings, and coordinated supply curtailments more consistent with an agreement than with tacit, interdependent pricing.

**2. Conduct Against Individual Self-Interest**

259. A hallmark plus factor supporting an inference of conspiracy is conduct that would be economically irrational for a single firm acting unilaterally but becomes rational as part of a coordinated scheme. A firm with significant idle capacity facing strong demand and record prices has every individual incentive to maximize output, capturing as much of the profit opportunity as possible before market conditions change. The consistent, industry-wide failure to do so during the Class Period is one of the most powerful plus factors in this record.

260. Defendants' parallel production curtailment became so commonplace during the Class Period that market analysts came to expect it. On December 9, 2022, a Scotiabank analyst wrote: "Unless Nutrien sees different data, we think the company would benefit by proportionately matching Mosaic's move, not to mention its shareholders and the industry overall. With Mosaic

taking the lead, Nutrien effectively holds a 'free' call option on tightening the potash market into the spring." The analyst framed Nutrien's decision whether to match Mosaic's curtailment as an opportunity and treated parallel curtailment as the expected and rational market response. In a competitive market, it would be neither.

261. Nutrien's conduct ran contrary to its unilateral self-interest. In Q1 2021, the world's largest potash producer publicly declared that its strategy was "price over supply," at a time when potash prices were rising sharply, farmer demand was strong, and Nutrien was "sold out," meaning customers could not obtain the potash they needed. A competitive firm sold out at record prices would immediately announce and execute capacity expansion to capture share. Nutrien instead publicly committed to "relatively limited new supply in the next couple of years," had returned $9 billion to shareholders since 2018, and allocated only $1 billion to capital expenditures in 2022. That posture was economically rational only if Nutrien was confident, based on a coordinated understanding with Mosaic and other competitors, that its rivals would also refrain from supply expansion. Unilateral supply restraint would simply have ceded market share to Mosaic and Koch.

262. Mosaic's conduct was similarly contrary to its unilateral self-interest. At the outset of the Class Period in Q1 2021, Mosaic's CEO publicly acknowledged that "demand for potash has been strong," yet Mosaic refused to restart idled production capacity at its Colonsay potash mine, conditioning any restart on "a sustained price, probably a little higher than what it is even today." A firm acting unilaterally in its own interest, facing strong demand and rising prices, would immediately restore idled capacity to capture the profit opportunity. Mosaic did the opposite: it withheld supply while prices rose and then, in December 2022, after publicly claiming

that it was "ramping up" Colonsay "to a targeted 1.8mn-2mn t/year by late 2023," abruptly curtailed production at that same facility.

263. Mosaic maintained that supply restraint for years. By 2023, Mosaic admitted that its "ability to produce processed phosphates has been less than our annual operational capacity," while reducing capital expenditures by $200 million for 2024 and returning nearly $900 million to shareholders year to date. On a Q1 2023 earnings call, Mosaic's CEO stated that he would not restore idled production capacity because doing so would "destroy the market," i.e., reduce prices. Mosaic's CEO affirmed that strategy as late as Q3 2024, stating that "until we see something change on the supply side fundamentally, that is going to stay," and expressing no concern about "an obvious catalyst for something to change on the pricing side." That is not the language of a firm competing for market share; it is the language of a firm confident that supply discipline will hold. For a firm acting unilaterally, it is economically irrational to withhold capacity during strong demand, curtail announced ramp-ups, cut capital investment while returning cash to shareholders at record margins, and publicly project that prices will remain elevated because no new supply is coming. That same conduct is entirely rational for a firm operating under a coordinated understanding with Nutrien that neither producer would relieve the supply tightness on which the conspiracy's pricing power depended.

264. Mosaic's 2026 statements confirm that its curtailments reflected a choice to restrict output to protect margins, not an inability to obtain inputs. On its second-quarter 2026 earnings call, Mosaic's CEO, Bruce Bodine, told investors that Mosaic's "long-standing relationships with Gulf Coast refiners and other global suppliers give us reliable access to sulfur," and that Mosaic had negotiated third-quarter U.S. sulfur supply "at a price that is considerably below the spot market." Mosaic settled those contracts at $705 per long ton. Mosaic nonetheless "further

curtailed phosphate production and minimized our purchases of high-cost raw materials," describing itself as "producing to meet as much demand as possible while trying to preserve margins and avoid high-cost inventory building." At the same time, Mosaic's CFO told investors that Mosaic's third-quarter guidance implied a "realized stripping margin well above historical averages, which is a good result." Mosaic thus withheld phosphate production while projecting above-average margins, following the same reasoning its CEO offered in 2023 when he declined to restore idled capacity because doing so would "destroy the market."

265. CF Industries' conduct reflects the same pattern. Despite achieving record EBITDA of $5.88 billion in 2022 and publicly acknowledging "all-time record" global nitrogen demand, CF Industries announced no new U.S. greenfield nitrogen production capacity during the Class Period. Instead, it permanently closed its Billingham ammonia plant in the United Kingdom and directed $5 billion to shareholder returns rather than to supply investment. That pattern repeated in Q2 2026 when CF Industries repurchased $230 million of shares and raised its dividend 20%. A competitive firm earning record margins in a market with acknowledged strong demand would invest aggressively in capacity expansion. CF Industries did not. Again, this behavior is irrational for a firm acting unilaterally but rational as part of a coordinated strategy to avoid the supply growth that would erode pricing power.

266. Defendants' own capacity and production figures show that they did not use their record Class Period margins to expand output and take share from one another. Mosaic's phosphate operations ran at an average of 80% of capacity from 2016 through 2020, but only 71% during the Class Period, falling to 68% in 2024 and 2025. Mosaic's potash operations, which reached 88% of capacity in 2018, never exceeded 80% in any year of the Class Period. Nutrien, the world's largest potash producer, never operated above 68% of its potash capacity in any year

of the Class Period, leaving roughly one-third of its capacity idle every year while potash prices reached record highs.

### 3. Opportunities for Collusion Through Joint Ventures, Trade Associations, and Industry Meetings

267. Defendants had abundant and repeated opportunities to communicate and coordinate their lockstep conspiracy through their shared participation in multiple joint ventures, trade associations, industry conferences, joint investor presentations, and shared market data and pricing intelligence platforms. Shared competitor forums are a recognized plus factor because they supply the structural opportunity for coordination, the means by which a common understanding could be reached and maintained throughout the Class Period. The record here goes well beyond shared membership. At the height of the alleged conspiracy, Defendants' own CEOs simultaneously held formal leadership positions in the same trade association, a direct institutional channel for interaction at the highest level of each competing firm.

#### a. Canpotex

268. Canpotex Limited ("Canpotex"), headquartered in Saskatoon, Saskatchewan, is a Canadian potash export and marketing company jointly owned by Defendants Nutrien and Mosaic. Formed in 1972 as a joint export association for Canadian potash producers, Canpotex is the vehicle through which its owners collectively market, sell, distribute, and transport potash produced at their Canadian mines to customers outside North America. Canpotex's five largest markets (Brazil, China, India, Indonesia, and Malaysia) account for approximately 75% of its annual potash exports. Its integrated export system of specialized railcars, port terminal facilities, and dedicated ocean vessels allows its members to move potash from Saskatchewan mines to overseas customers through a single centralized transportation network.

269. Employees rotate regularly among Nutrien, Mosaic, and Canpotex, including at the most senior levels. In August 2022, Nutrien announced that its Board of Directors had appointed Ken Seitz, the former President and CEO of Canpotex, as Nutrien's President and CEO. Canpotex President and CEO Gordon McKenzie is the former Mosaic VP of Global Sales, and Canpotex SVP of Operations Vinesh Kohli is the former Nutrien Senior Director of Transportation and Distribution Commercial. The Canpotex Board of Directors includes Chris Reynolds (Nutrien EVP), Todd Denzin (Nutrien VP, Commercial), Corrine Ricard (Mosaic SVP), and Jenny Wang (Mosaic SVP of Global Strategic Marketing).

270. As a single export marketing organization, Canpotex gives its owners a mechanism to coordinate key aspects of potash sales, including export volumes and shipping schedules. Canpotex also collects and manages competitively sensitive information about potash production, inventories, customer demand, pricing conditions, and shipment logistics. Although Canpotex deliberately does not export potash into the United States, it creates opportunities for would-be competitors Nutrien and Mosaic to exchange that information and align their pricing and supply strategies in this country.

271. Canpotex's structure requires Nutrien and Mosaic to share forward-looking production and supply information with Canpotex and, through its board, each other. Each company's proven peaking capacity sets its share of Canpotex sales. Nutrien and Mosaic set an annual budget for the volume Canpotex will sell in the coming year, measured against each company's production capability, and update it throughout the year through rolling production schedules and forecasts. Canpotex takes control of the potash when it is shipped from the companies' Saskatchewan mines and commingles the two companies' identical product and pays each the same average realized price, net of Canpotex's expenses. An operating budget approved

by Canpotex's board, which is "comprised of representatives from both shareholders," sets those expenses, and the same board determines "the prices and terms of sale" of all Canpotex potash. Nutrien and Mosaic therefore know how much potash the other can produce, how much it has committed offshore for the year, and the prices realized on their combined exports. Because potash not committed to Canpotex is sold in Canada and the United States, each company can determine, in advance, how much potash the other intends to sell into the U.S. market.

272. Canpotex's supply management conduct during the Class Period further confirms its role as a coordinating mechanism for Nutrien and Mosaic. In July 2024, Canpotex publicly announced that all potash volumes available for offshore sale through September 30, 2024, were fully contracted, citing "strong demand and engagement in all major offshore markets." In March 2025, Canpotex again confirmed that it was fully committed on its offshore sales volumes for the entire first half of 2025.

273. Those announcements, made during periods of elevated U.S. potash prices, are consistent with Nutrien and Mosaic using Canpotex to manage the timing and volume of global potash supply in a manner that supports domestic price levels. By committing offshore volumes forward and publicly signaling supply constraints in international markets, Canpotex gives Nutrien and Mosaic a joint mechanism to manage potash availability in ways that reinforce their respective commitment to domestic supply discipline documented herein.

274. In a 2010 article, the *New York Times* described Canpotex "as a legalized cartel for controlling potash prices." The article explained that "[r]ather than trade its product through open markets, Canpotex negotiates long-term, often secret, pricing agreements with customers," and that Canpotex and its members "often throttle back production to restrict supply" when "faced with demands for lower prices." Murray E. Fulton, an agricultural economist at the University of

Saskatchewan, said that Canpotex was the "price-setter" and that its contract agreements largely determined what the world paid for potash.

275. Indeed, "Professor Fulton and many others argue that [Canpotex's] cooperative pricing approach informally carries over into sales to the United States, the largest market for the Canadian mines."

276. "While there is no formal cartel for sales to the United States, there is no question that the discussions these companies have because of Canpotex have a significant impact on the U.S. market," Professor Fulton said. "Those discussions allow them to understand what each other is doing."

277. On January 21, 2026, USDA Deputy Secretary Stephen Vaden held a videotaped conversation with the National Agricultural Law Center in which he attributed high fertilizer prices to anticompetitive conduct, including the Canpotex arrangement, telling the audience:

> Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay. It's unacceptable.

### b. Point Lisas Nitrogen Limited

278. Defendants CF Industries Holdings, Inc., and Koch Fertilizer, LLC, jointly own and operate Point Lisas Nitrogen Limited ("PLNL"), a large-scale ammonia production facility in Trinidad and Tobago. PLNL is a 50/50 joint venture that produces hundreds of thousands of tons of anhydrous ammonia annually, an essential upstream input for certain nitrogen fertilizers, including urea and UAN, sold into the United States. Because ammonia is the foundational feedstock for certain downstream nitrogen products, control over ammonia production and allocation directly affects supply conditions, costs, and pricing in U.S. nitrogen fertilizer markets.

279. Through their joint ownership and operation of PLNL, CF Industries and Koch necessarily coordinate on production levels, plant operations, maintenance schedules, capital expenditures, and the disposition of output. Those joint activities bring two otherwise competing nitrogen producers into repeated, high-level contact concerning a critical upstream input. They also provide recurring opportunities to exchange competitively sensitive information, including present and anticipated production volumes, inventory positions, shipping plans, and demand expectations. In a concentrated commodity market, a shared production platform of this kind lowers the costs of coordination, increases each producer's transparency into the other's operations, and makes it easier to reach and maintain a common understanding about output discipline. Consistent with those economic incentives, CF Industries and Koch used PLNL as a mechanism to align production and supply decisions that had foreseeable and intended effects on prices in U.S. nitrogen fertilizer markets.

280. PLNL's ammonia output is export-oriented and can be directed into global markets, but it ships primarily to the United States, with regular deliveries to ports in Florida, California, Texas, and Louisiana. The joint venture's operational decisions can also withhold output from the market. By coordinating capacity utilization, turnaround timing, and output allocation at PLNL, CF Industries and Koch can influence the volume of ammonia, and, by extension, of downstream nitrogen products, available to the U.S. market. Coordinated reductions or delays in PLNL output, or aligned decisions about the timing and destination of shipments, can tighten supply conditions and support higher prices for ammonia, urea, and UAN sold domestically.

**c. The Fertilizer Institute: Board Leadership, Annual Meeting, and Industry Conferences**

281. The Fertilizer Institute ("TFI"), founded in 1969 and headquartered in Arlington, Virginia, is the primary domestic trade association and federal lobbying organization for the U.S.

fertilizer industry. TFI represents fertilizer producers, wholesalers, retailers, and trading firms before Congress and federal regulatory agencies, and its member services expressly include "market intelligence data collection and aggregation." All five Defendants are active TFI members, as set forth below.

282. TFI Board Leadership. In February 2019, W. Anthony Will, President and CEO of CF Industries, was elected Chairman of the TFI Board of Directors, a position he held through the 2021 board election, presiding over board meetings attended by competing fertilizer producers, including other Defendants. In 2021, as the price escalation accelerated, TFI held its Annual Meeting in Dallas, Texas, where Will was reconfirmed as TFI Chairman and Koch Fertilizer's Scott McGinn was elected Vice Chairman. That April 30, 2021, board election occurred while fertilizer prices were in the middle of their most rapid escalation, the same Q1 2021 period in which Nutrien publicly declared "price over supply" and Mosaic and CF Industries announced parallel supply discipline. Senior representatives of every Defendant were simultaneously elected as TFI board directors: Tony Will (CF Industries, Inc.), Scott McGinn (Koch Fertilizer, LLC), Michael Webb (Nutrien), Joc O'Rourke (The Mosaic Company), and Geraldo Mattioli (Yara). Senior officers of all five Defendants therefore sat together on TFI's Board of Directors at the height of the alleged conspiracy. Today, Scott McGinn, the President of Koch Fertilizer, LLC, is the Vice Chair of the TFI board and a member of the Executive Committee, which meets during TFI's Annual Business Conference. The CEOs of The Mosaic Company, Nutrien Ltd., and CF Industries also sit on the TFI Board and Executive Committee, along with the President of Yara North America.

283. TFI Annual Business Conference. TFI holds its Annual Business Conference each year in the United States and describes it as "the premier networking event for the fertilizer

industry" featuring "three days of meetings, networking and productive business." TFI makes private meeting suites and rooms available to member companies for bilateral meetings during the conference. Publicly available records show that senior representatives of at least three of the five Defendants attended each of these conferences, and discovery will establish the full schedule of meetings Defendants' senior leadership attended. TFI lists "Nutrien" and "Nutrien Ag Solutions" among the companies that attended its 2025 and 2026 Annual Business Conferences.

284. TFI World Fertilizer Conference. TFI also holds a World Fertilizer Conference each fall, described as "fall's most important business and networking event for the global fertilizer industry," drawing "hundreds of TFI members, industry professionals, and representatives from around the world." Recent conference locations include Dallas, Texas, and Chicago, Illinois. Commercial, market intelligence, and senior management staff from fertilizer companies, including Defendants, attend the conference. TFI also hosts other industry events throughout the year, including the TFI Agronomy Conference and Expo and the TFI Market & Logistics Conference.

285. TFI Market Intelligence Data Collection. TFI publishes "The Fertilizer RECORD," a quarterly report of monthly market data. Through it, TFI collects and aggregates individual member data on fertilizer production, producer inventories, and "producer disappearance," meaning sales volumes, and then provides that aggregated information back to member companies. TFI also publishes a Fertilizer Capacity Report disclosing "fertilizer production capacity by company by location in Canada and the United States" across all three macronutrients, including the capacity of each of the five Defendants. TFI member companies, including Defendants, supply their own capacity and production data to TFI for inclusion in these reports, which TFI then makes available to all member-competitors.

286. The Fertilizer Industry Round Table (“FIRT”). FIRT, which operates in partnership with TFI, holds an annual Fertilizer Outlook and Technology Conference, recently held in Savannah, Georgia, and publishes proceedings designed to “review best practices and processes across a wide range of fertilizer, agricultural, and environmental topics.” That conference provides a further forum for Defendants’ technical personnel to interact, share operational information, and discuss supply, demand, and production trends. FIRT’s participation at the technical and operational staff level supplements the CEO-level interactions at TFI, creating a multi-layer network of competitor interactions that extends from the TFI chairmanship down to technical and commercial staff. The FIRT Board of Directors has included David Bilby (CF Industries), Shawn McGreevy (Koch Fertilizer, LLC), and Gary Vogen (Yara North America).

287. As of 2026, key executives from Nutrien, Mosaic, CF Industries, Koch, and Yara continue to serve on the TFI Board of Directors. TFI expressly markets access to “trusted information and data” and “market intelligence data” to its manufacturer members as a primary membership benefit. During the Class Period, TFI sponsored more than 30 in-person trade events, creating a sustained and overlapping calendar of opportunities for Defendants’ commercial, executive, and technical personnel to interact in settings where supply, demand, and pricing are the primary subjects of discussion. TFI serves as an institutionalized information exchange through which Defendants’ competitively sensitive capacity and production data flows to their direct competitors.

#### d. The International Fertilizer Association: Executive Committee and Annual Conference

288. The International Fertilizer Association (“IFA”) is the sole global fertilizer trade association. Founded in 1927 and headquartered in Paris, France, IFA has approximately 500 members from approximately 80 countries. IFA’s Board of Directors includes permanent seats

allocated to major member organizations, including Nutrien and CF Industries, alongside rotating seats held by other producers.

289. IFA's Executive Committee is a senior governance body responsible for the association's financial oversight and operational coordination. During the Class Period, CF Industries' CEO Tony Will served as IFA Chair from 2023 to 2025. He replaced Svein Tore Holsether, President and CEO of Yara International ASA, who took the post in June 2021. When Will completed that term in May 2025, Nutrien's CEO Kenneth Seitz was elected IFA Chair, and Will remained on the Executive Committee as Immediate Past Chair. Seitz (Nutrien) and Will (CF Industries), the CEOs of two of the three largest nitrogen fertilizer producers in North America, therefore served simultaneously on IFA's Executive Committee, as Chair-elect and Chair and then as Chair and Immediate Past Chair. Senior representatives of the following Defendants currently serve on IFA's board: Chris Bohn (CF Industries, Inc.), Kenneth Seitz (Nutrien), Bruce Bodine (The Mosaic Company), and Svein Tore Holsether (Yara).

290. IFA holds an Annual General Meeting and Conference each spring, the primary global gathering for fertilizer industry executives. During the Class Period, IFA held its Annual Conference in Vienna in May 2022, the Czech Republic in May 2023, Singapore in May 2024, Monaco in May 2025, and again in June 2026. Defendants' senior representatives attended these conferences, where they presented, voted on governance matters, and interacted with one another in formal and informal settings.

291. IFA participants discussed pricing and held closed-door meetings at the annual conference. At the 2022 Vienna IFA Annual Conference, for example:

a. "Sources said the most likely price for the next [urea] tender, based on rumors and talk during the IFA conference in Vienna, would be around $640/mt CFR."

b. “Sources said they were surprised to hear a more bullish attitude [for quoted prices] during the IFA meeting in Vienna.”

c. “Jordan Phosphate Mines Co. (JPMC) and Indonesia’s Minister of Agriculture, Syahrul Yasin Limpo, have held talks about the further potential of Jordan supplying Indonesia with phosphate rock and fertilizers. . . . The two parties held the talks at a May 30 meeting on the sidelines of the International Fertilizer Association’s annual conference in Vienna.”

292. IFASTAT and Market Intelligence. IFA operates IFASTAT, a proprietary statistical database compiled by IFA’s Market Intelligence team that provides 15 years of global production, trade, and supply data, consumption data, and detailed market outlook reports. IFA member companies, including Defendants, which hold board seats, receive detailed statistical reports unavailable to non-members. IFA also holds separate thematic committee meetings, including meetings concerning strategy, attended by market analysts and commercial staff from member companies. Conducted between the annual conferences, these meetings provide additional forums for the exchange of market intelligence between the Defendants. For example, as pictured below, CF Industries CEO Tony Will and Yara International CEO Svein Tore Holsether sat together on a panel during the 2022 IFA Strategic Forum.




**e. Other Shared Forums and Trade Organizations**

293. The BMO Capital Markets Farm to Market Conference. The BMO Capital Markets Farm to Market Conference is a two-day event held each spring in New York City, and BMO describes it as featuring "candid and informative discussions and panels with leaders from more than 100 companies in the sector." Nutrien, Mosaic, CF Industries, and Yara International all participate regularly as presenters. Nutrien's CEO and CFO both spoke at the 2022, 2023, 2024, and 2025 editions, and CF Industries participated in 2025. At the May 2023 conference, for example, Nutrien CEO Seitz said that Nutrien saw "relative price stability for the balance of the year," while Mosaic's CEO, presenting at the same conference, told the audience that "the U.S. has been a rush." BMO has held the conference annually for at least 20 years, and it gives

Defendants' senior executives opportunities to interact directly in an intimate setting with approximately 300 investors, where competitive market intelligence, pricing strategy, and supply outlook are the primary topics of management presentations.

294. Fertilizer Canada ("FC"). All Defendants are members of FC, a Canadian fertilizer industry organization headquartered in Ottawa, Ontario. Executives from CF Industries, Inc., Koch Fertilizer Canada, Mosaic, Nutrien, and Yara North America, Inc., sit on FC's Board. In August 2023, Lindsay Kaspick, Regional Marketing Manager of Koch Fertilizer Canada ULC, was appointed Chair of FC's Board of Directors. Kaspick succeeded Sarah Fedrochuk, VP of Government and Public Affairs of The Mosaic Company in North America, who remained on the Board along with Greg Kennette (CF Industries), Duncan Pottinger (Nutrien), and Manda Huska (Yara North America). In 2025, Stephen Jonkhans replaced his CF Industries colleague Greg Kennette on the FC Board.

295. The Sulfur Institute ("TSI"). Nutrien Ltd. and The Mosaic Company are members of TSI, a global association for sulfur and sulfuric acid professionals based in Washington, D.C. Nutrien and Mosaic staff both sit on TSI's Board. Producers use sulfur to process phosphate rock into phosphate fertilizers. TSI sponsors several in-person trade events each year, including the Sulphur World Symposium and its annual Executive Committee Meeting.

296. Agricultural Retailers Association ("ARA"). Koch Agronomic Services, LLC, and The Mosaic Company are both members of the ARA, an industry trade group based in Arlington, Virginia. Eric Sheller (Nutrien Ag Solutions) and Bob Ness (The Mosaic Company) sit on the ARA Board. The ARA hosts recurring in-person events, including the Annual ARA Conference and Expo and semi-annual in-person meetings of ARA committees.

297. Taken together, TFI, IFA, Canpotex, PLNL, and the shared conference circuit created a multi-layered, overlapping network of competitor interaction that spanned every level of each Defendant's organization, from CEO to commercial staff, and operated continuously throughout the Class Period. That network supplied the infrastructure through which a common understanding could be reached, communicated, and maintained across the Class Period and all five Defendant families.

**4. High Barriers to Entry**

298. High barriers to entry make a market susceptible to collusion. Because a collusive arrangement that raised prices above competitive levels would ordinarily attract new entrants seeking to share in the supracompetitive pricing, significant barriers to entry facilitate both the formation and the maintenance of a cartel.

299. The fertilizer industry has exceptionally high barriers to entry that shield Defendants' coordinated pricing scheme from competitive erosion. High barriers are a recognized structural plus factor because they indicate that supracompetitive prices can be maintained for extended periods without triggering the entry that would restore competitive prices. *See* Areeda & Hovenkamp, *Antitrust Law* ¶1434 (2023). The barriers in this industry are among the most restrictive in the U.S. economy.

300. Capital requirements. As set forth above, Nutrien's own estimates put the minimum cost of a greenfield facility at $3.5 billion for nitrogen, $6.2 billion for phosphate, and $6 billion for potash, with minimum construction and ramp-up periods of four, six, and ten years, respectively. *See supra* ¶¶97-99. Investment of that magnitude places new entry beyond the realistic capacity of any firm not already operating in the industry at scale.

301. Natural resource constraints. Phosphate and potash fertilizers can be produced only where geological deposits of the relevant minerals exist. U.S. phosphate rock deposits are

concentrated in Florida, North Carolina, and Idaho, where Mosaic and Nutrien already control the dominant mining operations, and North American potash deposits lie overwhelmingly in Saskatchewan, Canada, where Nutrien controls the dominant mine network. No significant untapped phosphate or potash deposits in the continental United States are accessible to new entrants at competitive cost. A new entrant seeking to compete with Mosaic in phosphate or Nutrien in potash would have to develop low-grade domestic deposits at uncompetitive cost or rely on foreign supply.

302. Regulatory and permitting barriers. New mine development requires environmental impact assessments, mine permits, water rights, zoning approvals, and other regulatory authorizations that can take years to obtain and are subject to challenge and delay. Nutrien's Geismar clean ammonia project, announced years ago by a company with existing operational infrastructure, established supplier and customer relationships, and access to capital, remained "on indefinite pause" as of 2024.

303. Distribution infrastructure. Fertilizer distribution requires access to specialized terminal infrastructure, barge networks, rail loading facilities, and deep-water port capacity. It also requires access to a sales network to shift the product. But finding customers willing to take a chance on a new entrant who may not survive is difficult. Many cooperatives and fertilizer mixes, who remain dependent on Defendants for timely access to fertilizers, are reportedly concerned about retaliation should they support new entrants by purchasing their products. For example, addressing farmers on a September 2026 panel with USDA Deputy Secretary Stephen Vaden, the co-founder of Greenfield Nitrogen reported that her startup was essentially

"blackballed" by local cooperatives and fertilizer retailers who refused to buy fertilizer from Greenfield out of fear of retribution from the major fertilizer suppliers.[19]

304. Given these combined production, resource, regulatory, distribution, and sales barriers, the prospect that new entry will constrain Defendants' pricing power within any realistic time horizon is essentially nil.

305. Congressional testimony confirms these barriers. At the May 12, 2026 Senate Agriculture Committee hearing described above, Trent Kubik testified that the fertilizer market is not only highly concentrated but also vertically integrated. He testified that CF Industries controls 42% of ammonia production and that Nutrien and Mosaic produce 85% of U.S. phosphate rock. He also noted that Nutrien operates the largest direct-to-grower distribution network, with distribution points and retail locations.

306. The USDA found that just three companies control 90% of Midwest fertilizer storage and distribution. CF Industries distributes fertilizer through a system of terminals, warehouses, and associated transportation equipment located primarily in the Midwest. Nutrien operates approximately 440 wholesale fertilizer distribution points, including 21 terminals. These companies control warehouses for fertilizer storage through long-term leases, which they have used to block new entrants.

307. In comments submitted to the USDA, farmers described how incumbents made entry impossible, particularly for competitors with new technologies. One commenter explained that fertilizer manufacturers may exercise market power to "set prices below production costs in

---

[19] Chris Clayton, *Vaden Presses Fertilizer Antitrust Case*, PROGRESSIVE FARMER (Sept. 14, 2026), https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/09/14/deputy-ag-secretary-encourages-keep.

order to drive out the new competition [green ammonia competitor].” Another suggested that fertilizer companies with market power may also stifle research into new technology.

**5. Inelastic Demand**

308. Fertilizer demand is highly price-inelastic: farmers cannot meaningfully reduce their fertilizer purchases in response to price increases without suffering severe yield losses and economic harm. Inelastic demand is a recognized plus factor because it is one of the key conditions that enable and sustain a price-fixing conspiracy, ensuring that supracompetitive prices do not trigger the demand destruction that would undermine the conspiracy’s profitability.

309. Nitrogen, phosphorus, and potassium are essential, irreplaceable nutrients that crops require for growth, and no commercially viable substitute exists for commercial farming operations. Organic alternatives such as manure, compost, and cover crops can supplement but cannot replace synthetic fertilizers on the majority of U.S. commercial crop acres, particularly in corn production, which requires 140 to 160 pounds of nitrogen per acre applied each season. Farmers who do not apply adequate fertilizer face yield reductions of 20% to 40%, which at any realistic crop price exceed the cost of fertilizer even at supracompetitive prices. Farmers will therefore pay nearly any price for fertilizer before reducing crop production, a direct manifestation of inelastic demand.

310. On Mosaic’s Q1 2021 earnings call, its CEO said that “grower demand for fertilizer is relatively price inelastic,” and substantial evidence confirms the point. A USDA survey of more than 1,400 farmers found that 72% expressed concerns about fertilizer producer market power and 62% described unfair price-setting practices, reflecting that farmers perceived themselves as captive buyers with no realistic alternative. Economists at the University of Illinois projected that the 2021 and 2022 fertilizer cost increases would reduce net farm income in Illinois alone by 34%, confirming that farmers absorbed the cost increase rather than reducing their fertilizer purchases.

311. Published estimates confirm how inelastic fertilizer demand is. One recent study estimates that U.S. potash import demand falls only about 4% in the short run when prices rise 10%, an elasticity of about −0.4.[20] As Figure 26 illustrates, at that elasticity a 10% reduction in supply raises the price by roughly 30%.

**<u>Fig. 26. Illustrative Effect of a 10% Supply Reduction When Demand Is Inelastic</u>**




312. Inelastic demand also explains why Defendants' coordinated supply restrictions were so profitable. When purchasers cannot reduce their purchases in response to higher prices, even a modest reduction in available supply produces a disproportionately large increase in price, because purchasers bid against one another for the remaining volume rather than buying less. A fertilizer producer that restricts output under those conditions can earn more by selling less, but

20 Kenneth Annan & Jeffrey J. Reimer, The U.S. Elasticity of Import Demand for Potash, 57 J. Agric. & Applied Econ. 303 (2025).

only if its competitors do not expand output to fill the gap. A single producer that curtailed production on its own would simply cede sales to its rivals. That is why the curtailments described in §IV(E) made economic sense only if each Defendant could count on the others to hold back as well.

### 6. High Degree of Product Interchangeability

313. A high degree of product interchangeability facilitates collusion. When products are fungible or closely substitutable, a price increase by one producer drives buyers to its competitors, the mechanism that ordinarily disciplines pricing in competitive markets. But when products are standardized and interchangeable across all major producers, a price increase by a coordinating group of producers succeeds, because buyers have no competitive alternative.

314. Fertilizer Products are highly standardized commodities. Urea is urea: whether produced by CF Industries, Nutrien, or Koch, it is chemically identical. Muriate of potash (MOP) is standardized by nutrient grade and is fungible whether produced at Nutrien's Allan mine or Mosaic's Esterhazy mine. DAP and MAP are standardized phosphate fertilizers that follow strict industry standards and are interchangeable regardless of producer. NPK blends with the same ratio, such as 20-20-10, likewise substitute for one another no matter who produced the underlying nutrients. Because fertilizers lack meaningful product differentiation, farmers choose among producers on price and availability rather than on product quality or brand, and in a competitive market that fungibility would ensure robust price competition as buyers switched to the lowest-cost producer.

315. The fungibility of Fertilizer Products also lets Defendants observe each other's pricing through published commodity price indices, which supply a transparent verification mechanism for any coordinated pricing scheme. Green Markets, DTN/Progressive Farmer, and the USDA's Agricultural Prices report publish weekly or monthly fertilizer price data for all major

products and regions, so any discount offered by a Defendant deviating from coordinated pricing would appear in those indices within weeks.

316. Moreover, the fungibility of the product means that Defendants can, and in fact do, purchase product from each other.

317. The combination of product fungibility and transparent price discovery makes coordination both easy to implement and easy to monitor, conditions that antitrust economists identify as highly conducive to collusion.

**7. Defendants' Prior Antitrust Violations and History of Cartel Conduct**

318. The fertilizer industry has a well-documented history of antitrust violations and cartel behavior, including by at least two Defendants and their corporate predecessors. That history reflects an entrenched culture of anticompetitive conduct and demonstrates that the conspiracy alleged here is not an anomaly but a continuation of a long-standing pattern.

319. In 2008, the last time global potash prices spiked to their highest recorded levels, potash buyers filed multiple class action antitrust complaints in the United States alleging that a global cartel of potash producers, including PotashCorp (Nutrien's predecessor), Mosaic, and Agrium (also a Nutrien predecessor), conspired to fix potash prices and restrict supply in violation of Section 1 of the Sherman Antitrust Act.

320. In that litigation, plaintiffs alleged that Canpotex provided Mosaic, Agrium, and PotashCorp with "access to one another's sensitive production and pricing information." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 850 (7th Cir. 2012) (*en banc*).

321. The district court found that the plaintiffs had sufficiently "allege[d] parallel production cuts which at least for some Defendants represented a 'radical change' in behavior; overlapping business ventures; specific meetings attended by Defendants which precipitated production cuts and price increases; and a 'joint sales suspension' that was contrary to Defendants'

economic interests." *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 937 (N.D. Ill. 2009). The Seventh Circuit affirmed.

322. In 2013, Mosaic, PotashCorp, and Agrium agreed to pay a combined $97 million to the direct-purchaser plaintiffs to resolve that litigation. Those settlements, entered into by the direct corporate predecessors of Nutrien and by the same Mosaic entity named as a Defendant here, resolved claims that these very companies coordinated anticompetitively the last time prices reached comparable heights.

## IV. ANTITRUST INJURY AND STANDING

323. Defendants' anticompetitive conduct had the following effects, among others:

324. Price competition has been restrained or eliminated with respect to Fertilizer Products sold by Defendants;

325. Fertilizer Product prices have been fixed, raised, stabilized, or maintained at artificially inflated levels;

326. Plaintiffs and the proposed Classes have been deprived of free and open competition; and

327. Plaintiffs and the proposed Classes paid artificially inflated Fertilizer Product prices.

328. The magnitude of that harm is substantial: rising Fertilizer Product costs were projected to add approximately $128,000 in expenses per farm in 2022, even as Defendants reported record profits.

329. Defendants' conduct has imposed substantial and lasting costs on American farmers. Fertilizer is the single largest operating cost of growing corn, and its cost per planted acre rose sharply during the Class Period. According to the U.S. Department of Agriculture's Economic Research Service ("ERS"), fertilizer costs for corn nearly doubled from $103 per acre

in 2020 to $185 per acre in 2022 even after adjusting for inflation. Those costs never returned to pre-Class Period levels: they remained at $128 per acre in 2025. Over the Class Period as a whole, corn growers paid an average of $170 per acre for fertilizer, about 45% more than the $117 per acre average from 2016 through 2020. Soybean growers fared worse, with fertilizer costs nearly doubling from an average of $30 per acre in 2016 through 2020 to $52 per acre in 2021 through 2025. As Figure 30 illustrates, these elevated fertilizer costs persisted even as other drivers of farm operating costs stabilized, directly reducing the returns of Plaintiffs and members of the proposed Classes.[21]

**Fig. 27. U.S. Average Corn and Soybean Operating Costs, 2016-2026 ($ per planted acre)**[22]




---

21 All costs deflated by the CPI-U.

22 Note: 2016–2025 are ERS estimates; 2026F is the ERS forecast (June 18, 2026). Source: USDA ERS, Commodity Costs and Returns (October 1, 2026 release) and Cost of Production Forecasts for Major U.S. Field Crops, 2026F–2027F.

## A. DIRECT PURCHASER PLAINTIFFS

330. As to the Direct Purchaser Plaintiffs:

a. Direct Purchaser Plaintiffs and the proposed Direct Purchaser Class have standing under the antitrust laws pleaded below as direct purchasers of Defendants' products. The harm Plaintiffs and the proposed Classes suffered is directly traceable to Defendants' unlawful conduct.

b. The overcharges Direct Purchaser Plaintiffs and the proposed Direct Purchaser Class paid are paradigmatic antitrust injury, that is, injury of the type the federal antitrust laws were enacted to redress.

## B. INDIRECT PURCHASER PLAINTIFFS

331. As to Indirect Purchaser Plaintiffs:

a. Indirect Purchaser Plaintiffs and members of the Nationwide Indirect Purchaser Class and the State Law Indirect Purchaser Class who made purchases indirectly from Defendants (i.e., the "Indirect Purchaser Plaintiffs"), the conspiracy alleged here, and the actions of the members of that conspiracy, including Defendants, directly and proximately caused an overcharge in Fertilizer Product prices during the Class Period. The Indirect Purchaser Plaintiffs paid that overcharge and were thereby injured in their property due to Defendants' unlawful conduct. Indeed, Defendants' conspiracy had a direct effect on the Indirect Purchaser Plaintiffs by forcing them to pay supracompetitive prices for Fertilizer Products.

b. Defendants manufacture, produce, or supply Fertilizer Products and sell them, directly and through their subsidiaries and affiliates, to wholesalers, distributors, agricultural retailers, and cooperatives. Those entities in turn resell Fertilizer Products to Indirect Purchaser Plaintiffs and members of the Nationwide Indirect Purchaser Class and the State Law Indirect Purchaser Class.

c. As discussed above, Fertilizer Products are not components of another product. The nitrogen, phosphate, and potash fertilizers that Defendants sell into the distribution chain reach Indirect Purchaser Plaintiffs and members of the Nationwide Indirect Purchaser Class and the State Law Indirect Purchaser Class in substantially the same form, whether sold as manufactured or blended by a retailer or cooperative with other Fertilizer Products. The products Indirect Purchaser Plaintiffs and members of the Nationwide Indirect Purchaser Class and the State Law Indirect Purchaser Class purchased, and the overcharges on those products, can therefore be followed from Defendants through each level of distribution.

d. Wholesalers, distributors, agricultural retailers, and cooperatives price Fertilizer Products by reference to their cost of acquiring those products from Defendants and Defendants' distributors. The supracompetitive prices Defendants charged were therefore passed through each level of the distribution chain to Indirect Purchaser Plaintiffs and members of the Nationwide Indirect Purchaser Class and the State Law Indirect Purchaser Class in the form of higher prices.

e. Indirect Purchaser Plaintiffs and members of the Nationwide Indirect Purchaser Class and the State Law Indirect Purchaser Class's injuries and overcharges are fairly traceable to Defendants' conspiracy, not to the independent pricing decisions of intermediaries.

f. Any overcharge the Indirect Purchaser Plaintiffs paid can be measured. Any recovery presents no risk of duplicate recovery. Prices for Fertilizer Products are recorded at each distribution level, in Defendants' transactional data, in wholesaler, retailer, and cooperative sales records, and in publicly reported retail price series. Commonly used and well-accepted econometric models, including regression analyses, can measure both the extent and the amount of overcharges and the rate at which they were passed through the distribution chain to the Indirect

Purchaser Plaintiffs. As such, the economic harm to the Indirect Purchaser Plaintiffs can be measured using evidence common to the Class.

g. Indeed, as a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, along with overhead and a reasonable profit margin. In the long run, such costs are ultimately passed on to end purchasers, including the Indirect Purchaser Plaintiffs, in the form of higher retail prices. When demand is inelastic, as it is here for Fertilizer Products, the pass-through rate to Indirect Purchaser Plaintiffs is at, or near, 100%.

h. Consequently, while direct purchasers were the first to pay supracompetitive prices, the overcharge was passed down the distribution chain and absorbed by the Indirect Purchaser Plaintiffs.

i. The states under whose laws and common law the Indirect Purchaser Plaintiffs seek damages enable indirect purchasers to recover overcharges passed on to them and have accepted the allocation of damages among purchasers at different levels of the distribution chain. Again, the overcharges the Indirect Purchaser Plaintiffs paid are the type of injury that the state laws and the common law of unjust enrichment were intended to prevent.

## V. TOLLING OF THE STATUTE OF LIMITATIONS

332. Plaintiffs' claims are timely. To the extent any claim might otherwise be subject to a statute of limitations defense, Defendants' fraudulent concealment of their conspiracy tolled the running of any applicable limitations period.

333. The conspiracy alleged herein is, by its nature, self-concealing. It consisted of coordinated pricing and supply restriction decisions made privately among Defendants' senior executives, the details of which were never disclosed to Plaintiffs or the public.

334. Beyond the inherently self-concealing nature of the conspiracy, Defendants took affirmative steps to disguise their coordinated pricing and supply restriction as the product of legitimate market forces. Throughout the Class Period, Defendants publicly and repeatedly attributed their supracompetitive pricing to exogenous events and cost pressures, including pandemic-related disruptions, extreme weather events, geopolitical sanctions, foreign export restrictions, and the conflict in Ukraine. By offering these pretextual explanations in earnings calls, investor presentations, press releases, and public statements, Defendants constructed a facially legitimate but materially incomplete and misleading narrative that concealed the true cause of the price increases: their coordinated agreement to fix prices and restrict supply.

335. Defendants offered consistent, facially plausible explanations for the price increases, blaming natural gas prices, pandemic-related logistics disruptions, extreme weather events, and ultimately, the Russian invasion of Ukraine. What was not visible, and what Plaintiffs had no means to determine from public information alone, was that those explanations were pretextual and that the increases reflected a coordinated agreement rather than independent competitive responses to shared market conditions. Parallel pricing, standing alone, does not reveal an unlawful agreement on its face. Only the disclosure of the government investigations, including the DOJ's formal investigation announced in March 2026, the FTC's investigation announced in May 2026, and senior USDA officials' public statements characterizing Defendants' conduct as collusion, gave Plaintiffs a basis to understand that the coordination behind the prices was unlawful rather than merely structural.

336. Plaintiffs exercised reasonable diligence but could not have discovered Defendants' conspiracy before the public disclosure of the government investigations and official statements beginning in late 2025. Plaintiffs are farmers and agricultural purchasers, not market analysts or

antitrust investigators, and they lack the financial expertise required to detect Defendants' conspiracy from publicly available data alone. Before the disclosure of the government investigations, Plaintiffs had no basis to distinguish Defendants' supracompetitive pricing from the cost-driven and supply-shock explanations Defendants had publicly and repeatedly offered.

337. The conspiracy alleged herein also constitutes a continuing violation of Section 1 of the Sherman Act. Each sale of Fertilizer Products at supracompetitive prices during the Class Period was a separate overt act in furtherance of the conspiracy, and each such sale started a new limitations period for the injury it caused. The conspiracy was ongoing as of the date this Complaint was filed, as Defendants' continued supracompetitive pricing demonstrates. Plaintiffs' claims are therefore timely under both the fraudulent concealment doctrine and the continuing violation doctrine.

## VI. CLASS ACTION ALLEGATIONS

### A. DIRECT PURCHASER CLASS

338. Direct Purchaser Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of all other persons and entities similarly situated (the "Direct Purchaser Class"), defined as:

> All persons and entities in the United States and its territories who purchased a Fertilizer Product directly from one or more of the Defendants, their agents or affiliates at any time during the period from January 1, 2021, through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

### B. INDIRECT PURCHASER PLAINTIFF CLASSES

339. Indirect Purchaser Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(2), seeking injunctive and equitable relief, as representatives of all other persons and entities similarly situated (the "Nationwide Indirect Purchaser Class"), defined as:

> All persons and entities in the United States and its territories to the extent they purchased a Fertilizer Product indirectly from one or more of the Defendants at any time during the period from January 1, 2021, through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

340. Plaintiffs that purchased Fertilizer Products indirectly further bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages and equitable relief under the antitrust, unfair competition, and consumer protection laws, and the common law of unjust enrichment, of the jurisdictions identified below, as representatives of all other persons and entities similarly situated (the "State Law Indirect Purchaser Class"), defined as:

> All persons and entities to the extent they purchased a Fertilizer Product indirectly from one or more of the Defendants at any time in the Indirect Purchaser States during the period from January 1, 2021, through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

341. The "Indirect Purchaser States" are the States, the District of Columbia, and the territories under whose laws claims are asserted in Counts 3 through 51 below. Plaintiffs may seek certification of the State Law Indirect Purchaser Class as a series of subclasses by jurisdiction. The Nationwide Indirect Purchaser Class and the State Law Indirect Purchaser Class are referred to together as the "Indirect Purchaser Classes," and the Indirect Purchaser Classes and the Direct Purchaser Class are referred to together as the "Classes."

## C. EXCLUSIONS, MODIFICATIONS, AND RULE 23 FACTORS

342. Excluded from the Classes are: (1) the Court presiding over this action, including its staff, and any members of their immediate families; (2) all jurors assigned to this case; (3) Defendants, Defendants' subsidiaries, affiliates, parents, successors, and predecessors, any entity in which Defendants or their parents have a controlling interest, and their current or former employees, officers, and directors; (4) Plaintiffs' counsel and Defendants' counsel who have entered an appearance in this case; and (5) state and federal government entities.

343. Plaintiffs reserve the right to modify, change, expand, or narrow each Class definition based upon discovery and further investigation.

344. **Numerosity:** Each of these Classes is so numerous that joinder is impracticable. Plaintiffs do not know the exact number of Class members but believe, given the nature of the Fertilizer Product industry, that each Class includes at least hundreds of thousands of individuals and entities in the United States. The Indirect Purchaser Plaintiffs further believe that the State Law Indirect Purchaser Class includes hundreds of members in each of the Indirect Purchaser States.

345. **Commonality and Predominance:** Common questions of law and fact exist as to all members of each respective Class and predominate over questions affecting only individual members of each respective Class. The same unlawful price-fixing conspiracy injured named Plaintiffs and the members of each Class they seek to represent, and Defendants' anticompetitive conduct applied generally to all Class members. Common questions of fact and law include, but are not limited to, for each specific Class:

a. whether Defendants combined and/or conspired to fix, raise, maintain, and/or stabilize prices of Fertilizer Products at any time during the Class Period;

b. whether Defendants fixed, raised, maintained, and/or stabilized prices of Fertilizer Products sold to purchasers in the United States at any time during the Class Period, or committed other conduct in furtherance of the conspiracy alleged herein;

c. whether Defendants engaged in conduct that violated Sections 1 and 3 of the Sherman Act, and Section 16 of the Clayton Act;

d. whether Defendants fraudulently concealed their conduct from purchasers of Fertilizer Products in the United States;

e. whether Defendants' conduct caused the prices of Fertilizer Products sold to Plaintiffs and members of the Classes to be higher than the prices that would have prevailed in a competitive market as a result of their restraint of trade;

f. whether Plaintiffs and members of the Classes were injured by Defendants' conduct and, if so, the determination of the appropriate Class-wide measure of damages for the Direct Purchaser Class and the State Law Indirect Purchaser Class, including restitution; and

g. whether Plaintiffs and members of the Classes are entitled to, among other things, injunctive relief and, if so, the nature and extent of such relief.

346. As it relates to the Indirect Purchaser Plaintiffs and members of the Nationwide Indirect Purchaser and State Law Indirect Purchaser Classes, additional common questions of fact and law include, but are not limited to:

a. whether the conspiracy alleged herein is continuing, such that Indirect Purchaser Plaintiffs and members of the Nationwide Indirect Purchaser Class are threatened with future injury within the meaning of Section 16 of the Clayton Act, 15 U.S.C. §26;

b. whether Defendants' conduct violated the antitrust, unfair competition, and consumer protection laws of the Indirect Purchaser States identified below; and

c. whether Defendants were unjustly enriched at the expense of Indirect Purchaser Plaintiffs and members of the State Law Indirect Purchaser Class.

347. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Classes they seek to represent, because Plaintiffs and all members of the Classes were injured by the same misconduct (Defendants' contracting, combining, or conspiring to fix, maintain, or raise the prices of Fertilizer Products), and each paid artificially inflated prices for Fertilizer Products.

348. **Adequacy of Representation:** Direct Purchaser Plaintiffs will fairly and adequately represent and protect the interests of the Direct Purchaser Class, and the Indirect Purchaser Plaintiffs will fairly and adequately represent and protect the interests of the Nationwide Indirect Purchaser and State Law Indirect Purchaser Classes. Neither the Direct Purchaser Plaintiffs nor the Indirect Purchaser Plaintiffs have interests antagonistic to those of the Classes they seek to represent. Both the Direct Purchaser Plaintiffs and the Indirect Purchaser Plaintiffs have separately retained counsel with substantial experience prosecuting complex litigation and class actions, including antitrust class actions. Moreover, those counsel have been separately appointed to interim leadership positions by the Court. ECF No. 170.

349. **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of the Direct Purchaser Plaintiffs' and Indirect Purchaser Plaintiffs' respective claims. Class-wide damages for both the Direct Purchaser Class and the State Law Indirect Purchaser Class are essential to induce Defendants to comply with federal and state law. Because each individual Class member's claim is small relative to the complexity of the litigation, and because of Defendants' financial resources, members of the Direct Purchaser Class and the State Law Indirect Purchaser Class are unlikely to pursue redress individually for the violations detailed in this Complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of individual lawsuits, and it provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

350. **Injunctive Relief:** Defendants have acted or refused to act on grounds generally applicable to each of the Classes, which makes final injunctive relief and corresponding declaratory relief appropriate with respect to the Direct Purchaser Class and the Nationwide Indirect Purchaser Class as a whole.

## CLAIMS FOR RELIEF

## VII. VIOLATION OF FEDERAL ANTITRUST LAW

### A. DIRECT PURCHASER PLAINTIFFS

**Count 1: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3)**
**(On behalf of the Direct Purchaser Class)**

351. Direct Purchaser Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding paragraphs as if fully set forth herein.

352. During the Class Period, Defendants entered into, continued, and gave effect to a combination and conspiracy in unreasonable restraint of trade and commerce, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1, 3.

353. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to: (a) fix, raise, stabilize, and maintain the prices of Fertilizer Products sold in the United States at supracompetitive levels; and (b) restrict, limit, and suppress the supply of Fertilizer Products available to U.S. purchasers.

354. Direct Purchaser Plaintiffs and members of the Direct Purchaser Class have been injured and will continue to be injured in their businesses and property by paying more for Fertilizer Products purchased from Defendants and their co-conspirators than they would have paid (and will continue to pay) in the absence of the combination and conspiracy.

355. Defendants' conduct constitutes a *per se* violation of Sections 1 and 3 of the Sherman Act. It is also unlawful under a rule of reason analysis.

356. Direct Purchaser Plaintiffs and the members of the Direct Purchaser Class are entitled to treble damages, under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15, 26.

357. Direct Purchaser Plaintiffs and members of the Direct Purchaser Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## B. INDIRECT PURCHASER PLAINTIFFS

**Count 2: Section 16 of the Clayton Act (15 U.S.C. §26) for Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1, 3**
**(On behalf of the Nationwide Indirect Purchaser Class for Injunctive and Equitable Relief)**

358. Indirect Purchaser Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

359. This Count is asserted solely for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. §26, on behalf of the Nationwide Indirect Purchaser Class. Plaintiffs do not seek damages under Section 4 of the Clayton Act on behalf of indirect purchasers.

360. Beginning at a time currently unknown to Indirect Purchaser Plaintiffs, but at least as early as January 1, 2021 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

361. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of Fertilizer Products and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

362. The conspiracy has had the following effects, among others: (a) price competition for Fertilizer Products has been restrained, suppressed, and eliminated in the United States; (b) prices for Fertilizer Products sold by Defendants and their co-conspirators, and resold to members of the Nationwide Indirect Purchaser Class, have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and (c) Indirect Purchaser

Plaintiffs and members of the Nationwide Indirect Purchaser Class have been deprived of the benefits of free and open competition in the purchase of Fertilizer Products.

363. Indirect Purchaser Plaintiffs and members of the Nationwide Indirect Purchaser Class have been injured and will continue to be injured in the form of overcharges on Fertilizer Products.

364. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

365. By reason of Defendants' continuing violation of Sections 1 and 3 of the Sherman Act, members of the Nationwide Indirect Purchaser Class have been injured, and are threatened with future loss or damage, in their business and property within the meaning of Section 16 of the Clayton Act, 15 U.S.C. §26, because they have paid, and absent relief will continue to pay, more for Fertilizer Products than they would pay in the absence of the conspiracy.

366. Members of the Nationwide Indirect Purchaser Class are entitled to an injunction under Section 16 of the Clayton Act, 15 U.S.C. §26, against Defendants, preventing and restraining the violations alleged herein, together with corresponding declaratory relief.

## VIII. VIOLATIONS OF STATE ANTITRUST LAWS ALLEGED BY INDIRECT PURCHASER PLAINTIFFS

367. Indirect Purchaser Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

368. During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize the price of Fertilizer

Products in various states. This conduct caused an unreasonable restraint of trade and commerce and harmed indirect purchasers of Fertilizer Products in violation of the various state antitrust and consumer protection laws set forth below.

369. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the conspiracy, including agreeing to fix, raise, maintain, or stabilize the price of all Fertilizer Products sold in the United States, exchanging competitively sensitive information between and among Defendants, and participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

370. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize the price of Fertilizer Products at artificially high levels. The combination and conspiracy was purposefully directed at Indirect Purchaser Plaintiffs in each and every state in the United States and adversely impacted Indirect Purchaser Plaintiffs in each and every state in the United States. As a direct and proximate result of Defendants' conduct, Indirect Purchaser Plaintiffs and members of the State Law Indirect Purchaser Class were deprived of free and open competition and paid more to purchase Fertilizer Products than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

371. In addition, Defendants have profited significantly from the alleged conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense of, and to the detriment of, Indirect Purchaser Plaintiffs and members of the State Law Indirect Purchaser Class.

372. Moreover, Defendants sold Fertilizer Products into each of the jurisdictions below to wholesalers, distributors, agricultural retailers, cooperatives, and other sellers which in turn resold those products to Indirect Purchaser Plaintiffs Albert Mendes; Live Oak Farms, L.P.; Longs Peak Dairy, LLC; WoodHill, LLC; Mike Campion; Mitchel Eickmeyer and Eickmeyer Dairy, Inc.; Oberbroeckling Family Farms Ltd.; David Prolifka; Charles Frickey; Melinda Matson; Rocky Point Farms, Inc.; Hardy's Holsteins, LLC; E-D Farms; Chad Olsen and Pamela Olsen; Johnson Farm Minnesota LLC; Blane Benedict; Bryant Parrish Farms Partnership; John Weidenaar; David Schwaninger; Matt Bargen and Robin Bargen; Patch Orchards, Inc.; Dunham Family Farms; Oakfield-Alabama Farms; Lake Shore Dairy LLC; Gar-mac Dairy, Inc.; Qual Grain; CD Acres LLC; Dewitz Feedlot, Inc.; Ochsner Partnership; Collin Klebsch and Klebsch Farms, Inc.; Drumgoon Dairy Limited Partnership; Naedler Farms II LLC; and Lynn Kirschbaum and State Law Indirect Purchaser Class members. These wholesalers, distributors, agricultural retailers, cooperatives, and other sellers price Fertilizer Products by reference to their cost of acquiring those products from Defendants (in addition to other overhead costs and profit margins). As described above, the supracompetitive prices Defendants charged were therefore passed through each level of the distribution chain in each of the jurisdictions below to the Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members in the form of higher prices. Their injuries are fairly traceable to Defendants' conspiracy, not to the independent pricing decisions of intermediaries.

373. Accordingly, Indirect Purchaser Plaintiffs that indirectly purchased Fertilizer Products ("Indirect Purchaser Plaintiffs") and members of the State Law Indirect Purchaser Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law,

injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

374. Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust statutes.

375. The state law counts that follow are brought on behalf of Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members and any reference to the "Class" is a reference to the State Law Indirect Purchaser Class unless otherwise specified.

**Count 3: Violation of Arizona's Uniform State Antitrust Act,**
**Ariz. Rev. Stat. §44-1401, *et seq*.**

376. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

377. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Arizona during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

378. By reason of the conduct alleged, Defendants have violated Ariz. Rev. Stat. §44-1401, *et seq*.

*379.* Under Arizona law, indirect purchasers have standing to maintain an action under the Arizona Uniform State Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11–20 (2003).

380. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Fertilizer Products market, a substantial part of which occurred within Arizona, in violation of Ariz. Rev. Stat. §44-1402.

381. Defendants' combination and conspiracy had the following effects in Arizona: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer

Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in Arizona by paying supracompetitive, artificially inflated prices for Fertilizer Products.

382. Defendants' violations of Arizona law were flagrant and willful.

383. Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

384. As a direct and proximate result of Defendants' unlawful conduct, State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

385. By reason of the foregoing, State Law Indirect Purchaser Class members are entitled to seek all forms of relief available under Ariz. Rev. Stat. §44-1401, *et seq.*

386. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Arizona Attorney General in accordance with Ariz. Rev. Stat. §44-1415(A).

**Count 4: Violation of California's Cartwright Act,**
**Cal. Bus. & Prof. Code §16700 *et seq.***

387. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

388. The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§16700-16770, governs antitrust violations in California.

389. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code §301.

390. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code §16750(a).

391. A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code §16720. Every trust in California is unlawful except as provided by the Code. *Id.* §16726.

392. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the Fertilizer Products market, a substantial part of which occurred within California.

393. Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code §16700, *et seq*.

394. Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in California during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

395. Defendants' combination and conspiracy had the following effects in California: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiffs Albert Mendes, Live Oak Farms,

and State Law Indirect Purchaser Class members were injured in their business or property in California by paying supracompetitive, artificially inflated prices for Fertilizer Products.

396. During the Class Period, Defendants' illegal conduct substantially affected California trade and commerce. Defendants' violations of California law were flagrant and willful.

397. Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in California and are entitled to all forms of relief, including treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs, under Cal. Bus. & Prof. Code §16750(a).

**Count 5: Violation of Colorado Antitrust Act,**
**Colo. Rev. Stat. §6-4-101, *et seq.***

398. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

399. Plaintiff Longs Peak Dairy, LLC and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Colorado on or after June 7, 2023, from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

400. The Colorado Antitrust Act of 2023 allows a private action for actual damages by "[a]ny person injured, either directly or indirectly" by a violation of Colorado antitrust law. *See* Colo. Rev. Stat. §6-4-115. That provision took effect June 7, 2023, and this Count seeks damages only for purchases made on or after that date.

401. Defendants contracted, combined, or conspired to act in restraint of trade within Colorado, including by conspiring to fix prices of Fertilizer Products, in violation of Colo. Rev. Stat. §6-4-104.

402. Defendants' combination and conspiracy had the following effects in Colorado: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff Longs Peak Dairy, LLC and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiff Longs Peak Dairy, LLC and State Law Indirect Purchaser Class members were injured in their business or property in Colorado by paying supracompetitive, artificially inflated prices for Fertilizer Products.

403. During the Class Period, Defendants' illegal conduct substantially affected Colorado trade and commerce. Defendants' violations of Colorado law were flagrant and willful.

404. Plaintiff Longs Peak Dairy, LLC and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Colorado on or after June 7, 2023, and are entitled to all forms of relief, including actual damages, treble damages, interest, and reasonable attorneys' fees and costs. Colo. Rev. Stat. §6-4-115.

405. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Colorado Attorney General in accordance with Colo. Rev. Stat. §6-4-116.

**Count 6: Violation of Connecticut Antitrust Act,**
**Conn. Gen. Stat. §35-24, *et seq.***

406. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

407. Plaintiff WoodHill, LLC and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Connecticut during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

408. The Connecticut Antitrust Act allows a private action for recovery by indirect purchasers by prohibiting a defendant from "assert[ing] as a defense that the defendant did not deal directly with the person on whose behalf the action is brought." *See* Conn. Gen. Stat. §35-46a.

409. Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut, in violation of Conn. Gen. Stat. §35-24, *et seq*. Defendants' conduct and conspiracy restrained, suppressed, and eliminated price competition for Fertilizer Products; raised, fixed, maintained, and stabilized Fertilizer Products prices at artificially high levels; and deprived Plaintiff WoodHill, LLC and State Law Indirect Purchaser Class members of free and open competition. As a result, Plaintiff WoodHill, LLC and State Law Indirect Purchaser Class members paid supracompetitive, artificially inflated prices for Fertilizer Products.

410. During the Class Period, Defendants' illegal conduct substantially affected Connecticut trade and commerce. Defendants' violations of Connecticut law were flagrant and willful.

411. Plaintiff WoodHill, LLC and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Connecticut and are entitled to all forms of relief, including actual damages, treble damages, interest, and reasonable attorneys' fees and costs.

412. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Connecticut Attorney General in accordance with Conn. Gen. Stat. §35-37.

**Count 7: Violation of District of Columbia Antitrust Act,**
**D.C. Code §28-4501, *et seq.***

413. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

414. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in the District of Columbia during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

415. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code §28-4509(a).

416. Defendants contracted, combined, or conspired to act in restraint of trade within the District of Columbia in violation of D.C. Code §28-4501, *et seq*.

417. Defendants' combination and conspiracy had the following effects in the District of Columbia: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in the District of Columbia by paying supracompetitive, artificially inflated prices for Fertilizer Products.

418. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia trade and commerce. Defendants' violations of District of Columbia law were flagrant and willful.

419. State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, interest, and reasonable attorneys' fees and costs.

**Count 8: Violation of Hawaii Antitrust Act,**
**Haw. Rev. Stat. §480-1, *et seq.***

420. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

421. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Hawaii during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

422. The Hawaii Antitrust Act allows a private action for recovery by indirect purchasers. *See* Haw. Rev. Stat. §480-13.3.

423. Defendants contracted, combined, or conspired to act in restraint of trade within Hawaii in violation of Haw. Rev. Stat. §480-1, *et seq*.

424. Defendants' combination and conspiracy had the following effects in Hawaii: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in Hawaii by paying supracompetitive, artificially inflated prices for Fertilizer Products.

425. During the Class Period, Defendants' illegal conduct substantially affected Hawaii trade and commerce. Defendants' violations of Hawaii law were flagrant and willful.

426. State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Hawaii and are entitled to all forms of relief, including actual damages, interest, and reasonable attorneys' fees and costs.

427. In conjunction with the filing of this Complaint, Plaintiffs have provided notice of this action to the Hawaii Attorney General in accordance with Haw. Rev. Stat. §480-13.3(a).

**Count 9: Violation of Illinois Antitrust Act,**
**740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.***

428. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

429. Plaintiffs Mitchel Eickmeyer, Eickmeyer Dairy, Inc., Mike Campion, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Illinois during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

430. Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. 10/7(2).

431. Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their agreement, for the purpose of fixing, controlling, or maintaining prices for Fertilizer Products sold within the intrastate commerce of Illinois, in violation of 740 Ill. Comp. Stat. 10/3.

432. Defendants' combination and conspiracy had the following effects in Illinois: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs Mitchel Eickmeyer, Eickmeyer Dairy, Inc., Mike Campion, and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiffs Mitchel Eickmeyer, Eickmeyer Dairy, Inc., Mike Campion, and State Law Indirect Purchaser Class members were injured in their business or property in Illinois by paying supracompetitive, artificially inflated prices for Fertilizer Products.

433. During the Class Period, Defendants' illegal conduct substantially affected Illinois trade and commerce. Defendants' violations of Illinois law were flagrant and willful.

434. Defendants further unreasonably restrained trade or commerce in the market for Fertilizer Products in Illinois for the purpose of excluding competition, in violation of 740 Ill. Comp. Stat. 10/3.

435. Plaintiffs Mitchel Eickmeyer, Eickmeyer Dairy, Inc., Mike Campion, and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**Count 10: Violation of Iowa Competition Law,**
**Iowa Code §553.1, *et seq.***

436. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

437. Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-51 (Iowa 2002).

438. Plaintiff Oberbroeckling Family Farms Ltd. and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Iowa during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

439. Defendants contracted, combined, or conspired to restrain trade in the Fertilizer Products market, in violation of Iowa Code §553.1, *et seq*.

440. Defendants' combination and conspiracy had the following effects in Iowa: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff Oberbroeckling Family Farms Ltd. and State Law Indirect Purchaser Class members were

deprived of free and open competition; and (4) Plaintiff Oberbroeckling Family Farms Ltd. and State Law Indirect Purchaser Class members were injured in their business or property in Iowa by paying supracompetitive, artificially inflated prices for Fertilizer Products.

441. During the Class Period, Defendants' illegal conduct substantially affected Iowa trade and commerce. Defendants' violations of Iowa law were flagrant and willful.

442. Plaintiff Oberbroeckling Family Farms Ltd. and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Iowa and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

**Count 11: Violation of Kansas Restraint of Trade Act,**
**K.S.A. 50-101, *et seq.***

443. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

444. The Kansas Restraint of Trade Act prohibits arrangements, contracts, agreements, trusts, or combinations that "tend to prevent full and free competition in the importation, transportation or sale" of articles imported into Kansas, and that fix, control, or maintain prices. K.S.A. 50-112.

445. Beginning at least as early as January 1, 2021, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in Fertilizer Products within Kansas, including by fixing, raising, maintaining, and stabilizing prices and by exchanging competitively sensitive information.

446. Defendants' conduct constitutes a *per se* violation.

447. Plaintiffs David Prolifka, Charles Frickey, Melinda Matson, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Kansas during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

448. Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. K.S.A. 50-161(b).

449. Defendants' combination and conspiracy had the following effects in Kansas: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs David Prolifka, Charles Frickey, Melinda Matson, and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiffs David Prolifka, Charles Frickey, Melinda Matson, and State Law Indirect Purchaser Class members were injured in their business or property in Kansas by paying supracompetitive, artificially inflated prices for Fertilizer Products.

450. During the Class Period, Defendants' illegal conduct substantially affected Kansas trade and commerce. Defendants' violations of Kansas law were flagrant and willful.

451. Plaintiffs David Prolifka, Charles Frickey, Melinda Matson, and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**Count 12: Violation of Maine's Antitrust Statute,**
**Me. Rev. Stat. Ann. tit. 10, §1101, *et seq.***

452. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

453. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Maine during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

454. Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. tit. 10, §1104(1).

455. Defendants contracted, combined, or conspired in restraint of trade or commerce of Fertilizer Products within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. tit. 10, §1101, *et seq*.

456. Defendants' combination and conspiracy had the following effects in Maine: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in Maine by paying supracompetitive, artificially inflated prices for Fertilizer Products.

457. During the Class Period, Defendants' illegal conduct substantially affected Maine trade and commerce. Defendants' violations of Maine law were flagrant and willful.

458. State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**Count 13: Violation of Maryland's Antitrust Statute,**
**Md. Code Ann., Com. Law §11-204(a), *et seq.***

459. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

460. The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." Md. Code Ann., Com. Law §11-202(a)(1).

461. Plaintiff Rocky Point Farms, Inc. and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Maryland during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

462. Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Md. Code Ann., Com. Law §11-209(b)(2)(i).

463. Defendants entered into an unlawful agreement in restraint of trade in violation of Md. Code Ann., Com. Law §11-204.

464. Defendants' combination and conspiracy had the following effects in Maryland: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff Rocky Point Farms, Inc. and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiff Rocky Point Farms, Inc. and State Law Indirect Purchaser Class members were injured in their business or property in Maryland by paying supracompetitive, artificially inflated prices for Fertilizer Products.

465. During the Class Period, Defendants' illegal conduct substantially affected Maryland trade and commerce. Defendants' violations of Maryland law were flagrant and willful.

466. Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonable attorneys' fees. Md. Code Ann., Com. Law §11-209(b)(4).

467. Plaintiff Rocky Point Farms, Inc. and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**Count 14: Violation of the Michigan Antitrust Reform Act,**
**Mich. Comp. Laws §445.771, *et seq.***

468. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

469. The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984 (Mich. Comp. Laws §445.771, *et seq.*).

470. Plaintiffs Hardy's Holsteins, LLC, E-D Farms, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Michigan during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

471. Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws § 445.778(2).

472. Defendants entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771, *et seq*.

473. Defendants' combination and conspiracy had the following effects in Michigan: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs Hardy's Holsteins, LLC, E-D Farms, and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiffs Hardy's Holsteins, LLC, E-D Farms,

and State Law Indirect Purchaser Class members were injured in their business or property in Michigan by paying supracompetitive, artificially inflated prices for Fertilizer Products.

474. During the Class Period, Defendants' illegal conduct substantially affected Michigan trade and commerce. Defendants' violations of Michigan law were flagrant and willful.

475. Plaintiffs Hardy's Holsteins, LLC, E-D Farms, and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**Count 15: Violation of the Minnesota Antitrust Law,**
**Minn. Stat. §§325D.49 *et seq.* & 325D.57 *et seq.***

476. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

477. The Minnesota Antitrust Law of 1971 prohibits "any contract, combination, or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination, or conspiracy, wherever created, formed or entered into . . . whenever any of the foregoing affects the trade or commerce of [Minnesota]." Minn. Stat. §325D.54.

478. Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Minnesota during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

479. Under the Minnesota Antitrust Law of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. §325D.57.

480. Defendants entered into an unlawful agreement in restraint of trade or commerce in the market for Fertilizer Products within the intrastate commerce of and outside of Minnesota,

and fixed prices for Fertilizer Products within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. §325D.49, *et seq*.

481. Defendants' combination and conspiracy had the following effects in Minnesota: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members were injured in their business or property in Minnesota by paying supracompetitive, artificially inflated prices for Fertilizer Products.

482. During the Class Period, Defendants' illegal conduct substantially affected Minnesota trade and commerce. Defendants' violations of Minnesota law were flagrant and willful.

483. Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Minnesota and are entitled to all forms of relief available under Minn. Stat. §§325D.49 *et seq*. & 325D.57 *et seq*.

484. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Minnesota Attorney General in accordance with Minn. Stat. § 325D.63.

**Count 16: Violation of the Mississippi Antitrust Statute,**
**Miss. Code Ann. §75-21-1, *et seq.***

485. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

486. Title 75 of the Mississippi Code regulates trade, commerce, and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. §75-21-39.

487. "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, among other things, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. §75-21-1.

488. Plaintiff Bryant Parrish Farms Partnership and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Mississippi during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

489. Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. §75-21-9.

490. Defendants combined, contracted, understood, and agreed in the market for Fertilizer Products, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of Fertilizer Products, and hindering competition in the sale of Fertilizer Products, in violation of Miss. Code Ann. §75-21-1, *et seq*.

491. Upon information and belief, Plaintiff Bryant Parrish Farms Partnership indirectly purchased Fertilizer Products in Mississippi, where the ultimate supplier or manufacturer of the Fertilizer Products' nutrients was a Defendant, and those nutrients were distributed by Defendants into Mississippi.

492. Defendants' combination and conspiracy had the following effects in Mississippi: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff Bryant Parrish Farms Partnership and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiff Bryant Parrish Farms Partnership and State Law Indirect Purchaser Class members were injured in their business or property in Mississippi by paying supracompetitive, artificially inflated prices for Fertilizer Products.

493. During the Class Period, Defendants' illegal conduct substantially affected Mississippi trade and commerce. Defendants' violations of Mississippi law were flagrant and willful.

494. Plaintiff Bryant Parrish Farms Partnership and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**Count 17: Violation of the Montana Unfair Trade Practices Act – Unlawful Restraint of Trade**
**Mont. Code Ann. §§30-14-205, 30-14-222**

495. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

496. Part 2 of Montana's Unfair Trade Practices Act exists "to safeguard the public against the creation or perpetuation of monopolies and foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented," and it "must be liberally construed so that its beneficial purposes may be accomplished." Mont. Code Ann. §30-14-201.

497. Montana law makes it unlawful "for a person or group of persons, directly or indirectly: (1) to enter an agreement for the purpose of fixing the price or regulating the production of an article of commerce," or, "for the purpose of creating or carrying out any restriction in trade, to . . . (a) limit productions; (b) increase or reduce the price of merchandise or commodities; . . . [or] (d) fix a standard or figure whereby the price of an article of commerce intended for sale, use, or consumption will be in any way controlled." Mont. Code Ann. §30-14-205.

498. To state a claim, a plaintiff must allege (1) an agreement or other conduct by a person or group of persons, directly or indirectly; (2) for the purpose of fixing the price or regulating the production of an article of commerce, or of restricting trade by a means enumerated in Section 30-14-205(2); and (3) that the plaintiff "is or will be injured" by the violation. Mont. Code Ann. §§30-14-205, 30-14-222(1).

499. Beginning at least as early as January 1, 2021 and continuing through the present, Defendants and their co-conspirators entered into agreements for the purpose of fixing the price and regulating the production of Fertilizer Products, which are articles of commerce intended for sale, use, and consumption in Montana, and for the purpose of limiting production and increasing the price of Fertilizer Products, in violation of Mont. Code Ann. §30-14-205(1) and (2)(a), (b), and (d).

500. Defendants' conduct constitutes a *per se* violation.

501. Plaintiff John Weidenaar and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Montana during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

502. Upon information and belief, Plaintiff John Weidenaar indirectly purchased Fertilizer Products in Montana, where the ultimate supplier of the Fertilizer Products was a Defendant.

503. Under Montana law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mont. Code Ann. §30-14-222(1). The statute provides that "[a] person who is or will be injured . . . may bring an action to enjoin an act that is in violation of 30-14-205 . . . and for the recovery of damages." *Id.*

504. Defendants' combination and conspiracy had the following effects in Montana: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff John Weidenaar and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiff John Weidenaar and State Law Indirect Purchaser Class members were injured in their business or property in Montana by paying supracompetitive, artificially inflated prices for Fertilizer Products.

505. During the Class Period, Defendants' illegal conduct substantially affected Montana trade and commerce. Defendants' violations of Montana law were flagrant and willful.

506. Plaintiff John Weidenaar and State Law Indirect Purchaser Class members were injured, and are threatened with further injury, with respect to purchases of Fertilizer Products in Montana, and are entitled to all forms of relief, including the greater of three times their actual damages or $1,000, injunctive relief, and attorney fees and costs. Mont. Code Ann. §30-14-222(1), (2)(a), (4).[23]

---

[23] Although *Olson v. Microsoft Corp.*, No. CDV-2000-219, 2001 WL 36083237 (Mont. Dist. Feb. 15, 2001) is only a district court opinion, its logic applying *California v. ARC America Corp.*, 490 U.S. 93, 103 (1989) and textual analysis of the statute have never been questioned. This Count

**Count 18: Violation of the Nebraska Junkin Act,**
**Neb. Rev. Stat. §59-801, *et seq.***

507. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

508. Plaintiffs David Schwaninger, Matt Bargen, and Robin Bargen, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Nebraska during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

509. Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. §59-821.

510. Defendants contracted, combined, or conspired in restraint of trade or commerce of Fertilizer Products within the intrastate commerce of Nebraska, through agreements to fix prices and otherwise control trade, in violation of Neb. Rev. Stat. §59-801, *et seq*.

511. Defendants' combination and conspiracy had the following effects in Nebraska: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs David Schwaninger, Matt Bargen, and Robin Bargen, and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiffs David Schwaninger, Matt Bargen, and Robin Bargen, and State Law Indirect Purchaser Class members were injured in their business or property in Nebraska by paying supracompetitive, artificially inflated prices for Fertilizer Products.

---

is pleaded in addition to Count 41 (Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code Ann. §30-14-103, *et seq.*).

512. During the Class Period, Defendants' illegal conduct substantially affected Nebraska trade and commerce. Defendants' violations of Nebraska law were flagrant and willful.

513. Accordingly, Plaintiffs David Schwaninger, Matt Bargen, and Robin Bargen, and State Law Indirect Purchaser Class members are entitled to all forms of relief available under Neb. Rev. Stat. §59-801, *et seq*.

**Count 19: Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §598A.010, *et seq.***

514. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

515. The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. §598A.030(1).

516. The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." Nev. Rev. Stat. §598A.030(2). Such acts include, among other things, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* Nev. Rev. Stat. Ann. §598A.060.

517. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Nevada during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

518. Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

519. Defendants entered into an unlawful agreement in restraint of trade, including by fixing prices for Fertilizer Products, in violation of Nev. Rev. Stat. §598A.060.

520. Defendants' combination and conspiracy had the following effects in Nevada: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in Nevada by paying supracompetitive, artificially inflated prices for Fertilizer Products.

521. During the Class Period, Defendants' illegal conduct substantially affected Nevada trade and commerce. Defendants' violations of Nevada law were flagrant and willful.

522. State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Nevada in that at least thousands of sales of Fertilizer Products took place in Nevada, purchased by Nevada purchasers at supracompetitive prices caused by Defendants' conduct.

523. Accordingly, State Law Indirect Purchaser Class members are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

524. In accordance with Nev. Rev. Stat. §598A.210(3), Plaintiffs have mailed notice of this action to the Nevada Attorney General.

**Count 20: Violation of New Hampshire's Antitrust Statute,**
**N.H. Rev. Stat. Ann. Tit. XXXI, §356, *et seq*.**

525. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

526. Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

527. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. Rev. Stat. Ann. §§356:2, :3.

528. Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in New Hampshire during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

529. Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. §356:11(II).

530. Defendants fixed, controlled, or maintained prices for Fertilizer Products, constituting a contract, combination, or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. §356:1, *et seq*.

531. Defendants' combination and conspiracy had the following effects in New Hampshire: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members were injured in their business or property in New Hampshire by paying supracompetitive, artificially inflated prices for Fertilizer Products.

532. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire trade and commerce. Defendants' violations of New Hampshire law were flagrant and willful.

533. Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**Count 21: Violation of the New Mexico Antitrust Act,**
**N.M. Stat. Ann. §57-1-1, *et seq.***

534. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

535. The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. Stat. Ann. §57-1-15.

536. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in New Mexico during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

537. Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. Stat. Ann. §57-1-3(A).

538. Defendants contracted, agreed, combined, or conspired in restraint of trade for Fertilizer Products within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. §57-1-1, *et seq*.

539. Defendants' combination and conspiracy had the following effects in New Mexico: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in New Mexico by paying supracompetitive, artificially inflated prices for Fertilizer Products.

540. During the Class Period, Defendants' illegal conduct substantially affected New Mexico trade and commerce. Defendants' violations of New Mexico law were flagrant and willful.

541. State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**Count 22: Violation of the New Jersey Antitrust Act,**
**N.J. Stat. Ann. §56:9-3, *et seq.***

542. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

543. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in New Jersey on or after August 5, 2022, from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

544. Defendants' actions as alleged herein violate the New Jersey Antitrust Act, N.J.S.A. §§56:9-1, *et seq.*, in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of New Jersey and elsewhere. N.J.S.A. §56:9-3.

545. Defendants' combinations or conspiracies had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout New Jersey; (2) prices for Fertilizer Products were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in New Jersey by paying supracompetitive, artificially inflated prices for Fertilizer Products.

546. During the Class Period, Defendants' illegal conduct substantially affected New Jersey commerce.

547. State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in New Jersey and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs, including but not limited to expenses of discovery and document reproduction. N.J.S.A. §56:9-12.

**Count 23: Violation of the Donnelly Act,**
**N.Y. Gen. Bus. Law §340, *et seq.***

548. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

549. Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. Gen. Bus. Law §340(1).

550. Plaintiffs Dunham Family Farms, Oakfield-Alabama Farms, and Lake Shore Dairy LLC, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in New York during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

551. Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.Y. Gen. Bus. Law §340(6).

552. Defendants restrained competition in the free exercise of the conduct of the business of Fertilizer Products within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law §340, *et seq*. The conduct set forth above is a *per se* violation of the Donnelly Act.

553. Defendants' combination and conspiracy had the following effects in New York: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels;

(3) Plaintiffs Dunham Family Farms, Oakfield-Alabama Farms, and Lake Shore Dairy LLC, and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiffs Dunham Family Farms, Oakfield-Alabama Farms, and Lake Shore Dairy LLC, and State Law Indirect Purchaser Class members were injured in their business or property in New York by paying supracompetitive, artificially inflated prices for Fertilizer Products.

554. During the Class Period, Defendants' illegal conduct substantially affected New York trade and commerce. Defendants' violations of New York law were flagrant and willful.

555. Plaintiffs Dunham Family Farms, Oakfield-Alabama Farms, and Lake Shore Dairy LLC, and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in New York and are entitled to all forms of relief.

556. Pursuant to N.Y. Gen. Bus. Law §340(5), Plaintiffs have sent notice of this action to the New York Attorney General, identifying the relevant state antitrust provisions and enclosing a copy of this Complaint.

**Count 24: Violation of the North Carolina General Statutes,**
**N.C. Gen. Stat. §75-1, *et seq.***

557. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

558. Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

559. Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in North Carolina during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

560. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

561. Defendants entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. §75-1, *et seq*.

562. Defendants' combination and conspiracy had the following effects in North Carolina: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members were injured in their business or property in North Carolina by paying supracompetitive, artificially inflated prices for Fertilizer Products.

563. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce. Defendants' violations of North Carolina law were flagrant and willful.

564. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

565. Because of the foregoing, Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. §75-1, *et seq*.

**Count 25: Violation of the North Dakota Uniform State Antitrust Act,**
**N.D. Cent. Code §51-08.1-01, *et seq.***

566. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

567. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. Cent. Code §51-08.1-01, *et seq*.

568. Plaintiffs Qual Grain, CD Acres LLC, Dewitz Feedlot, Inc., and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in North Dakota during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

569. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code §51-08.1-08.

570. Defendants contracted, combined, or conspired in restraint of trade or commerce of Fertilizer Products, a substantial part of which occurred within North Dakota, in violation of N.D. Cent. Code §51-08.1-01, *et seq*.

571. Defendants' combination and conspiracy had the following effects in North Dakota: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs Qual Grain, CD Acres LLC, Dewitz Feedlot, Inc., and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiffs Qual Grain, CD Acres LLC, Dewitz Feedlot, Inc., and State Law Indirect Purchaser Class members were injured in their business or property in North Dakota by paying supracompetitive, artificially inflated prices for Fertilizer Products.

572. Defendants' unlawful conduct substantially affected North Dakota's trade and commerce. Defendants' violations of North Dakota law were flagrant and willful.

573. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Qual Grain, CD Acres LLC, Dewitz Feedlot, Inc., and State Law Indirect Purchaser Class members were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief available under N.D. Cent. Code §51-08.1-01, *et seq*.

**Count 26: Violation of the Oklahoma Antitrust Reform Act, 79 O.S. §201, *et seq.***

574. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

575. The Oklahoma Antitrust Reform Act provides that "[e]very act, agreement, contract, or combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal." 79 O.S. § 203(A).

576. The Act defines "[c]ommodity" as "any tangible personal property, article, or good," and "[p]erson" to include "a natural person, corporation, partnership, limited liability company, proprietorship, association, . . . or any other legal entity." 79 O.S. §202(2)–(3). Fertilizer Products are commodities, and Plaintiffs, Class members, and Defendants are persons, under the Act.

577. To state a claim, a plaintiff must allege (1) an act, agreement, contract, combination, or conspiracy; (2) in restraint of trade or commerce within Oklahoma; and (3) injury to the plaintiff's business or property by the violation. 79 O.S. §§203(A), 205(A)(1).

578. Beginning at least as early as January 1, 2021 and continuing through the present, Defendants and their co-conspirators entered into and engaged in an agreement, combination, or

conspiracy in restraint of trade and commerce in Fertilizer Products within Oklahoma, including by fixing, raising, maintaining, and stabilizing prices, restricting output, and exchanging competitively sensitive information, in violation of 79 O.S. §203(A). As discussed above, Defendants produce Fertilizer Products in Oklahoma, including at CF Industries' nitrogen complexes in Claremore and Woodward, Oklahoma, and Koch's facility in Enid, Oklahoma.

579. Defendants' conduct constitutes a *per se* violation.

580. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Oklahoma during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

581. Under the Oklahoma Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. 79 O.S. §205(A)(1). he Act provides that "[a]ny person who is injured in his or her business or property by a violation of this act, may obtain appropriate injunctive or other equitable relief and monetary damages and shall recover threefold the damages sustained, and the cost of suit, including a reasonable attorney fee." *Id*.

582. Defendants' combination and conspiracy had the following effects in Oklahoma: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in Oklahoma by paying supracompetitive, artificially inflated prices for Fertilizer Products.

583. During the Class Period, Defendants' illegal conduct substantially affected Oklahoma trade and commerce. Defendants' violations of Oklahoma law were flagrant and willful.

584. State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Oklahoma and are entitled to all forms of relief, including threefold damages, interest, the cost of suit, a reasonable attorney fee, and injunctive or other equitable relief. 79 O.S. §205(A)(1).[24]

**Count 27: Violation of the Oregon Antitrust Law,**
**Or. Rev. Stat. §646.705, *et seq*.**

585. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

586. Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. §646.715(1).

587. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Oregon during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

588. Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. §646.780(1)(a).

---

[24] There is no binding authority in Oklahoma on IPP antitrust recovery. *See* 20 O.S. §30.5 ("No opinion of the Court of Civil Appeals shall be binding or cited as precedent unless it shall have been approved by the majority of the justices of the Supreme Court for publication in the official reporter.").

589. Defendants entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. §646.705, *et seq.*

590. Defendants' combination and conspiracy had the following effects in Oregon: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in Oregon by paying supracompetitive, artificially inflated prices for Fertilizer Products.

591. During the Class Period, Defendants' illegal conduct substantially affected Oregon trade and commerce. Defendants' violations of Oregon law were flagrant and willful.

592. State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

593. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Oregon Attorney General in accordance with Or. Rev. Stat. §646.780(5)(b).

**Count 28: Violation of the Rhode Island Antitrust Act,**
**R.I. Gen. Laws §6-36-1, *et seq.***

594. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

595. The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade

and monopolistic practices" that hamper, prevent or decrease competition. R.I. Gen. Laws §6-36-2(a)(2).

596. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Rhode Island during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

597. Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws §6-36-11(a).

598. Defendants contracted, combined, and conspired in restraint of trade of Fertilizer Products within the intrastate commerce of Rhode Island, for the purpose of controlling, fixing, or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws §6-36-1, *et seq*.

599. Defendants' combination and conspiracy had the following effects in Rhode Island: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in Rhode Island by paying supracompetitive, artificially inflated prices for Fertilizer Products.

600. During the Class Period, Defendants' illegal conduct substantially affected Rhode Island trade and commerce. Defendants' violations of Rhode Island law were flagrant and willful.

601. State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

602. In conjunction with the filing of this Complaint, Plaintiffs have mailed a copy of this Complaint to the Rhode Island Attorney General in accordance with R.I. Gen. Laws §6-36-21.

**Count 29: Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §37-1-3.1, *et seq*.**

603. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

604. Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies, and discriminatory trade practices. S.D. Codified Laws §§37-1-3.1, -3.2.

605. Plaintiffs Ochsner Partnership, Collin Klebsch, Klebsch Farms, Inc., Drumgoon Dairy Limited Partnership, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in South Dakota during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

606. Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. *See* S.D. Codified Laws §37-1-33.

607. Defendants contracted, combined, or conspired in restraint of trade or commerce of Fertilizer Products within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws §37-1-3.1, *et seq*.

608. Upon information and belief, Plaintiffs Ochsner Partnership, Collin Klebsch, Klebsch Farms, Inc., and Drumgoon Dairy Limited Partnership purchased Fertilizer Products in South Dakota at supracompetitive prices as a result of the anticompetitive conspiracy alleged within this Complaint.

609. Defendants' combination and conspiracy had the following effects in South Dakota: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs Ochsner Partnership, Collin Klebsch, Klebsch Farms, Inc., Drumgoon Dairy Limited Partnership, and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiffs Ochsner Partnership, Collin Klebsch, Klebsch Farms, Inc., Drumgoon Dairy Limited Partnership, and State Law Indirect Purchaser Class members were injured in their business or property in South Dakota by paying supracompetitive, artificially inflated prices for Fertilizer Products.

610. During the Class Period, Defendants' illegal conduct substantially affected South Dakota trade and commerce. Defendants' violations of South Dakota law were flagrant and willful.

611. Plaintiffs Ochsner Partnership, Collin Klebsch, Klebsch Farms, Inc., Drumgoon Dairy Limited Partnership, and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**Count 30: Violation of the Tennessee Trade Practices Act,**
**Tenn. Code Ann. §47-25-101, *et seq*.**

612. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

613. The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, among other things, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen,

full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* Tenn. Code Ann. §47-25-101.

614. Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practices Act to maintain an action based on the facts alleged in this Complaint. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

615. Defendants competed unfairly and colluded by meeting to fix prices, restrain output, divide markets, and otherwise restrain trade as set forth above, in violation of Tenn. Code Ann. §47-25-101, *et seq.*

616. Defendants' conduct violated the Tennessee Trade Practices Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendants' combination or conspiracy had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout Tennessee; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members paid supracompetitive, artificially inflated prices for Fertilizer Products.

617. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce because Fertilizer Products were sold to and purchased by State Law Indirect Purchaser Class members in Tennessee at supracompetitive prices. Defendants' violations of Tennessee law were flagrant and willful.

618. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Tennessee during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

619. State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**Count 31: Violation of the Utah Antitrust Act,**
**Utah Code Ann. §76-10-3101, *et seq.***

620. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

621. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." Utah Code Ann. §76-10-3102.

622. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Utah during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

623. Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. §76-10-3109(1)(a).

624. Defendants contracted, combined, or conspired in restraint of trade or commerce of Fertilizer Products, in violation of Utah Code Ann. §76-10-3101, *et seq*.

625. Defendants' combination and conspiracy had the following effects in Utah: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in Utah by paying supracompetitive, artificially inflated prices for Fertilizer Products.

626. During the Class Period, Defendants' illegal conduct substantially affected Utah trade and commerce. Defendants' violations of Utah law were flagrant and willful.

627. State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

628. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Utah Attorney General in accordance with Utah Code Ann. §76-10-3109(9).

### Count 32: Violation of the West Virginia Antitrust Act, W. Va. Code §47-18-1, *et seq.*

629. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

630. The violations of law set forth above also constitute violations of Section 47-18-1 of the West Virginia Code.

631. During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia, in violation of W. Va. Code §§47-18-3, -4.

632. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in West Virginia during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

633. Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. Va. Code R. §142-9-2 ("Any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. Va. Code §47-18-1, *et seq.*, may bring an action for damages under W. Va. Code §47-18-9.").

634. Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

635. Defendants' combination and conspiracy had the following effects in West Virginia: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) State Law Indirect Purchaser Class members were injured in their business or property in West Virginia by paying supracompetitive, artificially inflated prices for Fertilizer Products.

636. During the Class Period, Defendants' illegal conduct substantially affected West Virginia trade and commerce.

637. As a direct and proximate result of Defendants' unlawful conduct, State Law Indirect Purchaser Class members have been injured in their business and property in that they

paid more for Fertilizer Products than they otherwise would have paid absent Defendants' unlawful conduct.

638. As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, State Law Indirect Purchaser Class members seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

**Count 33: Violation of the Wisconsin Antitrust Act,**
**Wis. Stat. §133.01, *et seq.***

639. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

640. Chapter 133 of the Wisconsin Statutes governs trusts and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. §133.01. Chapter 133 further provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal." Wis. Stat. §133.03(1).

641. Plaintiffs Naedler Farms II LLC, Lynn Kirschbaum, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Wisconsin during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

642. Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. *See* Wis. Stat. §133.18(1)(a).

643. Defendants contracted, combined, or conspired in restraint of trade or commerce of Fertilizer Products, with the intention of injuring or destroying competition, in violation of Wis. Stat. §133.01, *et seq*.

644. Defendants' combination and conspiracy had the following effects in Wisconsin: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs Naedler Farms II LLC, Lynn Kirschbaum, and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiffs Naedler Farms II LLC, Lynn Kirschbaum, and State Law Indirect Purchaser Class members were injured in their business or property in Wisconsin by paying supracompetitive, artificially inflated prices for Fertilizer Products.

645. Defendants' conduct substantially affected the people of Wisconsin and had impacts in Wisconsin.

646. Plaintiffs Naedler Farms II LLC, Lynn Kirschbaum, and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Wisconsin in that the actions alleged substantially affected the people of Wisconsin, with at least thousands of purchasers in Wisconsin paying substantially higher prices for Fertilizer Products in Wisconsin. Defendants' violations of Wisconsin law were flagrant and willful.

647. Accordingly, Plaintiffs Naedler Farms II LLC, Lynn Kirschbaum, and State Law Indirect Purchaser Class members are entitled to all forms of relief available under Wis. Stat. §133.01, *et seq*.

## IX. VIOLATION OF STATE CONSUMER PROTECTION STATUTES

648. Plaintiffs repeat the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

649. Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

650. Defendants' conduct was unfair and unconscionable independent of any misrepresentation. It offends established public policy against price fixing and supply restriction; it is immoral, unethical, oppressive, and unscrupulous because Defendants undertook it to maximize their profits at the expense of purchasers of Fertilizer Products; it caused substantial injury to the Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members in the form of overcharges; that injury was not reasonably avoidable, because Defendants' conspiracy restrained competition and limited purchasers' alternatives; and no countervailing benefit to purchasers or to competition outweighs it.

651. Moreover, Defendants sold Fertilizer Products into each of the jurisdictions below to wholesalers, distributors, agricultural retailers, cooperatives, and other sellers which in turn resold those products to Plaintiffs HCM Farm Partners; Generation Three Partnership; Bacon Lake Farm; Albert Mendes; Live Oak Farms, L.P.; Milking R, Inc.; Michael Kosinski d/b/a North Country Harvests; Chad Olsen and Pamela Olsen; Johnson Farm Minnesota LLC; Blane Benedict; DSA Farms GP; John Weidenaar; David Schwaninger; Matt Bargen and Robin Bargen; Patch Orchards, Inc.; Gar-mac Dairy, Inc.; Barnett's Dairy Farm, LLC; Christopher Fay; Chimney Point Farm Limited Partnership; and State Law Indirect Purchaser Class members. These wholesalers, distributors, agricultural retailers, cooperatives, and other sellers price Fertilizer Products by

reference to their cost of acquiring those products from Defendants (in addition to other overhead costs and profit margins). As described above, the supracompetitive prices Defendants charged were therefore passed through each level of the distribution chain in each of the jurisdictions below to the Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members in the form of higher prices. Their injuries are fairly traceable to Defendants' conspiracy, not to the independent pricing decisions of intermediaries.

652. The claims below rest first on that unfair and unconscionable conduct and do not depend on any misrepresentation by Defendants or any reliance by the Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members. Where a statute below also reaches deceptive conduct, Plaintiffs plead deception separately and in the alternative.

653. In the alternative, and to the extent any statute below reaches deceptive conduct, Defendants concealed the anticompetitive and unlawful nature of their combination, conspiracy, or agreement to unreasonably restrain trade in the market for Fertilizer Products through the public statements identified above at ¶¶159, 166, 183–84, 198, 202–03, 205, 216–17, 221, 225, 228(c), (e), (j)–(m), (o), (q)–(s), (v)–(x), 263, 265–66, 336–37.

654. Accordingly, the Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members paid, and will continue to pay, inflated prices for Fertilizer Products. The Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members could not reasonably have avoided injury from Defendants' wrongful conduct. This injury is of the type the state consumer protection statutes were designed to prevent and directly flows from Defendants' unlawful conduct.

655. Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state consumer protection statutes.

656. The state law counts that follow are brought on behalf of Indirect Purchaser Plaintiffs and Class members and any reference to the "Class" is a reference to the State Law Indirect Purchaser Class unless otherwise specified.

**Count 34: Violation of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §4-88-101, *et seq.***

657. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

658. Through the conduct alleged, Defendants have violated Ark. Code Ann. §4-88-101, *et seq.*

659. Plaintiffs HCM Farm Partners, Generation Three Partnership, Bacon Lake Farm, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Arkansas during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

660. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the Fertilizer Products market, a substantial part of which occurred within Arkansas.

661. Defendants' unlawful conduct substantially affected Arkansas' trade and commerce.

662. Defendants' combination and conspiracy to fix, raise, maintain, and stabilize Fertilizer Products prices was an unconscionable trade practice under Ark. Code Ann. §4-88-107(a)(10), independent of any misrepresentation.

663. In the alternative, Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs HCM Farm Partners, Generation Three Partnership, Bacon Lake Farm, and State Law Indirect Purchaser Class members concerning Defendants' unlawful activities and

artificially inflated prices for Fertilizer Products. The concealed, suppressed, and omitted facts would have been important to Plaintiffs HCM Farm Partners, Generation Three Partnership, Bacon Lake Farm, and State Law Indirect Purchaser Class members as they related to the cost of products they purchased.

664. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Fertilizer Products by making public statements that were not in accord with the facts. *See supra* ¶¶159, 166, 183–84, 198, 202–03, 205, 216–17, 221, 225, 228(c), (e), (j)–(m), (o), (q)–(s), (v)–(x), 263, 265–66, 336–37.

665. Defendants' statements and conduct related to the price of their products were deceptive as they had the tendency or capacity to mislead Plaintiffs HCM Farm Partners, Generation Three Partnership, Bacon Lake Farm, and State Law Indirect Purchaser Class members to believe that they were purchasing Fertilizer Products at prices established by a free and fair market.

666. The aforementioned conduct by Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10).

667. In the alternative, Defendants' public statements identified above concerning the causes of Fertilizer Products price increases were deceptive because they were likely to mislead Plaintiffs HCM Farm Partners, Generation Three Partnership, Bacon Lake Farm, and State Law Indirect Purchaser Class members acting reasonably into believing that they were paying prices set by a free and fair market. *See supra* ¶¶ 159, 166, 183–84, 198, 202–03, 205, 216–17, 221, 225, 228(c), (e), (j)–(m), (o), (q)–(s), (v)–(x), 263, 265–66, 336–37.

668. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs HCM Farm Partners, Generation Three Partnership, Bacon Lake Farm, and State Law Indirect Purchaser

Class members have been injured in their business or property and are threatened with further injury in that they paid and will pay supracompetitive prices for Fertilizer Products due to Defendants' unlawful conduct.

669. Accordingly, Plaintiffs HCM Farm Partners, Generation Three Partnership, Bacon Lake Farm, and State Law Indirect Purchaser Class members seek all relief available under Ark. Code Ann. §4-88-113.

**Count 35: Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**

670. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

671. Cal. Bus. & Prof. Code §17200 prohibits any "unlawful, unfair, or fraudulent business act or practice."

672. As residents and citizens of California, Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in California during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

673. Defendants' conduct was "unlawful" within the meaning of the Unfair Competition Law because it violated Section 1 of the Sherman Act and the Cartwright Act, Cal. Bus. & Prof. Code §16720, as alleged above. This theory does not depend on any misrepresentation or on reliance by Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members.

674. Defendants' conduct was also "unfair" within the meaning of the Unfair Competition Law because their conspiracy to fix and inflate Fertilizer Products prices violates the policy and spirit of the antitrust laws and caused Plaintiffs Albert Mendes, Live Oak Farms, and

State Law Indirect Purchaser Class members substantial injury that outweighs any benefit of the conduct.

675. In the alternative, Defendants' conduct was "fraudulent" within the meaning of the Unfair Competition Law because Defendants concealed their conspiracy through the public statements identified above. Defendants' public statements identified above concerning the causes of Fertilizer Products price increases were deceptive because they were likely to mislead Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members acting reasonably into believing that they were paying prices set by a free and fair market. *See supra* ¶¶ 159, 166, 183–84, 198, 202–03, 205, 216–17, 221, 225, 228(c), (e), (j)–(m), (o), (q)–(s), (v)–(x), 263, 265–66, 336–37.

676. Defendants' unlawful and unfair conduct caused Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members to pay inflated prices for Fertilizer Products. Accordingly, Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members have suffered injury in fact, including lost money or property, as a result of Defendants' unfair competition.

677. Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §17203.

**Count 36: Violation of the District of Columbia Consumer Protection Procedures Act, D.C. Code §28-3901, *et seq.***

678. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

679. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products primarily for personal, family, or household purposes in the District of Columbia during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

680. Through the conduct alleged, Defendants have violated D.C. Code §28-3901, *et seq*.

681. Defendants are "merchants" within the meaning of D.C. Code §28-3901(a)(3).

682. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

683. Defendants' conspiracy resulted in a gross disparity between the price State Law Indirect Purchaser Class members paid for Fertilizer Products and its value measured by the price at which similar Fertilizer Products would have been readily obtainable in a competitive market. *See* D.C. Code §28-3904(r)(3).

684. Defendants' conspiracy is also an unlawful trade practice under the D.C. Consumer Protection Procedures Act because it violated other laws, including Section 1 of the Sherman Act and D.C. Code §28-4501, *et seq*. *See Dist. Cablevision Ltd. v. Bassin*, 828 A.2d 714, 723 (D.C. 2003).

685. As a direct and proximate result of Defendants' unlawful conduct, State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

686. Because of the foregoing, State Law Indirect Purchaser Class members are entitled to seek all forms of relief, including treble damages or $1,500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code §28-3901, *et seq*.

**Count 37: Violation of Florida's Deceptive & Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.***

687. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

688. The Florida Deceptive & Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq*. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Fla. Stat. §501.204(1).

689. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

690. Plaintiff Milking R, Inc. and some other State Law Indirect Purchaser Class members, who purchased Fertilizer Products for use in their farming operations, are within the "legitimate business enterprises" the FDUTPA protects.

691. A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

692. Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. *See* Fla. Stat. §501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

693. Plaintiff Milking R, Inc. and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Florida during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial. As alleged above, Plaintiff Milking R, Inc.'s farming operation is in Okeechobee, Florida.

694. Defendants' combination and conspiracy to fix, raise, maintain, and stabilize Fertilizer Products prices was an unfair method of competition and an unconscionable and unfair act or practice in the conduct of trade or commerce. This theory does not depend on any misrepresentation or reliance.

695. In the alternative, Defendants' public statements identified above concerning the causes of Fertilizer Products price increases were deceptive because they were likely to mislead Plaintiff Milking R, Inc. and State Law Indirect Purchaser Class members acting reasonably into believing that they were paying prices set by a free and fair market. *See supra* ¶¶159, 166, 183–84, 198, 202–03, 205, 216–17, 221, 225, 228(c), (e), (j)–(m), (o), (q)–(s), (v)–(x), 263, 265–66, 336–37.

696. Defendants' unlawful conduct substantially affected Florida's trade and commerce. Defendants' violations of Florida law were flagrant and willful.

697. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Milking R, Inc. and State Law Indirect Purchaser Class members have been injured in their business or property because of overcharges for Fertilizer Products and are threatened with further injury.

698. Because of the foregoing, Plaintiff Milking R, Inc. and State Law Indirect Purchaser Class members are entitled to seek all forms of relief, including injunctive relief pursuant to Fla. Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Fla. Stat. §501.211.

**Count 38: Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A §1, *et seq.***

699. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

700. Through the conduct alleged, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §1, *et seq*.

701. Under Massachusetts law, indirect purchasers may assert claims for price fixing under Mass. Gen. Laws ch. 93A, §9. *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303, 306 (Mass. 2002).

702. Plaintiff Michael Kosinski d/b/a North Country Harvests and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products primarily for personal, family, or household purposes in Massachusetts during the Class Period from Defendants. But for Defendants' conduct, the price of the Fertilizer Products would have been lower, in an amount to be determined at trial.

703. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

704. Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce. Defendants' violations of Massachusetts law were knowing and willful.

705. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Michael Kosinski d/b/a North Country Harvests and State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

706. Because of the foregoing, Plaintiff Michael Kosinski d/b/a North Country Harvests and State Law Indirect Purchaser Class members are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under Mass. Gen. Laws ch. 93A, § 9.

**Count 39: Violation of the Minnesota Deceptive Trade Practices Act,**
**Minn. Stat. §325D.43, *et seq*.**

707. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

708. Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Minnesota during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

709. Through the conduct alleged, Defendants have violated Minn. Stat. § 325D.44. The Minnesota Uniform Deceptive Trade Practices Act prohibits "(i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices." Minn. Stat. §325D.44, subd. 1(13). As to Fertilizer Products purchased by Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members, Defendants' combination and conspiracy to fix, raise, maintain, and stabilize Fertilizer Product prices was an unfair method of competition and an unfair act or practice, independent of any misrepresentation.

710. Defendants' unlawful conduct had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout Minnesota; (2) Fertilizer

Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; and (3) Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members were deprived of free and open competition and paid supracompetitive, artificially inflated prices for Fertilizer Products.

711. During the Class Period, Defendants' illegal conduct substantially affected Minnesota trade and commerce. Defendants' violations of Minnesota law were flagrant and willful.

712. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

713. Because of the foregoing, Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members are entitled to seek all forms of relief available under Minn. Stat. §325D.43, *et seq*.

**Count 40: Violation of the Missouri Merchandising Practices Act,**
**Mo. Rev. Stat. § 407.010 *et seq.***

714. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

715. The Missouri Merchandising Practices Act (the "MMPA") governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization. Mo. Rev. Stat. §407.020 prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State

Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. §407.025, which provides for the relief sought in this count. Defendants' combination and conspiracy to fix, raise, maintain, and stabilize Fertilizer Products prices was an "unfair practice" in connection with the sale of merchandise in trade or commerce within the meaning of Mo. Rev. Stat. §407.020 and 15 CSR 60-8.020, independent of any misrepresentation. The latter provision defines "unfair practice" as follows:

> (1) An unfair practice is any practice which—
>
> (A) Either—
>
> 1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or
>
> 2. Is unethical, oppressive or unscrupulous; and
>
> (B) Presents a risk of, or causes, substantial injury to consumers.
>
> (2) Proof of deception, fraud, or misrepresentation is not required to prove unfair practices as used in section 407.020.1, RSMo.

716. In the alternative, Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members concerning their unlawful activities and artificially inflated prices for Fertilizer Products. They concealed, suppressed, and omitted facts that would have been important to Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members as they related to the cost of Fertilizer Products they purchased.

717. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Fertilizer Products by making public statements that were not in accord with the facts. *See supra* ¶¶ 159, 166, 183–84, 198, 202–03, 205, 216–17, 221, 225, 228(c), (e), (j)–(m), (o), (q)–(s), (v)–(x), 263, 265–66, 336–37.

718. Defendants' statements and conduct related to the price of Fertilizer Products were deceptive as they had the tendency or capacity to mislead Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members to believe that they were purchasing Fertilizer Products at prices established by a free and fair market.

719. Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products primarily for personal, family, or household purposes in Missouri during the Class Period from Defendants for their own use and not for resale. But for Defendants' conduct, the price of Fertilizer Products would have been lower, in an amount to be determined at trial.

720. Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members acted as any reasonable consumer would act under the circumstances and the challenged practice would cause a reasonable person to purchase Fertilizer Products at the prices set by Defendants, which were supracompetitive as a result of the conspiracy alleged herein. Damages can be shown for each class member using sufficiently definitive and objective evidence such that the loss can be calculated with a reasonable degree of certainty.

721. Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

722. Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Missouri and are entitled to all forms of relief, including actual damages, punitive damages, attorneys' fees, costs, and injunctive relief.

**Count 41: Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970,**
**Mont. Code Ann. §30-14-103 *et seq*. and §30-14-201 *et seq*.**

723. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

724. Plaintiff John Weidenaar and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Montana primarily for personal, family, or household purposes during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

725. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code Ann. §§30-14-103, *et seq.*, 30-14-201, *et seq*.

726. Defendants' combination and conspiracy to fix Fertilizer Products prices constituted "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. §30-14-103.

727. Defendants' unlawful conduct had the following effects: (1) price competition for Fertilizer Products was restrained, suppressed, and eliminated throughout Montana; (2) Plaintiff John Weidenaar and State Law Indirect Purchaser Class members were deprived of free and open competition; and (3) Plaintiff John Weidenaar and State Law Indirect Purchaser Class members paid supracompetitive, artificially inflated prices for Fertilizer Products.

728. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce.

729. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff John Weidenaar and State Law Indirect Purchaser Class members have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code Ann. §§30-14-103, *et seq.*, 30-14-201, *et seq.*, and,

accordingly, Plaintiff John Weidenaar and State Law Indirect Purchaser Class members seek all relief available under that statute.

730. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Montana Attorney General in accordance with Mont. Code Ann. §30-14-133(2).

**Count 42: Violation of the Nebraska Consumer Protection Act,**
**Neb. Rev. Stat. §59-1601 *et seq*.**

731. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

732. Plaintiffs David Schwaninger, Matt Bargen, Robin Bargen, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Nebraska during the Class Period from Defendants. ut for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

733. Through the conduct alleged, Defendants have violated Neb. Rev. Stat. § 59-1601, *et seq*.

734. Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. *See* Neb. Rev. Stat. §59-1609. efendants' conduct had a direct or indirect impact upon the ability of Plaintiffs David Schwaninger, Matt Bargen, Robin Bargen, and State Law Indirect Purchaser Class members to protect themselves.

735. Defendants' combination and conspiracy to fix Fertilizer Products prices was an unfair method of competition in the conduct of trade or commerce, independent of any misrepresentation.

736. Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

737. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs David Schwaninger, Matt Bargen, Robin Bargen, and State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

738. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

739. Because of the foregoing, Plaintiffs David Schwaninger, Matt Bargen, and Robin Bargen, and State Law Indirect Purchaser Class members seek all relief available under the statute, Neb. Rev. Stat. §59-1601, *et seq.*

**Count 43: Violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §598.0903, *et seq.***

740. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

741. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Nevada during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

742. Through the conduct alleged, Defendants have violated Nev. Rev. Stat. § 598.0903, *et seq*.

743. Defendants knowingly violated a state or federal statute relating to the sale of Fertilizer Products, including Nev. Rev. Stat. §598A.060(1)(a) and Section 1 of the Sherman Act, and thereby engaged in a deceptive trade practice under Nev. Rev. Stat. §598.0923(1)(c).

744. State Law Indirect Purchaser Class members are victims of consumer fraud, which includes a deceptive trade practice as defined in Nev. Rev. Stat. §§598.0915 to 598.0925, and may bring this action. *See* Nev. Rev. Stat. §41.600(1), (2)(e).

745. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

746. Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

747. Defendants' conduct was willful.

748. As a direct and proximate result of Defendants' unlawful conduct, State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

749. Because of the foregoing, State Law Indirect Purchaser Class members are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and other equitable relief.

**Count 44: Violation of New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. §358-A:1 *et seq.***

750. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

751. Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in New Hampshire during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

752. Through the conduct alleged, Defendants have violated N.H. Rev. Stat. Ann. §358-A:1, *et seq.*

753. Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92–100 (2007).

754. Defendants' conduct was trade or commerce directly or indirectly affecting the people of New Hampshire, within the meaning of N.H. Rev. Stat. Ann. §358-A:1(II), because Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members purchased Fertilizer Products in New Hampshire and paid overcharges there as a result of Defendants' conspiracy.

755. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

756. Defendants' conduct was willful and knowing.

757. Defendants' conduct had a direct or indirect impact upon the ability of Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members to protect themselves.

758. Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

759. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

760. Because of the foregoing, Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. §§358-A:10 and 358-A:10-a.

761. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the New Hampshire Attorney General in accordance with N.H. Rev. Stat. Ann. §358-A:10(II).

**Count 45: Violation of the New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. §57-12-1, *et seq*.**

762. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

763. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in New Mexico during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

764. Through the conduct alleged, Defendants have violated N.M. Stat. Ann. § 57-12-3, *et seq*.

765. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

766. Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

767. Defendants' conduct constituted "unconscionable trade practices" in that such conduct, *inter alia*, resulted in a gross disparity between the value received by State Law Indirect Purchaser Class members and the price paid by them for Fertilizer Products, as set forth in N.M. Stat. Ann. §57-12-2(E). *See supra* ¶¶114, 124, 159–84, 192–97, 206, 208–20, 242, 245, 306–08, 327.

768. Defendants' conduct was willful.

769. As a direct and proximate result of Defendants' unlawful conduct, State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

770. Because of the foregoing, State Law Indirect Purchaser Class members are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §57-12-10.

**Count 46: Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §75-1.1, *et seq.***

771.

772. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

773. Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in North Carolina during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

774. Through the conduct alleged, Defendants have violated N.C. Gen. Stat. § 75-1.1, et seq. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. See Hyde v. Abbott Labs., Inc., 123 N.C. App. 572, 584 (1996).

775. Defendants' combination and conspiracy to fix Fertilizer Products prices constituted "[u]nfair methods of competition in or affecting commerce." N.C. Gen. Stat. §75-1.1(a).

776. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

777. Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

778. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

779. Defendants' conduct constitutes deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

780. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

781. Because of the foregoing, Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. §75-16.

**Count 47: Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law,**
**73 Pa. Stat. Ann. §201-1, *et seq.***

782. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

783. Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Pennsylvania primarily for personal, family, or household purposes during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

784. Through the conduct alleged, Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §201-1, *et seq*.

785. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members concerning Defendants' unlawful activities and artificially inflated prices for Fertilizer Products. The concealed, suppressed, and omitted facts would have been important to Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members as they related to the Fertilizer Products that they purchased.

786. Defendants' unlawful conduct had the following effects: (1) Fertilizer Products price competition was restrained, suppressed, and eliminated throughout Pennsylvania; (2) Fertilizer Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Pennsylvania; (3) Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members were deprived of free and open competition; and (4) Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members paid supracompetitive, artificially inflated prices for Fertilizer Products.

787. During the Class Period, Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

788. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

789. Because of the foregoing, Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members are entitled to seek all forms of relief, including treble damages under the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §201-1, *et seq*.

**Count 48: Violation of the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §6-13.1-1, *et seq.***

790. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

791. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Rhode Island primarily for personal, family, or household purposes during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

792. Through the conduct alleged, Defendants have violated R.I. Gen. Laws §6-13.1-1, *et seq*.

793. Defendants' combination and conspiracy to fix Fertilizer Products prices constituted "[e]ngaging in any act or practice that is unfair or deceptive to the consumer" within the meaning of R.I. Gen. Laws §6-13.1-1(6)(xiii).

794. Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supracompetitive profits.

795. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

796. Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

797. Defendants' conduct was willful.

798. As a direct and proximate result of Defendants' unlawful conduct, State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

799. Because of the foregoing, State Law Indirect Purchaser Class members are entitled to seek all forms of relief, including actual damages or $500 per violation, whichever is greater, and injunctive relief and treble damages under R.I. Gen. Laws §6-13.1-5-2.

800. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Rhode Island Attorney General in accordance with R.I. Gen. Laws §6-13.1-5.2(c).

**Count 49: Violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10, *et seq.***

801. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

802. State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in South Carolina during the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

803. Through the conduct alleged, Defendants have violated S.C. Code Ann. § 39-5-10, *et seq*.

804. Defendants' combination and conspiracy to fix Fertilizer Products prices constituted "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. §39-5-20(a).

805. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina. Defendants' conduct had a direct or indirect impact upon the ability of State Law Indirect Purchaser Class members to protect themselves.

806. Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

807. As a direct and proximate result of Defendants' unlawful conduct, State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

808. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10, *et seq.*, and, accordingly, State Law Indirect Purchaser Class members seek all relief available under that statute.

**Count 50: Violation of the Vermont Consumer Protection Act,**
**Vt. Stat. Ann. tit. 9, §2451, *et seq.***

809. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

810. Through the conduct alleged, Defendants have violated Vt. Stat. Ann. tit. 9, §2451, *et seq*.

811. Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, among other things, unfair methods of competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. *See* Vt. Stat. Ann. tit. 9, §2453(a).

812. Plaintiffs Christopher Fay, Chimney Point Farm Limited Partnership, and State Law Indirect Purchaser Class members indirectly purchased Fertilizer Products in Vermont during

the Class Period from Defendants. But for Defendants' conduct, the price of those Fertilizer Products would have been lower, in an amount to be determined at trial.

813. The Vermont Consumer Protection Act defines "consumer" to mean "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services not for resale in the ordinary course of the person's trade or business but for the person's use or benefit or the use or benefit of a member of the person's household, or in connection with the operation of the person's household or a farm whether or not the farm is conducted as a trade or business, or a person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services not for resale in the ordinary course of the person's trade or business but for the use or benefit of the person's business or in connection with the operation of the person's business." Vt. Stat. Ann. tit. 9, §2451a(1). Plaintiffs Christopher Fay, Chimney Point Farm Limited Partnership, and State Law Indirect Purchaser Class members purchased Fertilizer Products not for resale, for use in and in connection with the operation of their farms and businesses, and are therefore consumers under that definition.

814. Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this Complaint. Vt. Stat. Ann. tit. 9, §2465(b); *see also Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

815. Defendants competed unfairly by restraining trade as set forth above, in violation of Vt. Stat. Ann. tit. 9, §2453, *et seq*.

816. Defendants' violations of Vermont law were flagrant and willful.

817. Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

818. Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

819. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Christopher Fay, Chimney Point Farm Limited Partnership, and State Law Indirect Purchaser Class members have been injured in their business or property and are threatened with further injury.

820. Plaintiffs Christopher Fay, Chimney Point Farm Limited Partnership, and State Law Indirect Purchaser Class members were injured with respect to purchases of Fertilizer Products in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

## X. UNJUST ENRICHMENT

### Count 51: Unjust Enrichment
### (On Behalf of the State Law Indirect Purchaser Class)

821. Plaintiffs reallege and incorporate by reference each allegation set forth in the preceding and subsequent paragraphs as if fully set forth herein.

822. This Count is pleaded in the alternative to Counts 3 through 50, to the extent Plaintiffs HCM Farm Partners; Generation Three Partnership; Bacon Lake Farm; Albert Mendes; Live Oak Farms, L.P.; Longs Peak Dairy, LLC; WoodHill, LLC; Po Boy Farms LLC; Mike Campion; Mitchel Eickmeyer and Eickmeyer Dairy, Inc.; Oberbroeckling Family Farms Ltd.; Aaron Hasser; David Prolifka; Charles Frickey; Melinda Matson; Rocky Point Farms, Inc.; Michael Kosinski d/b/a North Country Harvests; Hardy's Holsteins, LLC; E-D Farms; Chad Olsen and Pamela Olsen; Johnson Farm Minnesota LLC; Blane Benedict; DSA Farms GP; Bryant Parrish Farms Partnership; John Weidenaar; David Schwaninger; Matt Bargen and Robin Bargen; Patch Orchards, Inc.; Dunham Family Farms; Oakfield-Alabama Farms; Lake Shore Dairy LLC; Gar-

mac Dairy, Inc.; Qual Grain; CD Acres LLC; Dewitz Feedlot, Inc.; Jay Ackley; Barnett's Dairy Farm, LLC; Ochsner Partnership; Collin Klebsch and Klebsch Farms, Inc.; Drumgoon Dairy Limited Partnership; Lyon Farms Partnership; Christopher Fay; Chimney Point Farm Limited Partnership; Naedler Farms II LLC; Lynn Kirschbaum; and State Law Indirect Purchaser Class members lack an adequate remedy at law under the statutes pleaded in those Counts.

823. Defendants have unlawfully benefited from their sales of Fertilizer Products because of the unlawful and inequitable acts alleged in this Complaint, which caused the Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members to pay prices for Fertilizer Products that were higher than they would have been absent Defendants' conduct.

824. By purchasing Fertilizer Products at inflated prices, Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members conferred a benefit on Defendants in the form of the overcharge on those Fertilizer Products.

825. Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to the overcharges paid by Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members. The overcharge, rather than the physical product, is traceable to Defendants.

826. Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members have conferred upon Defendants an economic benefit, in the form of profits resulting from unlawful and ill-gotten overcharges during the Class Period to the economic detriment of Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members. Defendants' acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained through Defendants' unconscionable sales and unlawful acts.

827. Equity cannot in good conscience permit Defendants to be economically enriched for their unjust actions at the expense of Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members, and therefore restitution or disgorgement or both of such economic enrichment is required. Defendants have paid no consideration to anyone for any benefits received indirectly from Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members.

828. Thus, it would be inequitable under unjust enrichment principles under the laws of the following jurisdictions for Defendants to be permitted to retain any of the overcharges for Fertilizer Products derived from Defendants' unlawful, unfair, inequitable, and unconscionable methods, acts, and trade practices alleged throughout this Complaint.

829. Defendants should be compelled to disgorge into a common fund for the benefit of Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members all unlawful, ill-gotten, and/or inequitable proceeds and overcharges they received from their sales of Fertilizer Products intended for and paid for by Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members.

830. Defendants are aware of and appreciate the benefits bestowed upon them by Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

831. To the extent the statutes pleaded in Counts 3 through 50 do not provide Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members an adequate remedy at law in a given jurisdiction, Indirect Purchaser Plaintiffs and State Law Indirect Purchaser Class members have no adequate remedy at law and seek restitution and disgorgement under that jurisdiction's law of unjust enrichment.

832. Unjust enrichment is alleged under the laws of the following jurisdictions:

833. **Arizona**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Arizona during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Defendants have been enriched by revenue resulting from unlawful overcharges for Fertilizer Products. State Law Indirect Purchaser Class members have been detrimentally impacted and have suffered economic losses from those overcharges. Defendants' enrichment and the economic detriment of State Law Indirect Purchaser Class members are connected. There is no legitimate justification for Defendants' receipt of the benefits causing their enrichment, because State Law Indirect Purchaser Class members paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

834. **Arkansas**: Defendants unlawfully overcharged Plaintiffs HCM Farm Partners, Generation Three Partnership, Bacon Lake Farm, and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Arkansas during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Defendants received money from Plaintiffs HCM Farm Partners, Generation Three Partnership, Bacon Lake Farm, and State Law Indirect Purchaser Class members as a direct result of the unlawful overcharges, and Defendants have improperly retained this money. Defendants have paid no consideration to any other person in exchange for this money. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs HCM Farm Partners, Generation Three Partnership, Bacon Lake Farm, and State Law Indirect Purchaser Class members.

835. **California**: Defendants unlawfully overcharged Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members, who purchased Fertilizer Products

in California during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Defendants have received a benefit from Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members as a direct result of the unlawful overcharges. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members. Plaintiffs Albert Mendes, Live Oak Farms, and State Law Indirect Purchaser Class members therefore seek restitution from Defendants under California law, in the alternative to Counts 4 and 35.

836. **Colorado**: Defendants unlawfully overcharged Plaintiff Longs Peak Dairy, LLC and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Colorado, at prices that were higher than they would have been but for Defendants' conduct. Defendants have received a benefit from Plaintiff Longs Peak Dairy, LLC and State Law Indirect Purchaser Class members in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants have benefitted at the expense of Plaintiff Longs Peak Dairy, LLC and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff Longs Peak Dairy, LLC and State Law Indirect Purchaser Class members.

837. **Connecticut**: Defendants unlawfully overcharged Plaintiff WoodHill, LLC and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Connecticut during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Defendants benefitted in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff WoodHill, LLC and State Law Indirect Purchaser Class members.

Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff WoodHill, LLC and State Law Indirect Purchaser Class members.

838. **District of Columbia**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in the District of Columbia during the Class Period at prices that were higher than they would have been but for Defendants' conduct. State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of State Law Indirect Purchaser Class members. Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

839. **Georgia**: Defendants unlawfully overcharged Plaintiff Po Boy Farms LLC and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Georgia during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiff Po Boy Farms LLC and State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff Po Boy Farms LLC and State Law Indirect Purchaser Class members. efendants accepted the benefit bestowed upon them by Plaintiff Po Boy Farms LLC and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff Po Boy Farms LLC and State Law Indirect Purchaser Class members.

840. **Hawaii**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Hawaii during the Class Period at prices that were higher than they would have been but for Defendants' conduct. State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

841. **Illinois**: Defendants unlawfully overcharged Plaintiffs Mitchel Eickmeyer, Eickmeyer Dairy, Inc., Mike Campion, and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Illinois during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiffs Mitchel Eickmeyer, Eickmeyer Dairy, Inc., Mike Campion, and State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs Mitchel Eickmeyer, Eickmeyer Dairy, Inc., Mike Campion, and State Law Indirect Purchaser Class members. Defendants accepted and retained the benefit bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs Mitchel Eickmeyer, Eickmeyer Dairy, Inc., Mike Campion, and State Law Indirect Purchaser Class members. It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges without compensating Plaintiffs Mitchel Eickmeyer, Eickmeyer Dairy, Inc., Mike Campion, and State Law Indirect Purchaser Class members.

842. **Indiana**: Defendants unlawfully overcharged Plaintiff Aaron Hasser and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Indiana during the Class

Period at prices that were higher than they would have been but for Defendants' conduct. Defendants have been enriched by revenue resulting from unlawful overcharges for Fertilizer Products, which revenue resulted from anticompetitive prices paid by Plaintiff Aaron Hasser and State Law Indirect Purchaser Class members, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiff Aaron Hasser and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiff Aaron Hasser and State Law Indirect Purchaser Class members.

843. **Iowa**: Defendants unlawfully overcharged Plaintiff Oberbroeckling Family Farms Ltd. and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Iowa during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Defendants have been enriched by revenue resulting from unlawful overcharges for Fertilizer Products, which revenue resulted from anticompetitive prices paid by Plaintiff Oberbroeckling Family Farms Ltd. and State Law Indirect Purchaser Class members, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiff Oberbroeckling Family Farms Ltd. and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiff Oberbroeckling Family Farms Ltd. and State Law Indirect Purchaser Class members.

844. **Kansas**: Defendants unlawfully overcharged Plaintiffs Charles Frickey, Melinda Matson, David Polifka, and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Kansas during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiffs Charles Frickey, Melinda Matson, David Polifka, and State

Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs Charles Frickey, Melinda Matson, and State Law Indirect Purchaser Class members. Defendants appreciated and knew of that benefit, and retained it under unjust circumstances arising from unlawful overcharges to Plaintiffs Charles Frickey, Melinda Matson, David Polifka, and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs Charles Frickey, Melinda Matson, David Polifka, and State Law Indirect Purchaser Class members.

845. **Louisiana**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Louisiana during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Defendants have been enriched by revenue resulting from unlawful overcharges for Fertilizer Products. State Law Indirect Purchaser Class members have been detrimentally and adversely impacted by the overcharges for Fertilizer Products resulting from Defendants' unlawful conduct. Defendants' enrichment and State Law Indirect Purchaser Class members' economic losses are connected. There is no legitimate justification for Defendants' receipt of the benefits causing their enrichment because State Law Indirect Purchaser Class members paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable and unjust for Defendants to retain any revenue gained from their unlawful overcharges. State Law Indirect Purchaser Class members have no adequate remedy at law.

846. **Maine**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Maine during the Class Period at prices that were higher than they would have been but for Defendants' conduct. State Law Indirect Purchaser Class

members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of State Law Indirect Purchaser Class members. Defendants were aware of or appreciated the benefit bestowed upon them by State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

847. **Maryland**: Defendants unlawfully overcharged Plaintiff Rocky Point Farms, Inc. and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Maryland during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiff Rocky Point Farms, Inc. and State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff Rocky Point Farms, Inc. and State Law Indirect Purchaser Class members. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff Rocky Point Farms, Inc. and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff Rocky Point Farms, Inc. and State Law Indirect Purchaser Class members.

848. **Massachusetts**: Defendants unlawfully overcharged Plaintiff Michael Kosinski d/b/a North Country Harvests and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Massachusetts during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiff Michael Kosinski d/b/a North Country Harvests and State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff Michael Kosinski d/b/a North Country Harvests and State Law Indirect

Purchaser Class members. Defendants were aware of or appreciated the benefit conferred upon them by Plaintiff Michael Kosinski d/b/a North Country Harvests and State Law Indirect Purchaser Class members. Defendants accepted the benefit bestowed upon them by Plaintiff Michael Kosinski d/b/a North Country Harvests and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff Michael Kosinski d/b/a North Country Harvests and State Law Indirect Purchaser Class members.

849. **Michigan**: Defendants unlawfully overcharged Plaintiffs Hardy's Holsteins, LLC, E-D Farms, and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Michigan during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiffs Hardy's Holsteins, LLC, E-D Farms, and State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from anticompetitive prices to the economic detriment of Plaintiffs Hardy's Holsteins, LLC, E-D Farms, and State Law Indirect Purchaser Class members. Defendants accepted and retained the benefit bestowed upon them by Plaintiffs Hardy's Holsteins, LLC, E-D Farms, and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs Hardy's Holsteins, LLC, E-D Farms, and State Law Indirect Purchaser Class members.

850. **Minnesota**: Defendants unlawfully overcharged Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Minnesota during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser

Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members. Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs Chad Olsen, Pamela Olsen, Johnson Farm Minnesota LLC, Blane Benedict, and State Law Indirect Purchaser Class members.

851. **Mississippi**: Defendants unlawfully overcharged Plaintiff Bryant Parrish Farms Partnership and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Mississippi during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Defendants received money from Plaintiff Bryant Parrish Farms Partnership and State Law Indirect Purchaser Class members as a direct result of the unlawful overcharges. Defendants retained the benefit of overcharges received on the sales of Fertilizer Products, which in equity and good conscience belong to Plaintiff Bryant Parrish Farms Partnership and State Law Indirect Purchaser Class members on account of Defendants' anticompetitive and inequitable conduct. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff Bryant Parrish Farms Partnership and State Law Indirect Purchaser Class members.

852. **Missouri**: Defendants unlawfully overcharged Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Missouri during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members have conferred an

economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members. Defendants appreciated the benefit bestowed upon them by Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain these ill-gotten benefits without compensating Plaintiff DSA Farms GP and State Law Indirect Purchaser Class members.

853. **Montana**: Defendants unlawfully overcharged Plaintiff John Weidenaar and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Montana during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiff John Weidenaar and State Law Indirect Purchaser Class members conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff John Weidenaar and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff John Weidenaar and State Law Indirect Purchaser Class members.

854. **Nebraska**: Defendants unlawfully overcharged Plaintiffs David Schwaninger, Matt Bargen, and Robin Bargen, and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Nebraska during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Defendants received money from Plaintiffs David Schwaninger, Matt Bargen, and Robin Bargen, and State Law Indirect Purchaser Class members as a direct result of the unlawful overcharges, and they have retained this money. Defendants have paid no consideration to any other person in exchange for this money. In justice and fairness,

Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs David Schwaninger, Matt Bargen, and Robin Bargen, and State Law Indirect Purchaser Class members.

855. **Nevada**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Nevada during the Class Period at prices that were higher than they would have been but for Defendants' conduct. State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants in the form of revenue resulting from unlawful overcharges for Fertilizer Products. Defendants appreciated the benefits bestowed upon them by State Law Indirect Purchaser Class members, for which Defendants have paid no consideration to any other person. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

856. **New Hampshire**: Defendants unlawfully overcharged Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in New Hampshire during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Defendants have received a benefit from Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Under the circumstances, it would be unconscionable for Defendants to retain such benefits without compensating Plaintiff Patch Orchards, Inc. and State Law Indirect Purchaser Class members.

857. **New Mexico**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in New Mexico during the Class Period at

prices that were higher than they would have been but for Defendants' conduct. Defendants have knowingly benefitted at the expense of State Law Indirect Purchaser Class members from revenue resulting from unlawful overcharges for Fertilizer Products. To allow Defendants to retain these benefits would be unjust because the benefits resulted from anticompetitive and unlawful pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

858. **New York**: Defendants unlawfully overcharged Plaintiffs Dunham Family Farms, Oakfield-Alabama Farms, and Lake Shore Dairy LLC, and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in New York during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Defendants have been enriched by revenue resulting from unlawful overcharges for Fertilizer Products, which revenue resulted from anticompetitive prices paid by Plaintiffs Dunham Family Farms, Oakfield-Alabama Farms, and Lake Shore Dairy LLC, and State Law Indirect Purchaser Class members, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs Dunham Family Farms, Oakfield-Alabama Farms, and Lake Shore Dairy LLC, and State Law Indirect Purchaser Class members. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

859. **North Carolina**: Defendants unlawfully overcharged Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in North Carolina during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class

members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members. Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges to Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges is ascertainable by review of sales records and other financial data. Defendants consciously accepted the benefits conferred upon them. Under the circumstances alleged throughout this Complaint, it would be unjust for Defendants to retain such benefits without compensating Plaintiff Gar-mac Dairy, Inc. and State Law Indirect Purchaser Class members.

860. **North Dakota**: Defendants unlawfully overcharged Plaintiffs Qual Grain, CD Acres LLC, Dewitz Feedlot, Inc., and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in North Dakota during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Defendants have been enriched by revenue resulting from unlawful overcharges for Fertilizer Products. Plaintiffs Qual Grain, CD Acres LLC, Dewitz Feedlot, Inc., and State Law Indirect Purchaser Class members have been adversely impacted by the overcharges for Fertilizer Products resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs Qual Grain, CD Acres LLC, Dewitz Feedlot, Inc., and State Law Indirect Purchaser Class members' economic losses are connected. There is no legitimate justification for Defendants' receipt of the benefits causing their enrichment because Plaintiffs Qual Grain, CD Acres LLC, Dewitz Feedlot, Inc., and State Law Indirect Purchaser Class members

paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable and unjust for Defendants to retain any revenue gained from their unlawful overcharges. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs Qual Grain, CD Acres LLC, Dewitz Feedlot, Inc., and State Law Indirect Purchaser Class members.

861. **Ohio**: Defendants unlawfully overcharged Plaintiff Jay Ackley and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Ohio during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiff Jay Ackley and State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff Jay Ackley and State Law Indirect Purchaser Class members. Defendants accepted the benefit bestowed upon them by Plaintiff Jay Ackley and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff Jay Ackley and State Law Indirect Purchaser Class members.

862. **Oklahoma**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Oklahoma during the Class Period at prices that were higher than they would have been but for Defendants' actions. Defendants received money from State Law Indirect Purchaser Class members as a direct result of unlawful overcharges, and Defendants have retained this money. Defendants have paid no consideration to any other person in exchange for this money. State Law Indirect Purchaser Class members have no adequate remedy at law. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges. Under the circumstances alleged

throughout this Complaint, it would be unjust and inequitable for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

863. **Oregon**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Oregon during the Class Period at prices that were higher than they would have been but for Defendants' conduct. State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of State Law Indirect Purchaser Class members. Defendants were aware of the benefit bestowed upon them by State Law Indirect Purchaser Class members. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

864. **Pennsylvania**: Defendants unlawfully overcharged Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Pennsylvania during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members. Defendants appreciated the benefit bestowed upon them by Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members. Defendants accepted the benefit bestowed upon them by Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable

for Defendants to retain such benefits without compensating Plaintiff Barnett's Dairy Farm, LLC and State Law Indirect Purchaser Class members.

865. **Rhode Island**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Rhode Island during the Class Period at prices that were higher than they would have been but for Defendants' conduct. State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of State Law Indirect Purchaser Class members. Defendants appreciated the benefit bestowed upon them by State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

866. **South Carolina**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in South Carolina during the Class Period at prices that were higher than they would have been but for Defendants' conduct. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges to State Law Indirect Purchaser Class members. Defendants realized value from the benefit bestowed upon them by State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

867. **South Dakota**: Defendants unlawfully overcharged Plaintiffs Ochsner Partnership, Collin Klebsch, Klebsch Farms, Inc., Drumgoon Dairy Limited Partnership, and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in South Dakota during the Class Period at prices that were higher than they would have been but for Defendants' conduct.

Defendants have received a benefit from Plaintiffs Ochsner Partnership, Collin Klebsch, Klebsch Farms, Inc., Drumgoon Dairy Limited Partnership, and State Law Indirect Purchaser Class members in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by Plaintiffs Ochsner Partnership, Collin Klebsch, Klebsch Farms, Inc., Drumgoon Dairy Limited Partnership, and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs Ochsner Partnership, Collin Klebsch, Klebsch Farms, Inc., Drumgoon Dairy Limited Partnership, and State Law Indirect Purchaser Class members.

868. **Tennessee**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Tennessee during the Class Period at prices that were higher than they would have been but for Defendants' conduct. State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of State Law Indirect Purchaser Class members. Defendants appreciated the benefit bestowed upon them by State Law Indirect Purchaser Class members. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from State Law Indirect Purchaser Class members with respect to Defendants' sales of Fertilizer Products. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing State Law Indirect Purchaser Class members.

869. **Texas**: Defendants unlawfully overcharged Plaintiff Lyon Farms Partnership and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Texas during the Class Period at prices that were higher than they would have been but for Defendants' actions.

Defendants have received a benefit from Plaintiff Lyon Farms Partnership and State Law Indirect Purchaser Class members in the form of revenue resulting from unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff Lyon Farms Partnership and State Law Indirect Purchaser Class members. The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiff Lyon Farms Partnership and State Law Indirect Purchaser Class members are inequitable in that they result from Defendants' unlawful overcharges for Fertilizer Products. Plaintiff Lyon Farms Partnership and State Law Indirect Purchaser Class members have no adequate remedy at law. Under the circumstances alleged throughout this Complaint, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiff Lyon Farms Partnership and State Law Indirect Purchaser Class members.

870. **Vermont**: Defendants unlawfully overcharged Plaintiffs Christopher Fay, Chimney Point Farm Limited Partnership, and State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Vermont during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiffs Christopher Fay, Chimney Point Farm Limited Partnership, and State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs Christopher Fay, Chimney Point Farm Limited Partnership, and State Law Indirect Purchaser Class members. Defendants accepted the benefit bestowed upon them by Plaintiffs Christopher Fay, Chimney Point Farm Limited Partnership, and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for

Defendants to retain such benefits without compensating Plaintiffs Christopher Fay, Chimney Point Farm Limited Partnership, and State Law Indirect Purchaser Class members.

871. **Washington**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Washington during the Class Period at prices that were higher than they would have been but for Defendants' conduct. State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of State Law Indirect Purchaser Class members. Defendants were aware of or appreciated the benefit conferred upon them by State Law Indirect Purchaser Class members. Defendants accepted the benefit bestowed upon them by State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

872. **West Virginia**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in West Virginia during the Class Period at prices that were higher than they would have been but for Defendants' conduct. State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of State Law Indirect Purchaser Class members. Defendants were aware of or appreciated the benefit bestowed upon them by State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

873. **Wisconsin**: Defendants unlawfully overcharged Plaintiffs Naedler Farms II LLC, Lynn Kirschbaum, and State Law Indirect Purchaser Class members, who purchased Fertilizer

Products in Wisconsin during the Class Period at prices that were higher than they would have been but for Defendants' conduct. Plaintiffs Naedler Farms II LLC, Lynn Kirschbaum, and State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs Naedler Farms II LLC, Lynn Kirschbaum, and State Law Indirect Purchaser Class members. Defendants appreciated the benefit bestowed upon them by Plaintiffs Naedler Farms II LLC, Lynn Kirschbaum, and State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs Naedler Farms II LLC, Lynn Kirschbaum, and State Law Indirect Purchaser Class members.

874. **Wyoming**: Defendants unlawfully overcharged State Law Indirect Purchaser Class members, who purchased Fertilizer Products in Wyoming during the Class Period at prices that were higher than they would have been but for Defendants' conduct. State Law Indirect Purchaser Class members have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of State Law Indirect Purchaser Class members. Defendants accepted, used, and enjoyed the benefits bestowed upon them by State Law Indirect Purchaser Class members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating State Law Indirect Purchaser Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Classes, respectfully request that this Court:

A. Certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, and: (i) designate Direct Purchaser Plaintiffs as Class Representatives of the Direct

Purchaser Class and appoint their counsel as Class Counsel for the Direct Purchaser Class; and (ii) designate Indirect Purchaser Plaintiffs as Class Representatives of the Nationwide Indirect Purchaser and State Law Indirect Purchaser Classes and appoint their counsel as Class Counsel for those two Classes;

B. Find and adjudge that Defendants' conduct is illegal and unlawful, and that the conspiracies, and acts done in furtherance thereof by Defendants and their co-conspirators, constitute a *per se* violation of Sections 1 and 3 of the Sherman Antitrust Act, the state laws, and common law unjust enrichment;

C. Award all damages to which Plaintiffs and Class members are entitled, including treble damages under the Clayton Antitrust Act;

D. Award Plaintiffs and the Classes pre-judgment and post-judgment interest at the legal rate;

E. Enter injunctive relief, declaratory relief, or both, as is necessary to protect the interests of Plaintiffs and Class members, including enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from continuing, maintaining, or renewing in any manner the conduct, contract, conspiracy, or combination alleged herein, from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F. Award Plaintiffs and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

G. Award such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Under D. Kan. Rule 40.2, Plaintiffs request Kansas City, Kansas, as the place of trial.

Dated: November 13, 2026

**REBEIN BROTHERS, PA**

/s/ David Rebein
David Rebein, (KS #10476)
Pablo H. Mose (KS #27532)
1715 Central Ave.
Dodge City, KS 67801
Tel: 620-227-8126
dave@rbr3.com
pablo@rbr3.com

*Liaison Counsel for Plaintiffs*

/s/ Patrick McGahan
Patrick McGahan (NY #577027)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 S Main Street
P.O. Box 192
Colchester, CT 06415
Tel: 860-537-5537
Fax: 860-537-4432
pmcgahan@scott-scott.com

Patrick Coughlin (CA #111070)
Carmen Medici (CA #248417)
Daniel J. Brockwell (CA #335983)
Bridget F. Gramme (CA #231953)
Heidi B. Weaver (CA #204895)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: 619-233-4565
Fax: 619-233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
dbrockwell@scott-scott.com
bgramme@scott-scott.com
hweaver@scott-scott.com

Brian M. Hogan (IL #6286419)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Ave., 24th Floor
New York, NY 10169

/s/ Patrick J. Stueve
Patrick J. Stueve (KS #13847)
Steve N. Six (KS #16151)
Bradley T. Wilders (D. Kan #78301)
Caleb Wagner (D. Kan. #78945)
Benjamin J. Stueve (KS #28515)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel.: 816-714-7100
Fax: 816-714-7101
stueve@stuevesiegel.com
six@stuevesiegel.com
wilders@stuevesiegel.com
wagner@stuevesiegel.com
ben.stueve@stuevesiegel.com

/s/ Rex A. Sharp
Rex A. Sharp (KS #12350)
Hammons P. Hepner (KS #29138)
Isaac L. Diel (KS #14376)
Ryan C. Hudson (KS #22986)
Jennifer Salva-Cushing (KS #28244)
Henry A. Feyh (KS #31178)
**SHARP LAW, LLP**
4820 W. 75th Street
Prairie Village, KS 66208
Tel.: 913-901-0505
Fax: 913-261-7564
rsharp@midwest-law.com
hhepner@midwest-law.com
idiel@midwest-law.com

Tel.: 212-223-6444
Fax: 212-223-6334
brian.hogan@scott-scott.com

/s/ Stuart A. Davidson
Stuart A. Davidson (FL #84824)
Mark J. Dearman (FL #982407)
Anny Marie Martin (FL #1000491)
**ROBBINS GELLER RUDMAN & DOWD LLP**
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Tel.: 561-750-3000
Fax: 561-750-3364
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com
amartin@rgrdlaw.com

Alexandra S. Bernay (CA #211068)
Arthur L. Shingler III (CA #181719)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel.: 619-231-1058
Fax: 619-231-7423
xanb@rgrdlaw.com
ashingler@rgrdlaw.com

/s/ Michael Dell'Angelo
Michael Dell'Angelo (PA Bar No. 80910)
Candice J. Enders (PA Bar No. 92107)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: 215-875-3000
Fax: 215-875-4604
mdellangelo@bergermontague.com
cenders@bergermontague.com

*Interim Co-Lead Class Counsel for Direct Purchaser Plaintiffs*

/s/ Don M. Downing
Don M. Downing (MO #30405)
Gretchen Garrison (MO #33963)
Jack A. Downing (MO #70034)
Daniel R. Ritter (MO #69298)
**GRAY RITTER GRAHAM**
701 Market Street, Suite 800
St. Louis, MO 63101
Tel.: 314-241-5620
Fax: 314-241-4140
ddowning@grgpc.com
ggarrison@grgpc.com
jdowning@grgpc.com
dritter@grgpc.com

*Interim Co-Lead Class Counsel for Indirect Purchaser Plaintiffs*

/s/ Daniel C. Hedlund
Daniel C. Hedlund (MN Bar No. 258337)
Michelle J. Looby (MN Bar No. 0388166)
Anthony J. Stauber (MN Bar No. 0401093)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel.: 612-333-8844
Fax: 612-339-6622
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
tstauber@gustafsongluek.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2026, I caused a true and correct copy of the foregoing to be filed in this Court's CM/ECF system, which will send notification of such filing to all counsel of record, and have served the Notice hereof and a true and correct copy of the forgoing upon the following Attorney Generals via Certified Mail or by other means, as preferred by the Attorney General's Offices as follows:

Arizona Attorney General Kris Mays
2005 N. Central Ave.
Phoenix, AZ 85004-2926

Office of the Attorney General Phil Weiser
Colorado Department of Law
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, CO 80203

Office of the Attorney General
Attorney General William Tong
165 Capitol Avenue
Hartford, CT 06106

Department of the Attorney General
Attorney General Anne E. Lopez
425 Queen Street
Honolulu, HI 96813

Office of Minnesota Attorney General
Attorney General Keith Ellison
445 Minnesota Street, Suite 600
St. Paul, MN 55101

Office of the Attorney General
Attorney General Aaron D. Ford
100 North Carson Street
Carson City, NV 89701

Office of the New York Attorney General
Letitia James Attorney General
The Capitol
Albany, NY 12224-0341

Oregon Department of Justice
Office of the Attorney General Dan Rayfield
1162 Court St. NE
Salem, OR 97301-4096

RI Office of the Attorney General
Peter F. Neronha Attorney General
150 South Main Street
Providence, RI 02903

Office of the Attorney General
Attorney General Derek Brown
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, UT 84114-2320

/s/ David Rebein
David Rebein

## APPENDIX A: GLOSSARY OF FERTILIZER INDUSTRY TERMS

The following terms are used in this Consolidated Class Action Complaint and are listed alphabetically for convenience. Definitions are provided for reference and are drawn from the allegations in this Consolidated Class Action Complaint.

| Term | Definition |
|---|---|
| **Agronomic Rate** | The amount of a nutrient source (such as fertilizer) applied to land that supplies what the crop needs for a realistic yield, and no more. |
| **Ammonia (Anhydrous Ammonia, $NH_3$)** | The most concentrated nitrogen fertilizer, at 82% nitrogen by weight, stored as a pressurized liquid and injected directly into the soil; also the feedstock for urea, UAN, DAP, MAP and other fertilizers. |
| **Ammonium Nitrate (AN)** | A dry granular nitrogen fertilizer containing approximately 34% nitrogen. |
| **Ammonium Sulfate (AS)** | A nitrogen fertilizer containing 21% nitrogen and 24% sulfur, often a by-product of industrial processes. |
| **Average Realized Price** | The average price a producer actually received per ton sold during a period, as reported in its financial disclosures. |
| **Canpotex** | Canpotex Limited, the joint export venture, owned equally by Nutrien and Mosaic, that markets Canadian potash outside the United States and Canada. |
| **Capacity Utilization** | Production as a percentage of a facility's or company's production capacity. |
| **CFR (Cost and Freight)** | A price that includes the cost of the product and freight to the named destination (e.g., CFR Brazil, CFR India). |
| **Class Period** | January 1, 2021 to the present. |
| **Corn Belt (Eastern and Western Cornbelt)** | The Midwestern corn- and soybean-growing region of the United States; Green Markets reports separate prices for its eastern and western parts. |
| **DAP (Diammonium Phosphate)** | The world's most widely traded phosphate fertilizer, 18-46-0 (18% nitrogen, 46% P2O5). |

| Term | Definition |
|---|---|
| **Fertilizer Products** | Any single-nutrient fertilizer or multi-nutrient fertilizer blend containing nitrogen, phosphorus, potassium, or any combination thereof, including, but not limited to: (a) nitrogen fertilizers such as anhydrous ammonia, urea, urea ammonium nitrate (UAN) solutions, ammonium nitrate, and ammonium sulfate; (b) phosphate fertilizers such as diammonium phosphate (DAP), monoammonium phosphate (MAP), triple superphosphate (TSP), and phosphoric acid-based products; (c) potash fertilizers such as muriate of potash (MOP, also known as potassium chloride), sulfate of potash (SOP), and potassium magnesium sulfate; and (d) multi-nutrient blends, compound fertilizers, and custom-blended NPK products containing any combination of the foregoing nutrients in any ratio. |
| **Fertilizer Year / Crop Year** | The annual period used to measure fertilizer consumption and application. In the United States, it runs from July 1 through June 30. |
| **Fill Program** | A seasonal pricing program in which producers post prices for product ordered and delivered to terminals during a set window (e.g., summer fill, winter fill). |
| **FOB (Free on Board)** | A price at which the seller delivers product to a named point, such as a terminal, with the buyer bearing freight from that point. |
| **FRED / Producer Price Index (PPI)** | Federal Reserve Economic Data, a database maintained by the Federal Reserve Bank of St. Louis that republishes, among other data, the Bureau of Labor Statistics' Producer Price Indices (PPI) for fertilizer. |
| **Green Markets** | Bloomberg's Green Markets, the weekly trade publication reporting fertilizer prices and industry developments. |
| **Greenfield Project** | A new production facility built from the ground up, as opposed to expanding an existing facility. |
| **Henry Hub** | The benchmark U.S. natural gas pricing point. |
| **IFA (International Fertilizer Association)** | The global fertilizer trade association, whose secretariat sits in Paris, France. |
| **K-Mag (SOPM)** | Sulfate of Potash Magnesia, a product supplying potassium, magnesium, and sulfur. |
| **$K_2O$** | Potassium oxide, the standard measure of potash nutrient content. |
| **MAP (Monoammonium Phosphate)** | A phosphate fertilizer, 11-52-0 (11% nitrogen, 52% $P_2O_5$), used much like DAP. |
| **Metric Ton** | 1,000 kilograms (approximately 2,204.6 pounds). |
| **MMBtu** | One million British thermal units, the standard unit for natural gas prices. |

| Term | Definition |
|---|---|
| **MOP (Muriate of Potash)** | Potassium chloride (KCl), the most widely used potash fertilizer, at approximately 60% $K_2O$. |
| **Nitrogen (N)** | The most widely consumed fertilizer nutrient by volume; drives vegetative growth, protein synthesis, and chlorophyll production. |
| **NOLA** | New Orleans, a principal U.S. Gulf pricing benchmark for fertilizer (e.g., NOLA MAP, NOLA DAP, NOLA barge potash). |
| **NPK** | Nitrogen (N), phosphorus (P), and potassium (K), the three primary plant macronutrients; also pre-mixed fertilizers containing all three. |
| **$P_2O_5$** | Phosphorus pentoxide (phosphoric acid equivalent), the standard measure of phosphate nutrient content. |
| **Phosphate (Phosphorus, P)** | The nutrient essential for root development, energy transfer, seed formation, and crop maturation, derived from mined phosphate rock. |
| **PLNL (Point Lisas Nitrogen Limited)** | The Trinidad and Tobago ammonia producer owned equally by CF Industries Holdings, Inc. and Koch Fertilizer, LLC. |
| **Potash (Potassium, K)** | The nutrient governing water regulation, disease resistance, and plant health, mined from underground potassium-bearing deposits. |
| **Prepay** | A program in which a buyer pays in advance for product to be delivered in a later period, typically at a fixed price. |
| **Short Ton (st)** | 2,000 pounds; the unit in which U.S. fertilizer prices are commonly quoted ("$/st"). |
| **SOP (Sulfate of Potash)** | A premium potash product with 50% $K_2O$ and 17% sulfur, used for chloride-sensitive crops. |
| **SSP (Single Superphosphate)** | A lower-concentration phosphate fertilizer containing 18% to 22% $P_2O_5$. |
| **Supracompetitive Price** | A price above the level that would prevail in a competitive market. |
| **Tampa Benchmark** | The ammonia price delivered to Tampa, Florida, the principal U.S. ammonia import benchmark. |
| **Terminal** | A storage and distribution facility from which fertilizer is sold and shipped to wholesalers, retailers, and farmers. |
| **TFI (The Fertilizer Institute)** | The primary U.S. trade association for the fertilizer industry, headquartered in Arlington, Virginia. |

| Term | Definition |
|---|---|
| **TSP (Triple Superphosphate)** | A phosphate fertilizer containing approximately 46% $P_2O_5$. |
| **Turnaround** | A planned shutdown of a production facility for maintenance. |
| **UAN (Urea Ammonium Nitrate)** | A liquid nitrogen fertilizer solution containing 28% to 32% nitrogen. |
| **Urea** | A solid nitrogen fertilizer containing approximately 46% nitrogen, the most widely traded solid nitrogen product. |
| **Yield** | The amount of crop per acre or how productive a plot of land is. |

# APPENDIX B

## FIGURES


Fig. 1. Nutrien Defendants' Structure

Fig. 2. Mosaic Defendants' Structure

Fig. 3. CF Industries Defendants' Structure

Fig. 4. Koch Defendants' Structure

Fig. 5. Yara Defendants' Structure

Fig. 6. U.S. Fertilizer Consumption, 2016–2025

Fig. 7. U.S. Nitrogen Fertilizer Production Capacity Market Share, 2026

Fig. 8. North American Phosphate Fertilizer Production Capacity Market Share, 2026

Fig. 9. North American Potash Fertilizer Production Capacity Market Share, 2026

Fig. 10. U.S. Fertilizer Prices, 2016-2026

Fig. 11. Defendants' Average Realized NPK Fertilizer Prices, 2016-2026

Fig. 12. Nutrien v. Mosaic Average Realized Potash Fertilizer Prices, 2016-2026

Fig. 13. Nutrien v. Mosaic Average Realized Phosphate Fertilizer Prices, 2016-2026

Fig. 14. Nutrien v. CF Industries Average Realized Ammonia Fertilizer Prices, 2016-2026

Fig. 15. Nutrien v. CF Industries Average Realized Urea Fertilizer Prices, 2016-2026

Fig. 16. U.S. Fertilizer PPI Actual Price vs. Supply-and-Demand Predicted Price, January 2010-August 2026

Fig. 17. Fertilizer PPI and Corn Acres Planted, 2010-2026

Fig. 18. Actual U.S. Urea Prices vs. Expected Urea Prices Based on U.S. Natural Gas Changes, 2016-2026

Fig. 19. MAP Prices: NOLA vs. CFR Brazil ($/metric ton), 2016-2025

Fig. 20. DAP Prices: NOLA vs. CFR India ($/metric ton), 2016-2025

Fig. 21. Midwest Ammonia, Illinois Corn, and Natural Gas, January 2016-December 2025

Fig. 22. Defendants' Average Gross Margins Percent, 2016-2020 vs. 2021-2025

Fig. 23. Incremental Revenue from Margin Gain, 2021-2025 vs. 2016-2020

Fig. 24. The Cost-Price Disconnect: % Change in COGS v. % Change in Operating Income, by Defendant (2020-2021 and 2021-2022)

Fig. 25. Defendants' Average Cost of Goods Sold and Operating Income, 2016–2020 vs. 2021–2026

Fig. 26. Illustrative Effect of a 10% Supply Reduction When Demand Is Inelastic

Fig. 27. U.S. Average Corn and Soybean Operating Costs, 2016 to 2026 ($ per planted acre)

**Fig. 1. Nutrien Defendants' Structure**



**Fig. 2. Mosaic Defendants' Structure**



**Fig. 3. CF Industries Defendants' Structure**



**Fig. 4. Koch Defendants' Structure**



**Fig. 5. Yara Defendants' Structure**



**Fig. 6. U.S. Fertilizer Consumption, 2016–2025**



**Fig. 7. U.S. Nitrogen Fertilizer Production Capacity Market Share, 2026**



**Fig. 8. North American Phosphate Fertilizer Production Capacity Market Share, 2026**



**Fig. 9. North American Potash Fertilizer Production Capacity Market Share, 2026**



**Fig. 10. U.S. Fertilizer Prices, 2016-2026**



**Fig. 11. Defendants' Average Realized NPK Fertilizer Prices, 2016-2026**



**Fig. 12. Nutrien v. Mosaic Average Realized Potash Fertilizer Prices, 2016-2026**



**Fig. 13. Nutrien v. Mosaic Average Realized Phosphate Fertilizer Prices, 2016-2026**



**Fig. 14. Nutrien v. CF Industries Average Realized Ammonia Fertilizer Prices, 2016-2026**



**Fig. 15. Nutrien v. CF Industries Average Realized Urea Fertilizer Prices, 2016-2026**



**Fig. 16. U.S. Fertilizer PPI Actual Price vs. Supply-and-Demand Predicted Price, January 2010-August 2026**



**<u>Fig. 17. Fertilizer PPI and Corn Acres Planted, 2010-2026</u>**



**Fig. 18. Actual U.S. Urea Prices vs. Expected Urea Prices Based on U.S. Natural Gas Changes, 2016-2026**



**Fig. 19. MAP Prices: NOLA vs. CFR Brazil ($/metric ton), 2016-2025**



**Fig. 20. DAP Prices: NOLA vs. CFR India ($/metric ton), 2016-2025**



**Fig. 21. Midwest Ammonia, Illinois Corn, and Natural Gas, January 2016-December 2025**



**Fig. 22. Defendants' Average Gross Margins Percent, 2016-2020 vs. 2021-2025**



**Fig. 23. Incremental Revenue from Margin Gain, 2021-2025 vs. 2016-2020**



**Fig. 24. The Cost-Price Disconnect: % Change in COGS v. % Change in Operating Income, by Defendant (2020-2021 and 2021-2022)**



**Fig. 25. Defendants' Average Cost of Goods Sold and Operating Income, 2016–2020 vs. 2021–2026**



**Fig. 26. Illustrative Effect of a 10% Supply Reduction When Demand Is Inelastic**



**Fig. 27. U.S. Average Corn and Soybean Operating Costs, 2016-2026 ($ per planted acre)**

